No. 2014-1466

# United States Court of Appeals
### for the
# Federal Circuit

————————

PROGRESSIVE CASUALTY INSURANCE CO.,

*Appellant,*

v.

LIBERTY MUTUAL INSURANCE CO.,

*Appellee.*

————————

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeals Board in Case CBM2012-00002
(Judge Jameson Lee, Judge Joni Y. Chang, Judge Michael R. Zecher)

## CORRECTED APPELLANT PROGRESSIVE
## CASUALTY INSURANCE CO.'S OPENING BRIEF

Gary M. Ropski
Cynthia A. Homan
James A. Collins
Laura A. Lydigsen
Nicholas A. Restauri
BRINKS GILSON & LIONE
455 N. Cityfront Plaza Drive, Ste. 3600
Chicago, Illinois 60611

*Attorneys for Appellant,*
*Progressive Casualty Insurance Co.*

October 31, 2014

## United States Court of Appeals for the Federal Circuit

2014-1466

PROGRESSIVE CASUALTY INSURANCE v. LIBERTY MUTUAL INSURANCE CO.

## CERTIFICATE OF INTEREST

Counsel for Appellant certifies the following:

1.    The full name of every party or amicus represented by me is:

Progressive Casualty Insurance Co.

2.    The name of the real parties in interest (if the party named in the caption is not the real party in interest) represented by me are:

Not applicable.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

The Progressive Corporation
Drive Insurance Holdings, Inc.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by this firm in the trial court or agency or are expected to appear in this court are:

| | |
|---|---|
| Gary M. Ropski | Calvin P. Griffith |
| Cynthia A. Homan | James L. Wamsley, III |
| James A. Collins | Gregory A. Castanias |
| Laura A. Lydigsen | John V. Biernacki |
| Joseph S. Hanasz | JONES DAY |
| Nicholas A. Restauri | North Point |
| BRINKS GILSON & LIONE | 901 Lakeside Avenue |
| 455 N. Cityfront Plaza Drive | Cleveland Ohio 44114 |
| Chicago, Illinois 60611 | |

October 31, 2014                    */s/ Gary M. Ropski*_____
                                         Gary M. Ropski

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................v

TABLE OF ABBREVIATIONS ................................................. viii

STATEMENT OF RELATED CASES ....................................x

JURISIDICTIONAL STATEMENT ..........................................1

STATEMENT OF THE ISSUES..................................................1

STATEMENT OF THE CASE SETTING OUT
THE FACTS RELEVANT TO THE ISSUES...............................3

I.     PROGRESSIVE'S USAGE-BASED INSURANCE INVENTION...............3

    A.     Progressive Pioneers Usage-Based Insurance......................................3

    B.     Progressive's Usage-Based Insurance Patents .....................................5

    C.     The '970 Patent ...................................................................................7

        1.     Background Regarding Determination of Automobile
            Insurance Premiums...................................................................7

        2.     The Patent's Disclosure ............................................................8

        3.     Prosecution And Reexamination History ................................10

II.    LIBERTY'S FILING OF CBMPR PETITIONS CHALLENGING
      THE '970 PATENT ...............................................................................12

    A.     Liberty's CBMPR Strategy ...............................................................12

    B.     Liberty's Petition Challenging The '970 Patent ...............................14

    C.     The Alleged Prior Art .......................................................................15

        1.     Kosaka.....................................................................................15

        2.     Black Magic .............................................................................19

        3.     Herrod .....................................................................................19

        4.     Florida Guide ..........................................................................20

III.   THE BOARD DECISIONS...................................................................20

    A.     Institution Decision ..........................................................................20

    B.     Final Written Decision ......................................................................21

        1.     The Board's Claim Constructions............................................21

            a.     "Actuarial Class" ..........................................................21

|  | b. | "Insured Profile"................................................................23 |

2. The Board's Erroneous Obviousness Holdings .......................24

    a. Claims Requiring an "Insured Profile" (Claims 4-5 And 16-17).........................................................................24

    b. Claims Requiring A Vehicle "Log" (Claims 1 and 3) ..................................................................................25

    c. Claims Requiring An "Actuarial Class" (Claims 1, 3, 6, 9-15, And 18)................................................25

    d. Claims Requiring "Correlating" (Claims 6, 9-10, 13, and 18) .........................................................................26

SUMMARY OF THE ARGUMENT ................................................28

ARGUMENT ....................................................................................31

I. STANDARD OF REVIEW .............................................................31

II. THE BOARD ERRED IN ITS OBVIOUSNESS DETERMINATION FOR CLAIMS 1, 3, 6, 9-15, AND 18, ALL OF WHICH REQUIRE AN "ACTUARIAL CLASS" ................................................................31

  A. The Prior Art Does Not Disclose The Claimed "Actuarial Class"...........................................................................................33

    1. Herrod Does Not Disclose The Required "Expected Loss" For An "Actuarial Class" In An Insurance Context .......33

    2. Kosaka And Black Magic Do Not Disclose An "Actuarial Class Of Insurance"....................................................35

  B. The Purported Knowledge Of A Person Of Ordinary Skill Does Not Fill The Prior Art's Gap On "Expected Loss" ..............................36

III. THE BOARD'S FINDING OF OBVIOUSNESS OF CLAIMS 1 AND 3 RESTS ON IMPROPERLY READING OUT THE "LOG" LIMITATION ..................................................................................40

IV. THE BOARD ERRED IN FINDING CLAIMS 4-5 AND 16-17 OBVIOUS..........................................................................................43

  A. Neither Kosaka Nor The Florida Guide Disclose Using An "Insured Profile" To Determine The "Base Cost" Of Insurance ........43

  B. The Board Legally Erred By Relying On Hindsight Rather Than Articulating A Reason To Combine Kosaka And The

Florida Guide......................................................................48

V.    THE BOARD ERRED IN ITS OBVIOUSNESS DETERMINATION
      FOR CLAIMS 6, 9-15, AND 18, ALL OF WHICH REQUIRE THE
      "CORRELATING" LIMITATION.................................................51

VI.   THE BOARD IMPROPERLY RELIED ON NEW GROUNDS AND
      EVIDENCE IN ITS OBVIOUSNESS DETERMINATION.......................54

      A.    At A Minimum, Progressive Is Entitled To A Remand To
            Respond To The New Rejection Grounds ...........................54

            1.    The Board Improperly Relied on New Grounds With
                  Respect to Kosaka's Fuzzy Logic..............................55

            2.    The Board Improperly Relied On New Grounds With
                  Respect To "Actuarial Class" .................................57

      B.    The Board Erred By Not Excluding Evidence That Should
            Have Previously Been Presented In Liberty's Petition.......................59

CONCLUSION .......................................................................63

# TABLE OF AUTHORITIES

CASES

*Alco Standard Corp. v. Tennessee Valley Authority*,
 808 F.2d 1490, 1501 (Fed. Cir. 1986) ................................................51

*CFMT, Inc. v. Yieldup Intern. Corp.*,
 349 F.3d 1333 (Fed. Cir. 2003) ........................................... 40, 41, 43

*Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*,
 754 F.2d 404 (1st Cir. 1985) ...............................................................59

*Dayco Prods., Inc. v. Total Containment, Inc.*,
 329 F.3d 1358 (Fed. Cir. 2003) .........................................................43

*Dickinson v. Zurko*,
 527 U.S. 150 (1999) ...............................................................................54

*Dystar Textilfarben GmbH v. C.H. Patrick Co.*,
 464 F.3d 1356 (Fed. Cir. 2006) .........................................................50

*Ex Parte Burrowes*,
 110 O.G. 599 (Comm'r Pat. 1904) ...................................................55

*In re Biedermann*,
 733 F.3d 329 (Fed. Cir. 2013) ................................................ 31, 55, 56

*In re Glatt Air Techniques, Inc.*,
 630 F.3d 1026 (Fed. Cir. 2011) .........................................................32

*In re Grabiak*,
 769 F.2d 729 (Fed. Cir. 1985) ...........................................................47

*In re Kahn*,
 441 F.3d 977 (Fed. Cir. 2006) ...........................................................40

*In re Leithem*,
 661 F.3d 1316 (Fed. Cir. 2011) ................................................ 54, 58, 59

*In re Royka*,
 490 F.2d 981 (CCPA 1974) ................................................................40

*In re Stepan*,
 660 F.3d 1341 (Fed. Cir. 2011) ........................................ 54, 55, 57, 59

*In re Zurko*,
   258 F.3d 1379 (Fed. Cir. 2001). ...........................................................................50

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007) ............................................................................ 40, 48

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   694 F.3d 51 (Fed. Cir. 2012) .............................................................................31

*Leo Pharm. Prods., Ltd. v. Rea*,
   726 F.3d 1346 (Fed. Cir. 2013) .........................................................................31

*Platronics, Inc. v. Aliph, Inc.*,
   724 F.3d 1343 (Fed. Cir. 2013) .........................................................................49

*Rambus Inc. v. Rea*,
   731 F.3d 1248 (Fed. Cir. 2013) .........................................................................54

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*,
   655 F.3d 1364 (Fed. Cir. 2011) .........................................................................49

*Velander v. Garner*,
   348 F.3d 1359 (Fed. Cir. 2003) .........................................................................46

**STATUTES**

5 U.S.C. §§ 551-559................................................................................................54

28 U.S.C. § 1295 ......................................................................................................1

35 U.S.C. § 6 ............................................................................................................1

35 U.S.C. § 103 ......................................................................................................31

35 U.S.C. § 142 ........................................................................................................1

35 U.S.C. § 329 ........................................................................................................1

**REGULATIONS**

37 C.F.R. § 42.223 ..................................................................................................61

37 C.F.R. § 42.304 ..................................................................................................60

37 C.F.R. § 90.3 ........................................................................................................1

**OTHER AUTHORITIES**

157 Cong. Rec. S1362 (daily ed. Mar. 8, 2011) (statement of Sen. Leahy) ........................................................................................... 13

157 Cong. Rec. S5428 (daily ed. Sept. 8, 2011) (statement of Sen. Pryor) ........................................................................................... 13

Amy Danise, *Control Your Own Car Insurance Costs: Pay as You Drive*, Insure.com (May 29, 2009), *available at* http://www.insure.com/car-insurance/usage-based.html ..................................... 5

Morton & Prange, *Patent Owners Beware, Your Patent has a 15 Percent Chance (or Less) of Surviving the PTAB*, Inside Counsel (Mar. 19, 2014), *available at* http://www.insidecounsel.com/2014/03/19/patent-owners-beware-your-patent-has-a-15-percent ............................................................... 13

Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756 (Aug. 14, 2012) .......................................................... 61, 62

# TABLE OF ABBREVIATIONS

*Parties*

| | |
|---|---|
| Progressive | Progressive Casualty Insurance Company (Appellant) |
| Liberty | Liberty Mutual Insurance Company (Appellee) |

*Patents, Patent Applications, And Printed Publications*

| | |
|---|---|
| the '929 application | U.S. Patent Application No. 13/617,929 (filed Sep. 14, 2012, allowed Sep. 5, 2014) |
| the '958 application | U.S. Patent Application No. 08/592,958 (filed Jan. 29, 1996, issued Aug. 18, 1998) |
| the '358 patent | U.S. Patent No. 8,140,358 (filed Jun. 3, 2008, issued Mar. 20, 2012. |
| the '598 patent | U.S. Patent No. 8,090,598 (filed Jan. 23, 2004, issued Jan. 3, 2012) |
| the '970 patent | U.S. Patent No. 6,064,970 (filed Aug. 17, 1998, issued May 16, 2000) (A86-103) |
| Bouchard | U.S. Patent No. 5,465,079 (issued Nov. 7, 1995) |
| Black Magic | "An Interest in Black Magic – Motor Technology," *Insurance Age Magazine* (Jan. 1, 1994) (A146-47) |
| Herrod | UK Patent Application GB 2 286 369 (published Aug. 16, 1995) (A148-53) |
| Florida Guide | 1998 Automobile Insurance Shoppers' Guide, Florida Department of Insurance (A154-73) |
| Kosaka | JP H4/182868 (Jun 30, 1992) (A104-45) |
| Pettersen | PCT Patent Pub. No. WO 90/02388 (Mar. 8, 1990) |

*Defined Terms*

| | |
|---|---|
| AIA | Leahy–Smith America Invents Act |
| APA | The Administrative Procedure Act |
| ASOP | Actuarial Standard Of Practice |
| Board | Patent Trial and Appeal Board |
| CBM | Covered Business Method |
| CBMPR | Covered Business Method Patent Review |
| CRU | Central Reexamination Unit |
| PHOSITA | Person Having Ordinary Skill In The Art |
| PTAB | Patent Trial and Appeal Board |
| PTAB Practice Guide | Office Patent Trial Practice Guide |
| USPTO | United States Patent and Trademark Office |

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5, Progressive Casualty Insurance Co.

("Progressive") identifies the following cases that will directly affect or be directly

affected by this Court's decision in the present appeal.

1. *Progressive Cas. Ins. Co. v. Safeco Ins. Co.*, No. 1:10-cv-1370 (N.D. Ohio).

2. *Progressive Cas. Ins. Co. v. Allstate Ins. Co.*, No. 1:11-cv-00082 (N.D. Ohio).

3. *Progressive Cas. Ins. Co. v. State Farm Mut. Auto Ins. Co.*, No. 1:12-cv-1068 (N.D. Ohio).

4. *Progressive Cas. Ins. Co. v. Liberty Mut. Ins. Co.*, No. 2014-1656 (Fed. Cir.) (appeal from CBM 2012-00004).

The following are identified as appeals from the Board's decisions in

covered business method reviews of patents that are related to, but distinct from,

U.S. Patent No. 6,064,970 ("'970 patent") that is the subject of the present appeal.

All are currently pending before this Court.

1. *Progressive Cas. Ins. Co. v. Liberty Mut. Ins. Co.*, No. 2014-1586 (Fed. Cir.) (appeal from CBM2013-00004 involving U.S. Patent No. 8,090,598) ("'598 patent")

2. *Progressive Cas. Ins. Co. v. Liberty Mut. Ins. Co.*, Nos. 2014-1636, -1637 (Fed. Cir.) (appeals from CBM2012-00003 involving U.S. Patent No. 8,140,358) ("'358 patent").

3. *Progressive Cas. Ins. Co. v. Liberty Mut. Ins. Co.*, No. 2014-1639 (Fed. Cir.) (appeal from CBM2013-00009 involving the '358 patent).

## JURISIDICTIONAL STATEMENT

The Board purported to exercise jurisdiction over Liberty Mutual Insurance Company's ("Liberty's") Petition under 35 U.S.C. § 6 and Section 18 of the Leahy-Smith America Invents Act ("AIA"). The Board issued a Final Written Decision on January 23, 2014. A1. Progressive timely appealed on March 26, 2014. A5193-97; 37 C.F.R. § 90.3; 35 U.S.C. § 142; *see also* Fed. R. App. P. 4(a)(1). This Court has jurisdiction over Progressive's appeal pursuant to 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 329.

## STATEMENT OF THE ISSUES

1. Whether the Board erred in finding claims 1, 3, 6, and 9-18 obvious based on combinations of Kosaka with one or more of the Florida Guide, Herrod, and Black Magic, where:

a. None of the prior art relied on by the Board discloses groupings of insureds related to expected loss as is required for an "actuarial class" pursuant to claims 1, 3, 6, 9-15 and 18;

b. The Board failed to recognize that the prior art discloses only separately recording speed and location, but not recording a "corresponding log of vehicle speed for the time and location" as is required for the "log" limitation of claims 1 and 3;

1

c.    The Board legally erred in relying on a combination of Kosaka and Florida guide as rendering claims 4-5 and 16-17 obvious when neither reference discloses an "insured profile" for determining a "base cost" of insurance and the Board did not articulate any reason to combine the references; and

d.    The Board erred in finding Kosaka's use of a threshold speed value as an "on"/"off" trigger disclosed the limitation of claims 6, 9-15, and 18 requiring "correlating the group data values to preset values related to safety standards" where Kosaka's threshold value is not used to generate output data values and is not related to safety.

2.    Whether the Board erred in basing its obviousness determination for claims 1, 3, 6, and 9-18 at least in part on: (i) improper new grounds raised for the first time in its Final Written Decision; and (ii) new evidence presented by Liberty at the end of the briefing schedule, both of which improperly precluded Progressive from providing a meaningful response and requires remand.

## STATEMENT OF THE CASE SETTING OUT
## THE FACTS RELEVANT TO THE ISSUES

### I.     PROGRESSIVE'S USAGE-BASED INSURANCE INVENTION

#### A.     Progressive Pioneers Usage-Based Insurance

Progressive owns a family of patents directed to its invention of usage-based

insurance, which Progressive pioneered with its "Snapshot" program.  A3718-23.

Progressive's custom built Snapshot device is shown below:



A3724.  The Snapshot device plugs into a car's onboard diagnostic port (i.e., an

electronic connection to the vehicle's computer), where it records information

transmitted across a vehicle's internal data communication system (i.e., a vehicle

bus) such as time of day, vehicle speed, miles driven, and sudden stops.  *See* A96,

6:23-65; A97, 7:9-8:25.  With Snapshot, Progressive can remotely access the

recorded information through a wireless link.  A97, 7:18-20.  Likewise, a Snapshot

user can access the recorded information and view premium information via an online services interface. *E.g.*, A91-93, Figs. 4 and 6; A99, 11:4-7.

Due to Snapshot, Progressive overcame market skepticism and individual privacy concerns to become "one of the early leaders" in the field of usage-based insurance. A3724; *see also* A3650-51. Although gathering vehicle usage data was known prior to Progressive's invention (A94-95, 2:38-3:2), the form of the collected usage data was such that it could not practically be used to determine a cost of vehicle insurance. *See* A95, 3:3-24. For example, conventionally collected data often included demographic data, such as a driver's age or marital status (A94, 1:35-39) or information obtained through a personal interview or public records (*id.* at 1:16-22; 2:38-47). However, the conventionally collected data did not include actual vehicle usage-based information that correlated to an expected insurance loss or insurance cost, and thus could not be used to predict future usage of a vehicle. *Id.* at 2:43-53.

Other insurers, such as Liberty, have not been blind to Progressive's accomplishments with usage-based insurance and have sought to replicate Progressive's success. *See* A3724-25. One commentator noted: "While

Progressive was first out of the gate in implementation of usage-based car insurance, there's a pack forming at the starting line."[1]

### B.    Progressive's Usage-Based Insurance Patents

On January 29, 1996, Progressive filed U.S. Patent Application No. 08/592,958 ("'958 application") seeking protection for its usage-based insurance inventions.  A86.  Progressive subsequently filed several continuation and continuation-in-part patent applications, which culminated in the issuance of patents related to Progressive's invention, including the '970 patent (highlighted in red in the patent family tree below), a continuation of the '958 application.

---

[1] Amy Danise, *Control Your Own Car Insurance Costs: Pay as You Drive*, Insure.com (May 29, 2009).

**Figure 1: Progressive's Usage-Based Insurance Patent Family**



On September 5, 2014, the USPTO allowed a related application of the '970 patent: U.S. Patent Application No. 13/617,929 ("'929 application").  Notably, the USPTO allowed the '929 application over each and every one of the references cited to the Board in this case.

C.    **The '970 Patent**

1.    **Background Regarding Determination of Automobile Insurance Premiums**

Automobile insurance involves the transfer of risk of financial loss arising from ownership and operation of an insured vehicle. A3934, ¶ 23; A3880. An automobile insurance premium is determined so as to reasonably reflect both the degree of risk (also called "expected loss") being transferred, and the expected operational expenses of the insurer, including the expenses associated with resolving a claim and the insurer's cost of capital. A3935, ¶¶ 25-26.

"Expected loss" in the insurance context is the probability of an expected claim under an insurance contract due to a covered loss or accident multiplied by the expected claim severity under that insurance contract. *See* A4540, ¶ 11; A3933, ¶ 18. Notably, the probability of an expected claim is different than the probability of an accident because an insured may opt not to submit a claim for an accident. *See* A3933, ¶ 18.

Insurers group insureds with similar risk characteristics and expected losses. A3932-33, ¶ 16. These risk groupings are called "actuarial classes." *Id.* Insurers use actuarial class claims data to determine expected loss. *Id.* Prior to Progressive's invention of the subject matter of the '970 patent, actuarial classes were generated based on gathering relevant historical data from a personal interview and collecting an applicant's public motor vehicle record. A94, 1:17-22.

Conventional actuarial classes were based on classifications such as the age, type, and value of the vehicle and the driver's age, marital status, and gender. *Id.* at 1:28-58.

### 2. The Patent's Disclosure

In the usage-based insurance system of the '970 patent, actual operator and vehicle driving characteristics are acquired to derive data elements that can be used to determine a cost of vehicle insurance. A95, 3:60-4:30. This system provides an insurance cost based on an insured's actual driving behavior and operational characteristics, as opposed to conventional practices that estimate insurance cost based on demographic data or historical metrics, like prior traffic violations. A94, 1:16-27; A95, 3:40-50; *see also* A102, 1:32-33; A102, 2:31-32; A102, 2:59-62; A102, 1:60-61; A102, 2:14-17. By determining insurance costs or insurance ratings from actual driving data, the system allows vehicle operators to directly control insurance costs and pay for insurance based on how they actually drive. A96, 6:24-43. The system processes monitored vehicle data to determine those insurance costs and ratings. *Id.* at 5:34-47.

The '970 patent has 17 claims directed to telematics-based methods to generate, communicate, and process data reflecting actual driver behavior and vehicle operating characteristics used to determine insurance ratings or insurance costs. *Id.*; A99-100; A102-03.

1. A method of generating a database comprising data elements representative of operator or vehicle driving characteristics, the method comprising:

*generating acturial classes of insurance, which group operators or vehicles having a similar risk characteristic, from actual monitored driving characteristics during a selected time period as represented by recorded data elements representative of an operating state of the vehicles or an action of the operators; and*

monitoring a plurality of the data elements representative of an operating state of a vehicle or an action of [the] *an* operator during a *latter* selected time period; and,

recording selected ones of the plurality of data elements into the database when said ones are determined to be appropriate for recording relative to determining a cost of insurance for the vehicle during the *latter* selected time period, said ones including, a time and location of vehicle operation and a corresponding log of vehicle speed for the time and location.

4. A method of insuring a vehicle operator for a selected period based upon operator driving characteristics during the period, comprising, steps of:

generating an initial operator profile;

*generating an insured profile for the vehicle operator prior to any monitoring of any of the vehicle operator's driving characteristics wherein the insured profile comprises coverage information, including limits and deductibles, for determining a base cost of vehicle insurance for the vehicle operator;*

monitoring [operator] *the vehicle operator's* driving characteristics during the selected period; and deciding a *total* cost of vehicle insurance for the *selected* period based upon the [operating] *vehicle operator's driving* characteristics monitored in that *selected* period *and the base cost of insurance.*

5. A method of determining a cost of vehicle insurance for a selected period based upon monitoring, recording and communicating data representative of operator and vehicle driving characteristics during said period, whereby the cost is adjustable by relating the driving characteristics to predetermined safety standards *that are related to a safe operation of a vehicle,* the method comprising:

*determining an initial insured profile for the operator of the vehicle prior to any monitoring of any data elements representative of an operating state of the vehicle or an action of the operator of the vehicle* and *determining* a base cost of *the* vehicle insurance based on said *initial* insured profile *wherein the initial insured profile comprises coverage information, including limits and deductibles;*

monitoring a plurality of *the* data elements representative of [an] *the* operating state of [a] *the* vehicle or [an] *the* action of the operator *of the vehicle* during the selected period;

recording selected ones of the plurality of data elements when said ones are determined to have a preselected relationship to the safety standards;

consolidating said selected ones for identifying a surcharge or discount to be applied to the base cost; and,

producing a final cost of vehicle insurance for the selected period from the base cost and the surcharge or discount.

6. A method of monitoring a human *operator* controlled power source driven vehicle, the method comprising:

extracting one or more data elements *by a computer programmed to monitor sensor data* from at least one sensor wherein the one or more elements are *actual driving characteristics* of at least one operating state of the and [the] at least one [human's] *human operator's* actions during a data collection period;

analyzing, grouping, and storing the one or more data elements as group data values in a first memory related to a predetermined group of elements; and,

correlating the group data values to preset values in a second memory and generating an output data value based on the correlation wherein the output data value is used to compute an insurance rating for the data collection period [FOR the data collection period] *for the data collection period that is based on an actuarial class of insurance which groups other human operator controlled power source driven vehicles having a similar operator or vehicle risk characteristic and which also represents the actual driving characteristics of the vehicle monitored and recorded from the at least one sensor.*

18. A method of monitoring a human operator controlled power source driven vehicle, the method comprising:

extracting one or more data elements by an on-board computer from at least one sensor wherein the one or more elements are *actual driving characteristics* of at least one operating state of the vehicle and at least one human operator's actions during a data collection period;

analyzing, grouping, and storing the one or more data elements as group data values in a first memory related to a predetermined group of elements;

correlating the group data values to preset values related to safety standards in a second memory and generating an output data value based on the correlation; and

computing an insurance rating based upon the output data value for the vehicle for the data collection period, in which the insurance rating is also based on an actuarial class of insurance wherein said actuarial class of insurance groups other human operator controlled power source driven vehicles having a similar operator or vehicle risk characteristic as well as represents the actual driving characteristics of the vehicle monitored and recorded from the at least one sensor, and setting prospective insurance premiums based on the actuarial class of insurance.

Claims 1, 4-6, and 18 are independent claims, and claims 3 and 7-17 are dependent claims.[2] A102-03. Claim 1 is directed to generating a database that stores operator or vehicle driving characteristic data related to a cost of insurance. A102, 1:27-29, 1:40-46. The data include a time and location of a vehicle's operation and a corresponding log of vehicle speed for that time and location (the "log" limitation). *Id.* at 1:44-46. Claims 4-5 refer to methods that generate and process an insured's profile to determine an initial base cost of insurance (the "insured profile" limitations). *Id.* at 1:54-59, 2:6:13. The methods of claims 4-5 monitor vehicle operating data to identify a surcharge or discount and generate a final cost of vehicle insurance for a selected time period. *Id.* at 1:60-65, 2:14-25. Claims 1, 6, and 18 refer to methods that generate an insurance rating based on actuarial classes of insurance (the "actuarial class" limitations). *Id.* at 1:30-36, 2:37-48; A103, 3:4-4:5. Claims 6 and 18 also refer to methods that correlate the grouped data values (including actual driving characteristic data) to preset values related to safety standards (the "correlating" limitations). *See* A102, 2:38-41; A103, 3:1-3.

Portions of independent claims 1, 4, 5, 6, and 18 particularly relevant to issues in this appeal are highlighted on the facing page. *See* A102-03 (highlighting

---

[2] Claim 2 was cancelled during reexamination. A549; A102, 1:16.

added).  Italicized portions of the claims were added, and bracketed portions were deleted during the ex parte reexamination of the '970 patent.  *Id.*; *see also* A549-55.

### 3.    Prosecution And Reexamination History

As shown in Figure 1, *supra* Section I.B, at 6, the '970 patent issued from a continuation of the '958 application, now U.S. Patent No. 5,797,134.  A86; A94, 1:5-7.

The'970 patent was reexamined at length in a reexamination Liberty requested.  A3175-76; A3239.  After more than a year of repeated and rigorous examinations based on many of the same references and arguments Liberty raised before the Board, including arguments relating to U.S. Patent No. 5,465,079 ("Bouchard"), PCT Patent Pub. No. WO 90/02388 ("Pettersen"), JP H4/182868 ("Kosaka"), and "An Interest in Black Magic – Motor Technology," *Insurance Age Magazine* ("Black Magic"), the claims of the '970 patent were found novel and nonobvious by a panel of highly trained and experienced examiners in the Central Reexamination Unit ("CRU").  *See* A3244-46; A101-03.

During reexamination, claims 1 and 3-6 were amended; claim 2 was canceled; and claims 16-18 were added.  A102-03.  Specifically, independent claim 1 was amended to recite *"generating actuarial classes of insurance . . . from actual monitored driving characteristics"* (A102, 1:30-36), and independent

10

claims 6 and 18 were amended to recite "comput[ing] an insurance rating for the vehicle . . . *based on an actuarial class of insurance*" which "*groups other human operator controlled power source driven vehicles having a similar operator or vehicle risk characteristic*" and "*represents the actual driving characteristics of the vehicle*" (A102, 2:41-48; A103, 3:4-4: 6) (italicized portions added during reexamination).

In its Notice of Intent to Issue Ex parte Reexamination Certificate, the CRU held that one of skill in the art would understand that actual driving data is used to generate the actuarial classes. A557-58. Consequently, the CRU concluded that neither Bouchard, Kosaka, nor Black Magic disclosed the features of amended claim 1. A560-61. Specifically, with respect to claim 6 and pending claim 70 (now issued claim 18), the CRU likewise determined that their features were not disclosed by Kosaka and Black Magic. A567-68.

Claims 4-5 were amended during reexamination to include the italicized limitations shown below relating to an "insured profile":

| Claim 4 | Claim 5 |
|---|---|
| *generating an insured profile for the vehicle operator prior to any monitoring of any of the vehicle operator's driving characteristics wherein the insured profile comprises coverage information, including limits and deductibles, for determining a base cost of vehicle insurance for the vehicle operator.* A102, 1:54-59. | determining an initial insured profile *for the operator of the vehicle prior to any monitoring of any data elements representative of an operating state of the vehicle or an action of the operator of the vehicle* and *determining* a base cost of *the* vehicle insurance based on said *initial* insured profile *wherein the initial insured profile comprises coverage information, including limits and deductibles.* A102, 2:6-13. |

In allowing claims 4 and 5, the CRU explained that "Kosaka '868 . . . does not clearly and explicitly teach [these limitations] . . . . The prior art . . .[of] Bouchard '079 and Black Magic also do not teach such insured profile determination/generation and vehicle insurance base cost determination based thereon." A563-64.

## II.   LIBERTY'S FILING OF CBMPR PETITIONS CHALLENGING THE '970 PATENT

### A.   Liberty's CBMPR Strategy

On the very first day of the CBMPR program, September 16, 2012, Liberty filed the first of ten CBMPR petitions attacking Progressive's patents covering its

usage-based insurance and online servicing inventions.[3]  These CBMPR petitions

followed Liberty's prior ex parte reexamination attacks against three Progressive

patents, including its attack against the '970 patent.[4]

Liberty's serial attacks on Progressive's portfolio include six Covered

Business Method ("CBM") petitions directed to the '970 patent family alone.  *See*

'970 patent (CBM2012-00002, -00004); '358 patent (CBM2012-00003,

CBM2013-00009); and '598 patent (CBM2013-00003, -00004).

Like most patents reviewed by the Board in the initial months of the

CBMPR program, not one claim of any patent challenged by Liberty has ultimately

survived CBMPR.  Indeed, it has been reported that of the 357 claims evaluated

under the CBMPR program between its inception and March 2014, only 13 claims

survived.[5]

---

[3] In addition to the CBMPRs underlying the appeals listed in the Statement of
Related Cases, Liberty also filed CBM2012-00011, CBM2013-00001, and
CBM2013-00003 for which trials were denied.  *See* Statement of Related Cases,
*supra*, at xii.

[4] Liberty's strategy is contrary to the Congressional intent behind CBMPR to target
a class of patents that are commonly associated with non-practicing entities.  157
Cong. Rec. S1362 (daily ed. Mar. 8, 2011) (statement of Sen. Leahy).  "Section
18 is not intended to allow owners of valid patents to be harassed or subjected to
the substantial cost and uncertainty of the untested review process."  *See* 157
Cong. Rec. S5428 (daily ed. Sept. 8, 2011) (statement of Sen. Pryor).

[5] Morton & Prange, *Patent Owners Beware, Your Patent has a 15 Percent Chance
(or Less) of Surviving the PTAB*, Inside Counsel (Mar. 19, 2014).

### B.    Liberty's Petition Challenging The '970 Patent

Liberty's CBMPR Petition listed at least four grounds for rejection.  A177-78; A3811.  The Board instituted on three of those grounds (A3836):

(a)  Claims 4-5 and 16-17 over the combination of Kosaka and Florida Guide;

(b)  Claims 1, 3, 11-12, and 14-15 over Kosaka, Black Magic, and Herrod; and

(c)  Claims 6, 9-10, 13 and 18 over Kosaka and Herrod.[6]  *Id.*; A7.

All of the grounds asserted in Liberty's Petition rested on Kosaka as the base reference.  *See* A3811; A215-51.  In addition to Kosaka, Liberty's challenges to independent claims 1, 3, and 18 relied on Liberty's claim that Herrod suggests the "actual class" limitations.[7]  *See* A215-16; A235-36; A250-51.  Liberty's challenge to claim 1 further relied on Black Magic as allegedly disclosing recording location and time data to generate a log of vehicle speed for the time and locations.  A219.

In instituting review against independent claims 4 and 5, the Board rejected Liberty's argument that Kosaka alone discloses all of the limitations of these

---

[6] In instituting review against claims 6, 9-10, 13 and 18, the Board rejected Liberty's argument that Kosaka and Herrod disclosed the limitations of dependent claims 7 and 8 and instructed Progressive not to respond to Liberty's challenges of these claims.  A3833-34, 36.  Thus, claims 7 and 8 are not at issue in this appeal.

[7] Although Liberty's Petition included an argument that Kosaka "necessarily, and thus inherently, discloses basing an insurance rating on an actuarial class of insurance . . ." (A215; A235; A250), the Board relied on Herrod for this feature.  A3825-26.

claims – including the "insured profile" limitation.  A3836; A221-23; A226-31.
As a result, Liberty's patentability challenges to independent claims 4 and 5 rested
on the Florida Guide for allegedly disclosing an "insured profile" that determines a
base cost of vehicle insurance.  *See* A224-25; A227-28; A231.

## C.    The Alleged Prior Art

### 1.    Kosaka

Kosaka relates to an insurance premium determination device and a risk
evaluation device that uses fuzzy logic.  A120, (1):1-3; A128, (9):1-9-13.[8]
Figure 1 of Kosaka depicts a block diagram of the insurance premium
determination system:

---

[8] Citations to Kosaka are formatted as: (page):column:line number(s).

**Kosaka Block Diagram (FIG. 1)**



A128-29 (element labels added).  The specification of Kosaka explains that the external (1) and internal sensor (2) collect information regarding the external environment (e.g., air temperature) and "inside the insurance customer" (e.g., the customer's physiological state), respectively.  A123, (4):2:7-17.  This information output provides fuzzy logic input values in fuzzy logic part (3).  *Id.* at (4):2:18-20.

The outputs from external sensor (1) and internal sensor (2) are input into fuzzy logic part (3).  *Id.* at (4):2:18-20.  By applying fuzzy logic to the sensor outputs, the Kosaka device "determines comprehensive risk based on reasoning utilizing vague empirical knowledge . . . ."  *Id.* at (4):2:20-24.  The system also includes output interface (7) with a means for requesting a currency transfer or erasing a prepayment amount.  *Id.* at (4):2:33-38.  This is connected to a memory that stores a "prepayment balance or a transfer-side currency on-line system."  *Id.* at (4):2:36-38.

Kosaka's primary embodiment describes a diving watch that may be worn around the wrist of a diver that measures diver vitals and external forces, such as water temperature and pressure. *See* A123-24, (4):2:40-(5):1:5; A129, Figs. 2-4.

**Kosaka Diving Watch (FIG. 2)**



A129 (element labels added). Kosaka describes using the watch for insurance by conducting periodic deductions from a prepaid amount based on assessed risk levels while the diver is underwater. *See* A124-25, (5):2:45-(6):1:2. Thus, Kosaka explains a "prepayment amount that has been paid in advance on land is stored . . .

17

and a process is carried out in which a unit fee is taken from this prepayment

amount." *Id.*

Kosaka also describes a second embodiment that may be installed on a

vehicle, such as an automobile or boat. A125-26, (6):2:3- (7):2:25. A risk

evaluation unit performs "evaluation of the degree of risk during operation from

the state signals of the automobile (boat) using a signal processing process

including fuzzy logic." A126, (7):1:20-22. The device includes a memory that

stores a prepayment balance and the device "erases, from the prepayment money

balance, the insurance premium change corresponding to the risk evaluation value

output from the risk evaluation unit 42" during  vehicle operation. A126, (7):1:41-

44. Kosaka describes that the variables contributing to risk are "the doppler radar

main unit 30, the speed detector 38, the main engine rotation rate detector 43, and

the control operation detection part 44." A126, (7):1:49-(7):2:4.

During the '970 patent's reexamination, Kosaka was asserted in a

combination with Black Magic. A3244-45. In this CBMPR, the Board evaluated

substantially similar arguments with respect to Kosaka that were previously

rejected by the USPTO. *See id.* In evaluating claim 1, the CRU found that

"Kosaka '868 and Black Magic also ***do not provide such teachings***, see, e.g.,

English translation of '868 page 6 or 426, col. 1, last full paragraph." A561

(emphasis added); *see also* A3658. Similarly, for claims 4 and 5, the CRU found

that the "'868 [Kosaka reference] does not clearly and explicitly teach . . ." the limitations as "set forth in claims 4 and 5." A563-64.

## 2.    Black Magic

"Black Magic" is an article published near the effective filing date of the '970 patent, which describes the concept of usage-based insurance as "science fiction." A146-47. Black Magic discloses a "computerised unit installed near the dashboard of the vehicle" that allowed drivers to insert "personalised data cartridge[s]" into the unit that recorded "information such as driving speed, time and distance travelled and fuel consumption." A146. Black Magic recognizes that the impact of these devices "is still early days [sic]" and that as of the date of the article, only one insurance company offered an "***upfront*** premium discount for fleets fitting the unit." *Id.* (emphasis added).

Black Magic was previously considered in combination with Kosaka during the '970 patent reexamination. A561. The CRU found that Kosaka and Black Magic do not provide the teachings for the elements of claim 1. *Id.*

## 3.    Herrod

Herrod measures driver-acceleration patterns. A148. The four-page published application reports on the needs for continued driving education and driver-performance evaluations. A149. By monitoring driver acceleration, Herrod provides feedback to the driver on how to change driving habits to reduce accident

risk. *Id.* Like Kosaka, Herrod does not mention actuarial classes, expected insurance losses, or maintaining a log of vehicle speed for time and location, nor does it explain how it can be used for insurance rating.

### 4. Florida Guide

The Florida Guide is a "shoppers' guide" that provides general information about auto insurance in Florida. A154-55. Based on historical information and statutory requirements, the Florida guide explains when insurance coverage is required and, generally, the expected costs for various types of coverage. A157-62; A165-68. It provides "shopping tips" for the consumer, but does not disclose how insurance costs are generated. *See, e.g.,* A163. The Florida Guide describes the same conventional, non-usage based insurance practices discussed in the Background of the Invention section of the '970 patent. *See* A94, 1:17-2:37.

## III.    THE BOARD DECISIONS

### A.    Institution Decision

In deciding to institute review of the '970 patent, the Board construed nine different terms, including "actuarial class" and "initial operator profile" and "initial insured profile" (collectively, "insured profile' limitation"). A3817-19. With respect to "actuarial class" and "insured profile," the Board adopted wholesale and without comment Liberty's proposed constructions. *Id.*; *see also* A201-03. According to the Board, the original constructions offered in Liberty's pleadings

20

"seem to be consistent with the specification." A3817. Later, the Board retreated from these constructions with new factual findings, inferences, and claim constructions presented for the first time in the Final Written Decision. *See* A8-16.

### B.    Final Written Decision

#### 1.    The Board's Claim Constructions

Progressive's Response to the Institution Decision proposed claim constructions for "actuarial class" and "insured profile." A3884-89. The Board's Final Written Decision rejected both parties' proffered constructions as not providing the broadest reasonable constructions, and adopted revised claim constructions. *Compare* A8-16 *with* A3817-19.

#### a.    "Actuarial Class"

The constructions proposed for "actuarial class" were:

| Term | Petition/Institution Decision (Adopting Liberty's Proposed Construction) | Progressive's Response | Final Written Decision |
|---|---|---|---|
| **Actuarial class** (claims 1, 3, 6, 9-15, 18) | A combination/group /groupings related to loss/risk/safety which are determined from classifications/characteristics representative of motor vehicle operational characteristics and driver behavior for which data is gathered. A201-02; A3818. | A grouping of risks (*i.e.,* insureds) with similar risk characteristics and expected insurance claims loss (or insurance costs). A3887. | A grouping related to expected loss, which is determined from motor vehicle characteristics or driving characteristics. A11. |

The Board agreed with Progressive that within the context of the specification and vehicle insurance, actuarial classes are based on expected loss. A9; A3884-88.  Nonetheless, the Board rejected Progressive's construction for the stated reason that it believed it rendered claim terms "insignificant, if not wholly superfluous" and improperly "exclude[d] a grouping of vehicles."  A9-10.  As for Liberty's construction, which it initially adopted, the Board expressed concern that the phrases containing the "/" symbol were confusing.  *Id.*

In the Final Written Decision, the term "actuarial class" is defined as "a grouping related to expected loss, which is determined from motor vehicle characteristics or driving characteristics."  A11.  In arriving at this construction, the Board did more than simply replace the "/" symbols in its original construction.  The Board also removed the requirement that the groupings be determined from vehicle ***operational*** characteristics ***and*** driver behavior.  *See* A10-11; *see also* A201-02; A3818.  Instead, as shown by the following strikethroughs, all that was required was that groupings be determined from vehicle ***~~operational~~*** characteristics ***~~and~~ or*** driving characteristics.  A10-11.

22

### b.    "Insured Profile"

The constructions proposed for "insured profile" were:

| Term | Petition/Institution Decision (Adopting Liberty's Proposed Constructions) | Progressive's Response | Final Written Decision |
|------|------|------|------|
| "Insured profile" | Information with respect to the operator or the insuring thereof. A201; A3818.[9] | Basic insurance information pertaining to the insured from which an initial insurance cost is determined. A3889. | "Insurance information pertaining to the insured and the insured vehicle," which includes, for example, insurance coverage information, such as limits and deductibles.  A14. |

Although the Board recognized that the term "insured profile" should be interpreted consistently with the specification to include "information about [insurance] coverages including limits and deductibles, **which are necessary** for establishing *the appropriate **cost of insurance*** of the . . . insured," it ignored aspects of that passage that establish that the information be essential, instead allowing the term "insured profile" to encompass any information that relates to an insured and the insured's vehicle.  A13 (brackets in original) (emphasis added) (quoting A98, 10:36-39).

---

[9] Liberty's Petition proposed a combined construction for "'initial operator profile' / 'initial insured profile'" (A201), which the Board initially adopted in its Institution Decision.  A3818.  The Board's Final Written Decision, however, provided a construction for "insured profile" that was separate from "initial operator profile."  *See* A11-12.

2.    **The Board's Erroneous Obviousness Holdings**

a.    **Claims Requiring an "Insured Profile" (Claims 4-5 And 16-17)**

The Board did not make explicit findings regarding why it combined Kosaka and Florida Guide to hold independent claims 4 and 5 obvious.[10]  Rather, its motivation to combine is a single sentence adopting Liberty's conclusory statement put forth in the Petition.  A24 (citing A208).

The Board recognized the differences between the claimed invention and the prior art but dismissed these differences based on the alleged knowledge of a PHOSITA.  *See* A25-26.  The Board's findings relied almost exclusively on its reading of the conventional, non-usage-based insurance techniques discussed in the background of the '970 patent as alleged admitted prior art.  A25-26 (citing A94, 1:17-2:37).  In doing so, the Board placed heavy reliance on Liberty's expert's declaration testimony as to how she believed a PHOSITA would understand Kosaka.  A24-28 (citing A3566-67, ¶ 24; A4555, ¶ 40).

With respect to Kosaka's disclosure, the Board recognized that Kosaka's "prepayment amount" is only an initial deposit amount, but nevertheless concluded that "insurance companies would want to make the prepayment amount the same

---

[10] Although the Board relied on the Florida Guide in its combination for independent claims 4 and 5, it did not cite or refer to any specific portion of the guide in its obviousness analysis.  *See* A23-29.  The Board further recognized that the Florida Guide was cumulative of the background of the '970 patent.  A17.

24

as the base cost of insurance when utilizing Kosaka's insurance premium

determination device." A28-29.

### b.    Claims Requiring A Vehicle "Log" (Claims 1 and 3)

The Board recognized that "Kosaka does not disclose" the "log" limitation

of claims 1, 3, 11, 12, 14 and 15,[11] but held that the "log" was obvious in view of

Black Magic's black box data recorders and GPS satellite technology, which were

used in aircrafts and in shipping. A41-43. The Board recognized that Black Magic

did not explicitly disclose recording a *log* of vehicle location, but dismissed

Progressive's argument as "not tak[ing] into account the knowledge of a

[PHOSITA] at the time of the invention . . . ." A42.

### c.    Claims Requiring An "Actuarial Class" (Claims 1, 3, 6, 9-15, And 18)

In applying a new claim interpretation, the Board determined that Herrod

"discloses [1] classifying drivers into *groups,* [2] *each of which is associated with*

*a different level of accident risk*, [3] *based on actual monitored data*, such as

'levels of acceleration,' that represent driver behavior and vehicle operating

characteristics." A30 (citing A148-50) (emphasis in original).

---

[11] The Board held that claims 11-12 and 14-15 require the "log" limitation. A41.
 However, none of these claims or their intervening or base claims recite this
 limitation. A100, 13:1-8, 14:3-11.

With regard to the requirement that the claimed "actuarial classes" involve a grouping based on "expected loss data," the Board relied on the supposition in Herrod's speculative description that the device might be "*useful to insurance companies.*" A37 (emphasis in original). The Board also turned to the Actuarial Standard of Practice ("ASOP") and the conventional, non-usage-based insurance techniques discussed in the background section of the '970 patent for the proposition that "generating actuarial classes of insurance . . . was well known in the art." *See* A37-39 (citing A94, 1:27-2:47; A4432-33). Based on the foregoing, the Board leaped to the conclusion that "one with ordinary skill in the art would have known to analyze the monitored vehicle data collected by Herrod's device to determine any associated expected loss costs with such data . . . ." A40.

### d. Claims Requiring "Correlating" (Claims 6, 9-10, 13, and 18)

With respect to independent claims 6 and 18, the Board also rejected Progressive's argument that Kosaka and Herrod fail to disclose the "correlating" limitations of independent claim 6 and 18, which require "correlating the group data values to *preset values* related to *safety standards* in a second memory and generating an *output data value* based on the correlation." A45 (quoting A103, 3:1-3) (emphasis in original). The Board treated this language from independent claim 18 as representative, and did not address independent claim 6, which further requires that "the output data value is used to compute an insurance rating for the

26

vehicle for the data collection period that is based on an actuarial class of insurance . . . ." A102, 2:40-43; A3690-93.

The Board found that Kosaka's description of a "control operation detection part 44 [which] detects clearly intentional operations, for example, when there is a deviation in the rudder operation mechanism that is at or above a set value" discloses these features. A45 (citing A126, (7):1:29-33). The Board also emphasized that Kosaka "*compares the speed with a set value* to determine whether it exceeds the set value," A46 (emphasis in original), despite Kosaka's description using this comparison to "keep the system in an operating state" when the vehicle exceeds a threshold value. *See* A126, (7):1:9-11. According to the Board, "Kosaka's *speed threshold value,* used to activate risk assessment device, would have been understood by a person of ordinary skill in the art *as related to safety standards*." A46 (emphases in original).

The Board further rejected Progressive's argument that Kosaka's fuzzy logic system is not combinable with Herrod. A47-48. In particular, the Board found that "Kosaka's fuzzy logic feature need not be used" and that "a common insurance table" may be used to determine premiums. A53-54. Progressive was given no opportunity to address the Board's new findings and reasoning because the argument was not presented in Liberty's Petition or the Board's Institution Decision. *See, e.g.,* A204; A215-19; A221-23; A3813; A3827-30.

27

## SUMMARY OF THE ARGUMENT

Progressive's groundbreaking inventions in the area of usage-based insurance were dealt an undeserved blow in a series of five CBMPRs, including the CBMPRs underlying this appeal and companion appeal No. 2014-1656. The Board held all but two claims of Progressive's '970 patent invalid as obvious over Kosaka in combination with one or more of Black Magic, Herrod, and Florida Guide. Notably, Kosaka, Black Magic, and Florida Guide had been considered and overcome during reexamination of the '970 patent and Herrod is cumulative with other references that were before the USPTO.

The Board's departure from the USPTO's prior finding of patentability of the '970 patent based on the same art evidences the Board's lack of appreciation of the technical innovation achieved by the '970 patent claims. Among other things, the '970 patent claims methods for determining insurance cost by incorporating actual monitored driving data into new "actuarial classes of insurance," and for applying information regarding actual monitored driving behavior to derive a total or final cost of insurance from an initial base cost for the driver. Notwithstanding industry recognition that Progressive stood alone as an innovator in the area based on its development of these specific methods for using actual driving information, the Board held every claim on which it instituted trial invalid.

28

The Board was forced to rely on conclusory statements, speculative reasoning, and belatedly introduced evidence as its bases for invalidating the specific methods of using actual driving data to determine insurance cost recited in claims 1, 3, 6, and 9-18 of the '970 patent.  In fact, none of the prior art relied on by the Board discloses several limitations of these claims, including:

(i.)        generation of "actuarial classes of insurance" comprising groupings related to expected loss as required by claims 1, 3, 6, 9-15, and 18;

(ii.)       creation of a "corresponding log of vehicle speed for time and location" of claims 1 and 3;

(iii.)      use of an "insured profile" for determining a "base cost" of insurance as required by claims 4-5 and 16-17; or

(iv.)      the step of "correlating . . . group data values to preset values related to safety standards."

The Board's various flawed rationales for finding these elements in the prior art share a common pitfall – a complete lack of evidentiary support in the prior art itself.  Because none of the prior art discloses these limitations, the Board's finding of obviousness as to the claims requiring these limitations must be reversed.

With respect to claims 4-5 and 16-17, the Board's hindsight-driven finding of obviousness is particularly apparent.  In fact, the Board failed to even articulate a reason to combine Kosaka and Florida Guide to arrive at the claimed "insured

profile" for determining a "base cost of insurance" required by these claims.  This alone requires reversal of the Board's decision invalidating these claims.

Finally, in piecing together the prior art to arrive at the inventions of the '970 patent, the Board improperly relied on new grounds and evidence offered by Liberty at the close of briefing.  Should the Court find that the Board legally erred in relying on new grounds or abused its discretion in relying on inadmissible evidence that was necessary for Liberty to make out its prima facie case against the '970 patent, the Court should reverse or alternatively, vacate and remand for a new proceeding.

# ARGUMENT

## I.    STANDARD OF REVIEW

While the Board's factual findings are reviewed for substantial evidence, "whether a claimed invention would have been obvious under 35 U.S.C. § 103(a) is a question of law reviewed de novo." *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1353 (Fed. Cir. 2013).

Whether the Board relied on a new ground of rejection is a legal question that this Court reviews *de novo*. *In re Biedermann*, 733 F.3d 329, 335 (Fed. Cir. 2013). The Court reviews the denial of a motion to exclude evidence for an abuse of discretion. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 66 (Fed. Cir. 2012).

## II.   THE BOARD ERRED IN ITS OBVIOUSNESS DETERMINATION FOR CLAIMS 1, 3, 6, 9-15, AND 18, ALL OF WHICH REQUIRE AN "ACTUARIAL CLASS"

Under the Board's construction of "actuarial class," its obviousness conclusion for claims 1, 3, 6, 9-15, and 18 should be reversed because the prior art does not disclose "actuarial classes" meeting the two requirements of the Board's claim construction. First, under the Board's construction, an "actuarial class" requires a "grouping related to expected loss."[12] A11; A3933-34, ¶¶ 19-20;

---

[12] The relationship between an "actuarial class" and "expected loss" is well-established. Even Liberty's expert, O'Neil, testified that it is known to those of

A3884-88; *see also* A4056, 91:7-11.  Second, the Board's construction of "actuarial class" requires that the grouping be "determined from motor vehicle characteristics or driving characteristics."  A11.  Although the Board neglected to include any language requiring that the "actuarial class" pertains to insurance in its construction, the claims also require actuarial classes be "of insurance," indicating that the classes are component parts of an insurance process.  A102-03, 1:30-35, 2:42-47, 3:4-9 (claims 1, 6, and 18).

None of the prior art before the Board – Kosaka, Herrod, Black Magic, and Florida Guide – discloses an actuarial class meeting the first requirement: a "grouping related to expected loss" in which the grouping is "of insurance." Because none of the prior art discloses the claimed "actuarial class" of claims 1, 6, and 18 (and their dependent claims), the Board's obviousness conclusion must be overturned.  *See, e.g., In re Glatt Air Techniques, Inc.*, 630 F.3d 1026, 1029-30 (Fed. Cir. 2011) (overturning the Board's obviousness finding where the innovative concept of the claims – involving using an air wall for "shielding" –

---

ordinary skill in the art that "actuarial classes" are based on predicted expected losses and further attested that actuarial classes group similar risk characteristics with differentiated loss costs.  A3966; A4056:7-11; A4058:22-A4059:23. Liberty's glossary even defines "loss" as "amount sought in a claim."  *Insurance Glossary*, Liberty Mutual Ins., *available at* http://www.libertymutual.com/insurance-glossary.

was not disclosed by the prior art description of "modulating gas flow" to clear

particle blockage).

### A.    The Prior Art Does Not Disclose The Claimed "Actuarial Class"

### 1.    Herrod Does Not Disclose The Required "Expected Loss" For An "Actuarial Class" In An Insurance Context

The Board's construction of "actuarial class" requires a "grouping related to

expected loss," which is not disclosed by Herrod's mention of "different levels of

accident risk."  *See* A11.  Both parties' experts agreed that an "expected loss" in

the insurance context is the probability of an expected claim under an insurance

contract due to a covered loss or accident multiplied by the expected claim severity

under that insurance contract.  *See* A4540, ¶ 11; A3933, ¶ 18.  In other words, an

expected loss has two components: (1) a frequency component; and (2) a severity

component.  A3933, ¶ 18.  Notably, the frequency component speaks to more than

just the probability of an accident; this component also depends on the probability

that the insured will then file a claim.[13]  *Id.*  Thus, Herrod's mention of "different

---

[13] Under an insurance policy, an insured party submits claims to an insurer for
damage caused by the insured or otherwise covered under the policy.  *See* A3933,
¶ 18.  Thus, an insurer has two sources of uncertainty for its policies: (1) whether
a claim will be filed, and (2) if so, the amount of the claim.  *See id.*  The
possibility of an accident does not determine whether the insured will file a claim,
and therefore cannot disclose expected loss.  *See id.*

level of accident risk" and "behavioural groups" simply does not disclose an "expected loss." *See* A149.

Herrod also fails to disclose the second component of an "expected loss" in the insurance context – expected claim *severity* (i.e., the likely cost of the insurance claim), and thus does not disclose an "actuarial class" as required by the claims. In fact, as discussed below, the Board's improper attempt to address Herrod's deficiencies through generalizations from conclusory declaration testimony regarding the knowledge of a PHOSITA, the '970 patent's background, and the ASOP, confirms that Herrod does not disclose claim severity, and therefore, does not disclose generating actuarial classes of insurance having both components. *See* A38-40; *see* Argument Section II.B, *infra*, at 36.

A PHOSITA also would not have understood that Herrod's "accident risk" and "behavioural groups" should be used to generate actuarial classes "of insurance." *See* A3945, ¶ 48. The Board erred in finding otherwise based on Herrod's statement that Herrod's data "might also be used by driver training officers, fleet vehicle operators or insurance companies, who wish to monitor the standard of driving of certain vehicles." A150; A33-34. However, this statement, like the rest of Herrod, concerns assessing driving competence – not generating insurance premiums using actuarial classes of insurance generated from actual monitored driving data. *See* A149-50.

### 2.    Kosaka And Black Magic Do Not Disclose An "Actuarial Class Of Insurance"

Neither Kosaka nor Black Magic discloses the claimed "actuarial class." Liberty effectively conceded that Kosaka does not explicitly disclose "actuarial classes" of insurance when it failed to cite any portion of Kosaka as disclosing an "actuarial class" in its Petition.  A215-17; A235-36; A250-51.  Liberty's unsuccessful attempt to rely on Kosaka as inherently showing "actuarial classes" further demonstrates that this limitation is not described in Kosaka.  *See* A215-17; A235-36; A250-51.  The Board's Institution Decision further recognized this fact when it rejected Liberty's argument that the combination of Kosaka, Black Magic, and New York Guide (without Herrod), disclosed all the elements of independent claims 1, 6, and 18.  A3811; A3836.  Thus, Liberty's arguments and the Board's prior findings at the institution stage establish that Liberty's sole support for "actuarial classes" hinged on Herrod.  *See also* A48 ("Liberty relies on Herrod to show that actuarial classes can be generated based on *actual monitored driving characteristics*.") (emphasis in original).

Likewise, Kosaka omits any disclosure of the expected claims loss required for an "actuarial class."  Even Liberty's original self-serving expert declaration from O'Neil – the only one discussing Kosaka – is silent on this point.  *See* A3566-68, ¶¶ 23-26.  This declaration discusses Kosaka's "prepayment amount," which O'Neil claims is somehow related to the derived premium adjustments.  A3566,

35

¶ 24.  Then, in conclusory fashion, O'Neil states that Kosaka's premium charges determined during use of the device ***necessarily*** would have been derived from an "actuarial classes."  A3567-68, ¶ 26.  However, Kosaka describes that the determined insurance charge is based on fuzzy logic that evaluates input values. A122, (3):2:38-47; A122, (3):2:52-A122, (4):1:8.  There is no suggestion that Kosaka generates or uses "actuarial classes" of insurance, and O'Neil's attempt to create support for Liberty's failed inherency argument does not change this.  *See* A3567, ¶ 26; A216 (citing A3567, ¶ 26 for inherency); *see also* A3939-42, ¶¶ 37-43.  Further, O'Neil's testimony refers to an "actuarial class" under Liberty's proposed construction, which was not adopted by the Board in its Final Written Decision.  *Compare* A3564-65, ¶ 21, *with* A3887 *and* A11.

### B.    The Purported Knowledge Of A Person Of Ordinary Skill Does Not Fill The Prior Art's Gap On "Expected Loss"

Given the lack of any prior art disclosure of a "grouping related to expected loss" as required under the Board's construction of "actuarial class" in claims 1, 3, 6-15, and 18, the Board attempted to draw upon the purported knowledge of a PHOSITA.  *See* A37-40.  Specifically, the Board reasoned that the PHOSITA would have "known to analyze" the data collected by Herrod's driver training device based on his or her knowledge of insurance.  A40.  However, none of the evidence relied upon by the Board – O'Neil's declaration testimony, the

background section of the '970 patent, and ASOP – discloses an "actuarial class" that is formed of "a grouping related to expected loss." *See* A37-40.

The Board incorrectly relied on the circular logic presented in O'Neil's belated supplemental declaration submitted with Liberty's Reply to find that Herrod's deficiency on "expected loss" is filled by the knowledge of a PHOSITA. *See* A37-40.  The Board merely parroted O'Neil's finding that a PHOSITA "would have known to analyze the monitored vehicle data collected by Herrod's device to determine any associated expected loss costs . . . ."  A40; *see also* A4557-58, ¶ 45.

However, O'Neil's reasoning begins with what she attempted to prove. O'Neil's declaration prefaces her analysis with: "A P[H]OSITA would know that, in order to create such behavioural groups relevant to insurance *rating* . . . ."  A38 (quoting A4556-57, ¶ 43).  But this is not what Herrod discloses.  Herrod discloses only a device used to promote driving safety; it has nothing to do with insurance ratings.

Thus, O'Neil mistakenly assumed that a PHOSITA would understand that Herrod concerns insurance *rating*.  From there, she concluded that a PHOSITA would understand that Herrod's purported disclosure of insurance rating transforms Herrod's behavioral groups into actuarial classes.  *Id.*  However, Herrod's vague references to driver safety data possibly being "use[ful] to vehicle owners and insurers" does not speak to insurance rating and thus says nothing about actuarial

37

classes.   *See* A149; A4555-57, ¶¶ 41-43.  Such circular logic is a fallacy because O'Neil's premise is just as much in need of proof as is her conclusion.

The Board further erred in relying on the '970 patent's background discussion of "Conventional methods for determining costs of motor vehicle insurance," which explicitly distinguishes prior art "actuarial classes" from those required by the claims.  *See* A39-40 (quoting A94, 1:17-52).  The passage cited by the Board describes how ***prior art*** systems create actuarial classes based on "relevant historical data."  *See* A94, 1:17-52.  The '970 patent subsequently distinguishes these prior art actuarial classes by explaining that the claimed "new actuarial classes" are "based on data derived from motor vehicle operational characteristics and driver behavior," and that such "classes ***heretofore have been unknown in the insurance industry***."  A96, 5:34-40 (emphasis added).  The specification further notes that these new "actuarial class[es have] . . . a vastly reduced rating error over conventional insurance cost systems."  A95, 3:49-50.  Yet, the Board consistently and erroneously equated the background's description of conventional actuarial classes with these new classes to find the claimed "actuarial classes" obvious in light of Herrod.  A35-36; A38-A40.

The Board's reliance on isolated passages from the ASOP that supposedly show the knowledge of a PHOSITA is equally misplaced.  *See* A38-40.  The gap between ASOP's generalizations and the "expected loss" required by the claimed

38

"actuarial classes" is particularly clear when the teachings of ASOP are applied to Herrod.  The Board noted that Herrod discloses "behavioural groups" based on collection of acceleration information and accident statistics.  A38.  The ASOP provisions quoted by the Board mention use of "professional judgment," "statistical tools," and "mathematical analysis" (A40), but fail to disclose how an actuary would use the information provided by Herrod to predict either of the agreed-upon requirements for determining "expected loss": (1) the probability of an expected claim; or (2) the expected severity.[14]  *See* A4540, ¶ 11; A3933, ¶ 18.  Nothing in ASOP articulates how a PHOSITA would determine "expected loss" costs from the type of information provided by Herrod (e.g., accumulated acceleration data and surveys), especially when Herrod explains that "accidents are *such rare events*."  *See* A149 (emphasis added).  For example, an insurer could provide a discount based only on the insured agreeing to be monitored which would not require any expected loss calculation.

Further, the Board provides no analysis explaining why the passages of ASOP on which it relies render the claimed "actuarial classes of insurance"

---

[14] A PHOSITA would not understand how to associate the naked "acceleration data" collected by Herrod to "expected loss" without an understanding of the driving conditions.  A3946-47, ¶¶ 50-51.  For example, frequent acceleration may not be a predictor of "expected loss" for a driver in an urban setting whose commute involves numerous traffic lights.  *See* A3904-05.

obvious.  *See* A39-40.  The Board's conclusory statement that a PHOSITA "would have known to . . ." (A40) is not evidence.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) ("[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness.") (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).  The Board's generalizations about "professional judgment," "statistical tools," and "mathematical analysis" based on ASOP cannot trump the specific teachings of the '970 patent that the use of an actuarial class of insurance derived from actual driving data was "unknown in the insurance industry."  *Id.*; A96, 5:34-47.

## III.  THE BOARD'S FINDING OF OBVIOUSNESS OF CLAIMS 1 AND 3 RESTS ON IMPROPERLY READING OUT THE "LOG" LIMITATION

The Board's finding of obviousness for claims 1 and 3 must be reversed because none of the references relied on by the Board discloses recording a "log" as recited in the claims.  *See CFMT, Inc. v. Yieldup Intern. Corp.*, 349 F.3d 1333, 1342 (Fed. Cir. 2003) ("[O]bviousness requires a suggestion of all limitations in a claim.") (citing *In re Royka*, 490 F.2d 981, 985 (CCPA 1974)) .  Claim 1 of the '970 patent requires the recording of three types of data: "[1] a time and [2] location of vehicle operation and [3] a corresponding log of vehicle speed for the time and location."  A102, 1:44-46.  With respect to the third type of recorded data,

40

the recorded log must provide a ***relationship*** between a vehicle speed and each recorded combination of time and location. *Id.*; *see also* A1196-97, ¶¶ 14-16. The "corresponding log of vehicle speed for the time and location" is explicitly recited in the claim, and thus is an element that must be accounted for in the prior art in order to justify an obviousness rejection. *See CFMT,* 349 F.3d at 1342. Separately recording the speed, time and location of a vehicle, does not equate with recording "a corresponding log" as recited in the claims.

The Board's Final Written Decision implicitly acknowledges that none of the passages of Black Magic on which Liberty relied in its Petition for the "log" limitation disclose recording a "corresponding log of vehicle speed for the time and location" as required by claims 1 and 3. A41-42. Specifically, the Board cited to distinct passages describing "recording speed, time and distance," as well as the "vehicle's location," but failed to make any finding with respect to recording a ***relationship*** between the data elements as a vehicle "log." *See id.* This is not surprising, because Liberty's Petition simply parsed the claim language into individual data components by suggesting that Black Magic discloses: "recording [1] *time*, [2] *location*, and [3] *speed*." A218-19 (emphases in original). Liberty's treatment of this disclosure in Black Magic is telling. By arguing that Black Magic discloses "time, location, and speed," Liberty effectively admits that the time, location, and speed are stored separately by Black Magic and not as a ***log*** of

relationships between the individual elements. *See id.* Liberty's argument that Black Magic "at a minimum inherently discloses" the log as claimed further evidences this fact. *See* A219.

Similarly, Liberty's citations to Black Magic's discussion of GPS technology likewise fails to disclose this limitation. *See* A219. Black Magic describes that location may be recorded and used to rate premiums according to "styles of driving and locality of use." A147. There is no discussion, however, of recording a log of "vehicle speed for the time *and* location" pairs as required by claim 1. A102, 1:44-46. Black Magic simply does not disclose generating a corresponding *log* of the data elements' *relationships* with one another, and Liberty provides no reason to conclude otherwise.

The Board's incorrect grouping of claims 1, 3, 11-12, and 14-15 further evidences the Board's failure to recognize that the "log" limitation of claims 1 and 3 is a requirement distinct from simply measuring speed and location. *See* A41. The Board reasoned that Black Magic disclosed "'a time and location of vehicle operation and a corresponding *log* of vehicle speed for the time and location,' as *required* by claims 1, 3, *11, 12, 14 and 15*." A41 (emphases added). However, claims 11, 12, 14 and 15 require only the separate recording of "location and time" as data elements. They depend from claim 6 which, unlike claim 1, does not require a "log" recording the corresponding "speed for the time and location."

The language of dependent claims 11-12 and 14-15 does not add a "log." *Compare* A100, 13:3-5 (claim 11) *and* A100, 14:5-8 (claim 14) *with* A102, 1:45-46 (claim 1). By finding that the "log" limitation disclosed by prior art met only the separate data element requirements of claims 11 and 14, the Board improperly read the "log" limitation out of claims 1 and 3. *See, e.g., Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1370 (Fed. Cir. 2003) (finding error where the court's construction and application of prior art "improperly read out" a requirement of the claims).

## IV.  THE BOARD ERRED IN FINDING CLAIMS 4-5 AND 16-17 OBVIOUS

### A.  Neither Kosaka Nor The Florida Guide Disclose Using An "Insured Profile" To Determine The "Base Cost" Of Insurance

The Board's finding of obviousness of independent claims 4 and 5 and their dependents (claims 6 and 17) should be reversed because the combination of Kosaka and Florida Guide does not disclose generating a "base cost" of insurance based on the "insured profile" of an insured. *See CFMT*, 349 F.3d at 1342. The Board relied on Kosaka and the background section of the '970 patent itself as disclosing that the "insured profile" of claims 4 and 5 be used for "determining a base cost of vehicle insurance." *See* A23-29. However, Kosaka and the background contain no such disclosure and there is no evidence to support the Board's finding to the contrary. Rather, as found by the CRU during

reexamination, the "'868 [Kosaka reference] does not clearly and explicitly teach . . ." the limitations as "set forth in claims 4 and 5." A563-64.

The Board's reliance on Kosaka's "prepayment amount" as disclosing the claimed use of an "insured profile" for generating a "base cost of insurance" is misplaced. *Id.* The passages of Kosaka relevant to the "prepayment amount" provide:

> The prepayment amount that has been paid in advance on land is stored in the logic part 21, and a process is carried out in which a unit fee is taken from this prepayment amount. A124, (5):2:45-A125, (6):1:2.

> The output of the risk evaluation unit 42 is output to the warning device 45 and monetary amount file part 46. The warning device 45 warns of the presence of risk using an alarm, voice, or vibration through operation of the risk evaluation unit 42. The monetary amount file part 46 has a memory that stores the prepayment balance. This monetary amount file part 46 erases, from the prepayment money balance, the insurance premium charge corresponding to the risk evaluation value output from the risk evaluation unit 42. A127, (7):1:34-44.

A24.[15] As shown above, Kosaka's "prepayment amount" is simply a deposit from which charges could be drawn. A3943-44, ¶¶ 45-46; A123, (4):2:33-38. There is no disclosure that this prepayment amount is determined from an "insured profile" comprised of "insurance information pertaining to the insured and the insured

---

[15] The Board also cited a passage on page 4 of Kosaka for the proposition that Kosaka's "premium calculation part 6 . . . calculates insurance premiums." A24 (quoting A123, (4):2:24-31). This passage says nothing about Kosaka's "prepayment amount feature" and has nothing to do with determining an "insured profile" or using that "insured profile" to calculate a "base cost" before monitoring driving.

vehicle" as required by the Board's construction. A14. Instead, the Kosaka

prepayment amount is more analogous to an EZ pass mechanism in which prepaid

funds are loaded and a "unit fee" may be deducted.[16] A124-25, (5):2:45-(6):1:2;

A3921-22.

The '970 patent's background discussion of the use of conventional

techniques for generating a *final* insurance premium does not somehow transform

Kosaka's "prepayment amount" into the claimed "insured profile" for generating a

"base cost" that may then be adjusted based on actual driving data. *See* A102,

claims 4 and 5. The Board erred to the extent it found otherwise. *See* A25-26.

The portions of the background relied on by the Board simply describe

"[c]onventional methods for determining costs of motor vehicle insurance" by

"gathering relevant historical data from a personal interview . . . and by referencing

the applicant's public motor vehicle driving record . . . ." *Id.* (citing A94, 1:17-

2:37). The patent indicates that these conventional methods were used to

determine a single *final* insurance premium, *see id.*, while the claimed invention

---

[16] That Kosaka describes deducting charges from the prepayment amount during
use of the device does not imply that the "prepayment amount" is generated based
on an "insured profile" as required by the claims. *See* A102, 1:56-59 (claim 4
"wherein the insured profile comprises coverage information . . . for determining
a base cost of vehicle insurance for the vehicle operator . . . ."); A102, 2: 9-13
(claim 5 reciting "determining a base cost of the vehicle insurance based on said
initial insured profile . . . .").

instead envisions a "new and improved" method in which an "insured profile" is used to determine a "base cost" that is then adjusted based on actual driving data to achieve "final cost." A102, 2:14-25; A95, 3:40-58.

The Board erroneously substituted O'Neil's strained declaration testimony for the teachings of the prior art itself. *See* A24-29 (citing A3566-67, ¶¶ 24; A4555, ¶ 40). Given the lack of any disclosure of an "insured profile" for generating a "base cost," the Board placed heavy emphasis on O'Neil's characterizations of Kosaka. *Id.* Contrary to the Board's reliance on O'Neil, the fact that O'Neil provided a declaration stating that "Kosaka *explicitly* explains that the 'prepayment amount' is a base [premium][17] amount that is eventually adjusted to reflect the calculation of a premium for the period in which operating data is actually monitored" does not make it so. *See* A26-27 (quoting A3566, ¶ 24 (emphasis added)). Kosaka contains no such disclosure—explicit or otherwise. *See* A124-25, (5):2:45-(6):1:2; A127, (7):1:34-44. The Board erred in relying on O'Neil and not heeding its own advice to "giv[e] more weight to prior publications than to subsequent conclusory statements by experts . . . ." A34 (quoting *Velander v. Garner*, 348 F.3d 1359, 1371 (Fed. Cir. 2003)).

---

[17] The Board inserted the word "premium" into O'Neil's testimony. *Compare* A26-27 *with* A3566, ¶ 24.

The lack of any citation to Kosaka, the '970 patent or even O'Neil for the Board's ultimate conclusion is telling. A29. There is no support for the Board's conclusion that a PHOSITA "would have understood that insurance companies would want to make the prepayment amount the same as the base cost of insurance when utilizing Kosaka's insurance premium determination device." *Id.*; *see also* A3943-44, ¶¶ 45-46. The Board is not free to substitute its own judgment for the teachings of the prior art. *See In re Grabiak*, 769 F.2d 729, 732 (Fed. Cir. 1985) (holding USPTO's obviousness position "lacking in a critical element: support in the prior art"). Further, even if the Board were correct in its conjecture about what "insurance companies would want" to do with respect to Kosaka's "prepayment amount," the fact remains that Kosaka simply does not disclose using a "prepayment amount" as a "base cost of insurance."

Similarly, the Florida Guide does not disclose generating a "base cost" of insurance based on an "insured profile." *See* A154-73. Tellingly, the Board's Final Written Decision does not rely on the Florida Guide as disclosing an "insured profile" for determining a "base cost." A23-29. This is unsurprising given that the select passages of the Florida Guide on which Liberty relied for teaching an "insured profile" simply provide a generic discussion of various types of insurance coverage and premiums. *See* A224-25; A231 (citing A157; A160; A165-66). Missing from the Florida Guide is a suggestion to determine a "base cost" of

insurance that may then be modified based on actual driving data.  *See* A102.

Instead, the Florida Guide merely discloses conventional techniques for

determining a final insurance premium similar to the background of the '970

patent.  *Compare* A157 *and* A160 *and* A165-66 (cited at A224-25; A231) *with*

A94, 1:16-2:38.

> ### B.    The Board Legally Erred By Relying On Hindsight Rather Than Articulating A Reason To Combine Kosaka And The Florida Guide

The Board's obviousness determination with respect to independent claims 4

and 5 and their dependents (claims 16 and 17) should be overturned because the

Board failed to articulate a reason to combine the references.  *KSR*, 550 U.S. at 418

("Often, it will be necessary for a court to look to interrelated teachings of multiple

patents . . . in order to determine whether there was an apparent reason to combine

the known elements in the fashion claimed by the patent at issue.  To facilitate

review, this analysis should be made explicit.").  The Board simply adopted

wholesale and without analysis Liberty's asserted motivation to combine Kosaka

and the Florida Guide.  *Compare* A24 *with* A208.  The entirety of the Board's

rationale for this combination is reproduced below:

> [A person of ordinary skill in the art] would have been motivated to implement Kosaka's teachings of using monitored driving characteristics to determine insured risk and premiums with Florida Guide's teachings that insurers are required, in issuing policies, to generate an insured profile comprising coverage information, including limits and deductibles, for determining a base cost of

48

vehicle insurance, *because insurance companies are required, in issuing policies, to do so*.

A24 (brackets in original) (emphasis added).  Once the Board's opening

paraphrasing of the "insured profile" limitations themselves is set aside, it is

apparent that the Board's alleged reason to combine consists of the following

eleven word clause: "because insurance companies are required, in issuing

policies, to do so."  *Id.*  Ironically, this is the exact same self-serving statement that

Liberty provided with respect to the purported reason to combine Pettersen with

Florida Guide in the companion appeal to this case.  *See* A7025 in appeal No. 14-

1646.  Liberty's and the Board's consistent reliance on identical reasoning for

finding obviousness in two appeals involving distinct combinations evidences their

use of hindsight.  *See Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364,

1375 (Fed. Cir. 2011) (cautioning that "the great challenge of the obviousness

judgment is proceeding without any hint of hindsight.").

Further, this single sentence, when distilled down to the final clause,

amounts to nothing more than an unsubstantiated, conclusory statement to the

effect that it would be common sense to combine the two references that form the

basis of the Board's obviousness determination.  This is legally insufficient and

cannot pass muster against this Court's precedent against using forbidden

hindsight.  *See Platronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1354 (Fed. Cir. 2013)

("Where, as here, the necessary reasoning is absent, we cannot simply assume that

49

'an ordinary artisan would be awakened to modify prior art in such a way as to lead to an obviousness rejection.'  It is in such circumstances, moreover, that it is especially important to guard against the dangers of hindsight bias.") (internal citation omitted); *Dystar Textilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356, 1366-67 (Fed. Cir. 2006) ("[W]e instructed the Board to explain why 'common sense' of an ordinary artisan seeking to solve the problem at hand would have led him to combine the references.").  As this Court has explained, "core factual findings in a determination of patentability" cannot rest on the Board's "assessment of what would be . . . common sense." *In re Zurko*, 258 F.3d 1379, 1386 (Fed. Cir. 2001).  To hold otherwise would defeat the appellate review process for substantial evidence.  *Id.*

The Board provided no evidentiary support – not even a single citation to any of the references – for why a PHOSITA at the time of invention would have deemed it obvious to select the various portions of these two different references in the manner claimed in the '970 patent.  Instead, the Board simply adopted Liberty's superficial approach.  Nowhere did the Board explain how a PHOSITA would conclude that the combination of elements in these two references, published six years (Kosaka) and eight years (the Florida Guide) before Progressive filed its patent application, would have been obvious; yet, despite insurance companies continuing to issue insurance policies during the span of these

50

years, *no one created it before Progressive*. *See Alco Standard Corp. v. Tennessee Valley Authority*, 808 F.2d 1490, 1498 (Fed. Cir. 1986) (finding industry's failure to develop and commercialize a viable solution to be strong evidence of nonobviousness); *see also* A3718-23 (recognizing the commercial success of Progressive's Snapshot program and that other carriers "are following suit"); A3724-26 (same). The only explanation is impermissible hindsight.

## V.    THE BOARD ERRED IN ITS OBVIOUSNESS DETERMINATION FOR CLAIMS 6, 9-15, AND 18, ALL OF WHICH REQUIRE THE "CORRELATING" LIMITATION

The Board also erroneously determined that Kosaka and Herrod disclose the "correlating" step recited in independent claims 6 and 18. Both claims require "correlating the group data values to preset values" in a memory which "generat[es] an output data value based on the correlation," with claim 18 further requiring that the preset values be related to safety standards. A102, 2:38-40; A103, 3:1-3.

The Board's holding that Kosaka discloses the "output data value" recited in the "correlating" limitation rests on the Board's misreading of Kosaka's comparison of speed (shown in yellow as $V_o$ in Fig. 5 below) to a set value. A45-46; A126, (7):1-22. The Board points to Kosaka's system activation control part, which describes a comparison of speed to a set value that keeps Kosaka's system in an activated state. A46. Based on this comparison, the Board, without

51

substantiation, finds: "Clearly, Kosaka's system produces a *risk evaluation value* (i.e., an *output data value*) based upon the correlation between the vehicle speed and the threshold value." A46 (emphases in original) (citing A126, (7):1-22). However, just because the system is on does not mean the circuit that keeps it on generates an output. This is tantamount to finding that a circuit for an on/off switch in a computer necessarily teaches the circuitry of the rest of the computer just because the "on" position is a predicate for operation of the computer itself. Further, Kosaka's risk evaluation values *are generated by* the risk evaluation unit 42, not the system activation control part relied on by the Board. A126, (7):2:4-7.



Fig. 5

A130 (color and element labels added).

The errors in the Board's analysis are made worse by its belief that a *comparison* to a *single* preset value is a *correlation* to *multiple* preset values. *See*

A46.  In Kosaka, the system remains in an active state, when speed exceeds a

*single* preset value.  A126, (7):1-22.  In the claims, an output data value is

generated when group data values are correlated to preset ***values***; thus, the claimed

correlation to multiple values is not present.  A102, 2:37; A103, 3:1.

The Board also erred in finding that Kosaka's threshold speed value $V_0$

sufficiently discloses "preset values related to ***safety standards*** . . . " as recited in

claim 18.  A103, 3:1-2 (emphasis added).  The Board found in conclusory fashion

that "Kosaka's *speed threshold value*, used to activate risk assessment device,

would have been understood by a person of ordinary skill in the art *as related to*

*safety standards*."  *See* A46 (emphases in original).  However, there is no

disclosure in Kosaka that the threshold speed is tied to safety standards.  In fact,

Kosaka states that as an "alternative[ ]" to a threshold speed for a boat, "a system

may be used in which a signal from land is received when the moving body passes

through a gateway, and the system is placed in an operational state."  A126,

(7):1:11-14.  Passage through a "gateway" such as a boat slip or marina entrance

has nothing to do with safety standards.  Likewise, a speed threshold for

determining whether the system should remain "on" is not tied to safety standards.

## VI.   THE BOARD IMPROPERLY RELIED ON NEW GROUNDS AND EVIDENCE IN ITS OBVIOUSNESS DETERMINATION

### A.   At A Minimum, Progressive Is Entitled To A Remand To Respond To The New Rejection Grounds

The Board's cancellation of claims 1, 3, 6, 9-15 and 18 must be vacated to permit Progressive an opportunity to respond to new grounds for rejection raised for the first time in the Board's Final Written Decision.  *See Rambus Inc. v. Rea*, 731 F.3d 1248, 1255-56 (Fed. Cir. 2013) (applying law regarding new grounds for rejection to inter partes reexamination).  Pursuant to the provisions of the Administrative Procedure Act ("APA") (5 U.S.C. §§ 551-559) and this Court's precedent, the introduction of new facts to support the Board's rejections is improper and warrants remand.

The Supreme Court has made it clear that the USPTO is subject to the APA. *Dickinson v. Zurko*, 527 U.S. 150, 154 (1999); *see also Rambus*, 731 F.3d at 1255-56 (applying APA to inter partes reexamination)   Under the APA, the parties are entitled to be "fully and fairly treated" before the USPTO.  *See In re Leithem*, 661 F.3d 1316, 1319 (Fed. Cir. 2011); *In re Stepan*, 660 F.3d 1341, 1343-44 (Fed. Cir. 2011).  Accordingly, the USPTO is required to provide notice of "the matters of fact and law asserted" prior to an agency hearing.  5 U.S.C. § 554(b)(3).  Failure to adhere to these notice procedures requires vacating the Board's decision.  *See Rambus*, 731 F.3d at 1256.

54

For more than 100 years, applicants have been afforded the right to respond to new rejections raised for the first time by a reviewing board. *Ex Parte Burrowes*, 110 O.G. 599 (Comm'r Pat. 1904) ;. As this Court has explained, the determination as to whether a decision by the Board presents a new ground of rejection is whether the party "had fair opportunity to react to the thrust of the rejection." *In re Biedermann*, 733 F.3d 329, 337 (Fed. Cir. 2013). "Mere reliance by the Board on the same type of rejection or the same prior art . . . is insufficient to avoid a new ground of rejection where it propounds new facts and rationales to advance a rejection" not previously raised. *See In re Stepan Co.*, 660 F.3d at 1345.

As explained below, with respect to at least the "actuarial class" limitations of claims 1, 3, 6, 9-15, and 18, the Board's Final Written Decision relies on new facts and rationales for which Progressive never had an opportunity to respond. Remand is required to permit Progressive that opportunity.

## 1. The Board Improperly Relied on New Grounds With Respect to Kosaka's Fuzzy Logic

In its Final Written Decision, the Board improperly made and relied on new fact findings regarding Kosaka's use of fuzzy logic. A53-56. These findings form the bases of new grounds for rejection and thus require remand. *See In re Beidermann*, 733 F.3d at 338. For example, in the Final Written Decision, the Board found – for the first time – that Kosaka did not require the use of fuzzy logic, but instead could use "a common insurance table" to determine premiums.

55

A53; *see also* A51.  This finding is based on a single sentence describing Kosaka's *diving watch* – not the vehicle embodiment.  A125, (6):1:45-51; A124, (5):1:22-34.  Neither Liberty's Petition nor the Board's Institution Decision refer to the use of a common insurance table, or even cite the passage of Kosaka on which the Final Written Decision relies.  Instead, both repeatedly rely on Kosaka's "fuzzy logic deduction unit" as teaching the calculation of insurance premiums based on sensor data.  *See, e.g.,* A204; A215-19; A221-23; A3813; A3827-30; *see also* A4881-82; A5028-50.

In the Final Written Decision, the Board also improperly relied on new references that were not raised until Liberty's Reply to find that fuzzy logic was enabled in Kosaka.  *See* A50-52.  Specifically, the Board relied on a string of references concerning fuzzy logic, all of which were identified by Liberty for the first time at the reply stage in O'Neil's improper supplemental declaration.  A52; A52, n. 13; A4546-48, ¶ 24.  Relying on these new references, the Board reasoned that "applying fuzzy logic to insurance classification rating and underwriting was well known at the time of invention."  A63 (citing A4546-48, ¶ 24).  The Board's reliance on these new references alone warrants remand so that Progressive may present rebuttal articles and testimony.  *See In re Beidermann*, 733 F.3d at 338 ("Ordinarily, citation by the board of a new reference, such as the dictionary in this

case, and reliance thereon to support a rejection, will be considered as tantamount to the assertion of a new ground of rejection.").

### 2. The Board Improperly Relied On New Grounds With Respect To "Actuarial Class"

The Board's finding of obviousness with respect to claims 1, 3, 6, 9-15, and 18 should be vacated and remanded due to the Board's reliance on new grounds in finding that Herrod discloses the claimed "actuarial class" limitations. The Board relied upon O'Neil's improper supplemental declaration as to the understanding of Herrod from the perspective of a PHOSITA along with the ASOP document. A31-40 (citing A4537-41, ¶¶ 7-13; A4556-64, ¶¶ 43-47, 49, 51, 53-54, 56). Under this rationale, the Board introduced new factual findings to support O'Neil, and presented new inferences not raised in Liberty's Petition or offered from a PHOSITA's perspective. A37-40. Yet, before the Board's Final Written Decision issued, Progressive had no notice of this basis for an obviousness rejection. By making and relying on previously unraised factual findings and inferences, the Board improperly relied on a new ground of rejection. *In re Stepan*, 660 F.3d at 1344.

While the Institution Decision acknowledged that Herrod "must be read in light of the knowledge of [a PHOSITA]," the Board made no factual findings with respect to this knowledge. *See* A3825. In fact, Liberty elected not to present any declaration testimony regarding Herrod's teachings at the petition stage. *See*

A3561, ¶ 14; A3594-95, ¶ 13; A216-17.  Only after Progressive pointed out the

already-apparent flaws in Herrod did Liberty present ten pages of "supplemental"

testimony explaining, for the first time, how Herrod's four-page disclosure should

be read with regard to "actuarial class" in light of the purported knowledge of a

PHOSITA, the '970 patent's background section, and ASOP.  A4555-64.

Although the Board's Final Written Decision characterizes O'Neil's testimony as

being "consistent with Herrod . . . and other evidence on the record with respect to

the level of ordinary skill in the art" (A38-39), the basis of rejection is wholly

different from that presented in Liberty's Petition and the Institution Decision.

*Compare* A37-40 (analyzing expected loss costs) *with* A3823-27 (containing no

mention of expected loss costs) *and* A214-15 (same).

The change in the Board's position on "actuarial class" is even more striking

than the change in the USPTO's position that was held to constitute a new grounds

for rejection in *In re Leithem*, 661 F.3d at 1319-20.  In *Leithem*, the examiner

rejected the claim directed to a personal hygiene device based on its finding that

the prior art disclosed fluff pulp.  *Id.* at 1320.  The Federal Circuit held that the

Board of Patent Appeals and Interferences's finding that the same prior art

reference taught pulp "which may be fluffed" – as opposed to already fluffed pulp

– presented a new grounds of rejection.  *Id.*  Here, the Board's Final Written

Decision presents a new finding that Herrod discloses an expected loss, which is

based on new supplemental testimony and new references, including ASOP, raised after Progressive's Response.[18]  A37-40.  Accordingly, just as in *Leithem*, "fairness dictates" that this case be remanded so that Progressive may have an opportunity to respond.  *See* 661 F.3d at 1320.

## B.    The Board Erred By Not Excluding Evidence That Should Have Previously Been Presented In Liberty's Petition

The Board abused its discretion in admitting evidence presented for the first time with Liberty's reply to find the '970 patent claims obvious.  *See, e.g.*, *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 409-10 (1st Cir. 1985) (holding that the district court abused its discretion by admitting reply brief containing new expert affidavit without allowing opposing party to file rebuttal, noting the district court had two options, "[I]t could strike the brief or grant plaintiff as the nonmoving party the opportunity to respond to it.").

Liberty offered no declaration testimony to show how Herrod's behavioral classes would be interpreted as an actuarial class by a PHOSITA when it filed its Petition.  A3561, ¶ 14 (identifying that O'Neil did not consider Herrod for her declaration).  This stands in stark contrast to Liberty's numerous references to

---

[18] It is irrelevant that the ASOP document was submitted by Progressive to support the validity of its claims (A4424).  *See In re Stepan*, 660 F.3d at 1345 (prohibiting the Board from rejecting a patentee declaration as ineffective even though it was only addressed by the patentee).

O'Neil's opinions as to a PHOSITA's understanding of the other prior art submitted with Liberty's Petition. *See, e.g.*, A215 ("P[H]OSITA would have recognized that Kosaka . . . ."); A231 ("Florida Guide confirms that a POSITA would know that . . . ."). Nothing prevented Liberty from proffering such testimony when it challenged the patent. Rather, Liberty made a conscious decision not to do so, and instead laid in waiting for Progressive to demonstrate how the claims were patentable over Herrod. Only then, at a time when Progressive could not respond, did Liberty improperly introduce new evidence as to a PHOSITA's understanding of Herrod. A4534; A4555-64, ¶¶ 41-56. The Board denied Progressive's motion to strike Liberty's improper new supplemental declaration, and, in fact, instead relied heavily on that declaration in its Final Written Decision. A31-40 (citing A4537-41, ¶¶ 7-13; A4556-64, ¶¶ 43-47, 49, 51, 53-54, 56). This prejudiced Progressive, and as a result, this Court is left with a skewed and incomplete picture of the patentability of the '970 patent.

The Board's reliance on the new PHOSITA evidence presented in O'Neil's untimely supplemental declaration is contrary to the Board's strict rules regarding introduction of evidence. To prove obviousness, Liberty was required to set forth in its Petition all the bases for its position that the claims of the '970 patent were unpatentable, including all the supporting evidence. *See* 37 C.F.R. § 42.304(b)(4)-

(5).[19]  It did not do so.  At the time that Liberty filed its Petition, it believed that

there was sufficient support for its obviousness positions without having to rely on

a PHOSITA's understanding of Herrod.  The disclosure of Herrod has not

changed, so Liberty should not now be permitted to argue belatedly that it needs to

rely on the knowledge of a PHOSITA to explain the teachings of this reference.

The USPTO's Trial Practice Guide further confirms the impropriety of the

Board basing its decision on issues and evidence improperly presented for the first

time in Liberty's reply.  *See* Office Patent Trial Practice Guide, 77 Fed. Reg.

48,756, at 48,767 (Aug. 14, 2012) (hereinafter "PTAB Practice Guide").  The

Practice Guide states that the Board will not even consider "new issue[s] or

belatedly present[ed] evidence" in a reply and cites the presentation of "new

evidence necessary to make out a *prima facie* case" as one example of improper

new reply evidence.  *Id.*

Here, not only did the Board consider Liberty's new PHOSITA evidence

and argument, but also the Board repeatedly relied on it to find the "actuarial class"

limitation of claims 1, 3, 6-15, and 18 disclosed in the prior art.  *See* A31-40 (citing

[19] A limited exception is permitted under 37 C.F.R. § 42.223(b), which allows for
the introduction of supplemental evidence, if such introduction is "in the
interests-of-justice."  In order to submit such evidence, a party must seek
authorization to file a motion, which must also demonstrate why the information
"reasonably could not have been obtained earlier."  *Id.*

A4537-41, ¶¶ 7-13; A4556-64, ¶¶ 43-47, 49, 51, 53-54, 56).  The Board relied on

O'Neil's new supplemental testimony regarding Herrod and ASOP to conclude

that "one with ordinary skill in the art would have known to analyze the monitored

vehicle data collected by Herrod's device to determine any associated expected

loss costs with such data, in order to classify drivers into groups relevant to

insurance rating" that O'Neil calls actuarial classes.  *See* A38-40 (citing A4540-41,

¶ 12; 4556-59, ¶¶ 43, 45-47).  The error in allowing this testimony is particularly

harmful here, as it was presented when Progressive no longer had a meaningful

opportunity to address these arguments and present opposing evidence and

testimony.[20]

Because Liberty's proffered evidence was untimely and should have been

presented with its Petition, this Court should reverse the Order allowing ¶¶ 43,

45-47, 49, and 51 of O'Neil's second declaration.  *See* A4882-83.  Because the

Board (over Progressive's objection) refused to strike ¶¶ 43, 45-47, 49, and 51 of

O'Neil's supplemental declaration, and this testimony was necessary for its

---

[20] While Progressive filed observations related to O'Neil's "rebuttal" declaration,
the observations were not a sur-reply as observations cannot exceed one short
paragraph, include arguments, or new evidence.  The USPTO's Trial Practice
Guide is clear that observations "should be in the form of: "In exhibit __, on page
__, lines__, the witness testified __. This testimony is relevant to the __ on page
__ of __. The testimony is relevant because __."  PTAB Practice Guide at 48,767-
68.

decision cancelling claims 1, 3, 6, 9-15, and 18, the Board's Final Written Decision should be vacated and the case remanded for further consideration absent this improper new evidence.

## CONCLUSION

For the above reasons, Progressive respectfully requests this Court reverse the Board's holding that claims 1, 3-6, and 9-18 of the '970 patent are invalid. At a minimum, the Court should vacate the Board's holding that claims 1, 3-6, and 9-18 are invalid and remand for further proceedings and consideration before the Board.

October 31, 2014                     Respectfully submitted,

                                     */s/ Gary M. Ropski*
                                     Gary M. Ropski
                                     Cynthia A. Homan
                                     James A. Collins
                                     Laura A. Lydigsen
                                     Nicholas A. Restauri
                                     BRINKS GILSON & LIONE
                                     455 N. Cityfront Plaza Drive
                                     Suite 3600
                                     Chicago, Illinois 60611

                                     *Counsel for Appellant Progressive
                                     Casualty Insurance Co.*

# ADDENDUM

# TABLE OF CONTENTS
## TO ADDENDUM

Final Written Decision 35 U.S.C. § 328(a) and 37 C.F.R. § 42.73 . . . . . . .A1-A72

U.S. Patent No. 6,064,970 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A86-A103

Decision Institution of Covered Business Method Patent Review
37 C.F.R. § 42.208 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A3803-A3837

Trials@uspto.gov                                              Paper 66
571-272-7822                                    Entered:  January 23, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

LIBERTY MUTUAL INSURANCE CO.
Petitioner

v.

PROGRESSIVE CASUALTY INSURANCE CO.
Patent Owner
_____

Case CBM2012-00002
Patent 6,064,970
_____

Before JAMESON LEE, JONI Y. CHANG, and MICHAEL R. ZECHER,
*Administrative Patent Judges*.

CHANG, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 328(a) and 37 C.F.R. § 42.73*

Case CBM2012-00002
Patent 6,064,970

## I.    INTRODUCTION

Liberty Mutual Insurance Company ("Liberty") filed a petition on September 16, 2012, requesting a covered business method patent review of U.S. Patent No. 6,064,970 ("the '970 patent") pursuant to section 18(a) of the Leahy-Smith America Invents Act ("AIA").[1]  Paper 1 ("Pet."). Progressive Casualty Insurance Company ("Progressive") filed a patent owner preliminary response.  Paper 8 ("Prelim. Resp.").  Taking into account Progressive's preliminary response, the Board determined that the information presented in Liberty's petition demonstrated that it was more likely than not that the challenged claims are unpatentable.  Pursuant to 35 U.S.C. § 324, the Board instituted this trial on January 25, 2013, as to claims 1, 3-6, and 9-18 of the '970 patent.  Paper 10 ("Dec.").

During the trial, Progressive filed a patent owner response (Paper 27, "PO Resp."), and Liberty filed a reply to the patent owner response (Paper 33, "Reply").  An oral hearing was held on October 21, 2013.[2]

The Board has jurisdiction under 35 U.S.C. § 6(c).  This decision is a final written decision under 35 U.S.C. § 328(a) as to the patentability of claims 1, 3-6, and 9-18 of the '970 patent.  We hold that claims 1, 3-6, and 9-18 of the '970 patent are unpatentable under 35 U.S.C. § 103(a).

---

[1] Pub. L. 112-29, 125 Stat. 284, 329 (2011).

[2] The oral arguments for the instant trial and for CBM2012-0004 were merged and conducted at the same time.  A transcript of the oral hearing is included in the record as Paper 64 ("Tr.").

2

Case CBM2012-00002
Patent 6,064,970

## A. Related Proceedings

Liberty indicates that the '970 patent was asserted against it in *Progressive Casualty Ins. Co. v. Safeco Ins. Co. of Ill.,* No. 1:10-cv-01370 (N.D. Ohio).  Pet. 5.  The '970 patent also is subject to a covered business method patent review in CBM2012-00004.  A final written decision in CBM2012-00004 is entered concurrently with this decision.

## B. The '970 Patent

The '970 patent relates to a method for determining an automobile insurance premium based on data collected from monitored motor vehicle operational characteristics and operator's driving characteristics.  Ex. 1001, Abs.; 3:61-66.  The method assesses vehicle usage by collecting and recording monitored vehicle data, such as miles driven, types of roads driven, speeds driven, rate of acceleration, and rate of braking.  *Id.* at 4:27-29; 6:29-43.  According to the '970 patent, the method determines insurance costs more precisely and fairly, because new actuarial classes generated based on actual usage of the vehicle and driver behavior are better predictors of loss.  *Id.* at 4:27-29; 4:53-56.

Claims 1, 4-6, and 18 are independent.  Claim 3 depends directly from claim 1; claims 9-15 depend ultimately from claim 6; and claims 16 and 17 depend directly from claim 5.  Claim 4, reproduced below, is illustrative of the claimed subject matter of the '970 patent.

3

Case CBM2012-00002
Patent 6,064,970

> 4.  A method of insuring a vehicle operator for a selected period based upon operator driving characteristics during the period, comprising, steps of:
>
>> generating an initial operator profile;
>>
>> generating an insured profile for the vehicle operator prior to any monitoring of any of the vehicle operator's driving characteristics wherein the insured profile comprises coverage information, including limits and deductibles, for determining a base cost of vehicle insurance for the vehicle operator;
>>
>> monitoring the vehicle operator's driving characteristics during the selected period; and
>>
>> deciding a total cost of vehicle insurance for the selected period based upon the vehicle operator's driving characteristics monitored in that selected period and the base cost of insurance.[3]

### C. Covered Business Method Patent

Upon consideration of Liberty's contentions in the petition and Progressive's arguments in the preliminary response, the Board, in the Decision on Institution, determined that the '970 patent is a covered business method patent as defined in section 18(a)(1)(E) of the AIA and 37 C.F.R. § 42.301, because at least one claim of the '970 patent is directed to a covered business method.  Dec. 3-8.  Accordingly, the Board concluded that the '970 patent is eligible for a covered business method patent review.  *Id.*

In its patent owner response, Progressive argues that the Board must conduct a claim-by-claim analysis and determine that every challenged

---

[3] Ex. 1001, Reexam. Cert., 1:50-65 (original emphases and bracketed matters omitted).

4

Case CBM2012-00002
Patent 6,064,970

claim is directed to a covered business method, before it is authorized, under
section 18(a)(1)(E) of the AIA, to review all of the challenged claims.
PO Resp. 2-3, n.1.  Progressive asserts that the Board exceeded its "statutory
authority to institute review of any patent claim which the Board has not
determined to be directed to a covered business method."  *Id.*

     Progressive's argument is based on an erroneous statutory
construction that interprets the word "patent" in the statutory provision on
what is subject to review as "claim."  We decline to adopt such an
interpretation.

     As in any statutory construction analysis, we begin with the language
of the statute.  *In re Swanson*, 540 F.3d 1368, 1374-75 (Fed. Cir. 2008);
*Duncan v. Walker*, 533 U.S. 167, 172 (2001); *Crandon v. United States*, 494
U.S. 152, 158 (1990).  "In the absence of a clearly expressed legislative
intention to the contrary, the language of the statute itself must ordinarily be
regarded as conclusive."  *United States v. James*, 478 U.S. 597, 606 (1986)
(internal quotation marks and citations omitted).  "It is well settled law that
the plain and unambiguous meaning of the words used by Congress prevails
in the absence of a clearly expressed legislative intent to the contrary."
*Hoechst AG v. Quigg*, 917 F.2d 522, 526 (Fed. Cir. 1990).

     Section 18(d)(1) of the AIA defines the term "covered business
method patent" to mean (emphases added):

> [A] *patent* that claims a method or corresponding apparatus for
> performing data processing or other operations used in the
> practice, administration, or management of a financial product

5

Case CBM2012-00002
Patent 6,064,970

or service, except that the term does not include *patents* for technological inventions.

If Congress intended to limit the availability of the covered business method patent review on a claim-by-claim basis, as urged by Progressive, it could have used the term "claim" rather than "patent."  Notably, when specifying the subject matter for review, Congress could have used the language "a *claim* that is directed to a method or corresponding apparatus" rather than "a *patent* that claims a method or corresponding apparatus." Section 18(d)(1) of the AIA sets forth a single threshold based on just one claim—the satisfaction of which qualifies an entire patent as eligible for review—rather than a test that must be applied on a claim-by-claim basis to justify review of each claim.[4]  Therefore, a *patent* is eligible for a covered business method patent review if the subject matter of at least one claim is directed to a covered business method.  Nothing in the legislative history, or other parts of the AIA, requires us to deviate from the plain meaning of the definition set forth in section 18(d)(1) of the AIA, as proposed by Progressive.  Moreover, Progressive has not identified any statutory provision or legislative history that requires "each" claim for which trial is instituted to meet the test for a covered business method patent.

Further, Progressive provides no meaningful explanation as to why the Board's analysis—e.g., "[d]etermining a cost of vehicle insurance is a

---

[4] *See also* Transitional Program for Covered Business Method Patents – Definitions of Covered Business Method Patent and Technological Invention; Final Rule, 77 Fed. Reg. 48734, 48736 (Aug. 14, 2012).

6

Case CBM2012-00002
Patent 6,064,970

financial problem rather than a technical problem" (Dec. 8)—was incorrect. PO Resp. 2-3, n. 1.

For the foregoing reasons, we disagree with Progressive that the Board exceeded its statutory authority to institute a covered business method patent review as to claims 1, 3, 5-6, and 9-18 of the '970 patent.

### D. Prior Art Relied Upon

Liberty relies upon the following prior art references:

Kosaka      JP H4/182868      June 30, 1992      (Ex. 1004)
Herrod      GB 2 286 369 A    Aug. 16, 1995      (Ex. 1007)

FLA. DEPT. OF INS., 1988 Automobile Insurance Shoppers' Guide (1988) ("Florida Guide") (Ex. 1005)

N.Y. STATE INS. DEPT., 1995 Consumers Guide on Automobile Insurance (Downstate) (1995) ("New York Guide") (Ex. 1006)

*An Interest in Black Magic – Motor Technology*, INS. AGE (Jan. 1, 1994) ("Black Magic") (Ex. 1008)

### E. Grounds of Unpatentability

The Board instituted the instant covered business method patent review based on the following grounds of unpatentability:

| Claims | Basis | References |
|---|---|---|
| 4, 5, 16, and 17 | § 103 | Kosaka and Florida Guide |
| 1, 3, 11, 12, 14, and 15 | § 103 | Kosaka, Black Magic, and Herrod |
| 6, 9, 10, 13, and 18 | § 103 | Kosaka and Herrod |

7

Case CBM2012-00002
Patent 6,064,970

## II.   ANALYSIS

### A.  Claim Construction

In a covered business method patent review, claim terms are given their broadest reasonable construction in light of the specification of the patent in which they appear.  37 C.F.R. § 42.300(b).  Under the broadest reasonable construction standard, claim terms are given their ordinary and customary meaning as would be understood by one of ordinary skill in the art in the context of the entire disclosure.  *In re Translogic Tech. Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).  In that regard, we must be careful not to read limitations from a particular embodiment appearing in the written description into the claim if the claim language is broader than the embodiment.  *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993).

### 1.  *"actuarial class" (claims 1, 3, 6, 9-15, and 18)*

Claim 1 recites "generating [actuarial] classes of insurance, which group operators or vehicles having a similar risk characteristic."  Liberty proposes that the claim term "actuarial class" should be construed as "a combination/group/groupings related to loss/risk/safety which are determined from classifications/characteristics representative of motor vehicle operational characteristics and driver behavior for which data is gathered."  Pet. 21-22 (citing Ex. 1003, 937-38).  Progressive counters that the claim term should be construed as "a grouping of risks (*i.e.*, insureds) with similar risk characteristics and expected insurance claims loss (or insurance costs)."  PO Resp. 12; *see also id*. at 9-13.  Progressive argues that

8

Case CBM2012-00002
Patent 6,064,970

its proposed construction is consistent with the specification and the understanding of one of ordinary skill in the art. *Id*. at 9-10 (citing Ex. 1001, 4:52-54 ("new and more precise actuarial classes are considered to be better predictors of loss because they are based on actual use of the vehicle and the behaviors demonstrated by the driver.")).

Although we agree with Progressive that, in light of the specification and in the context of vehicle insurance, actuarial classes are generated based on expected loss, we are not persuaded that the construction proposed by either Liberty or Progressive is the broadest reasonable interpretation of the claim term "actuarial class." The phrases that contain the "/" symbol in Liberty's proposed construction are subject to multiple interpretations, which cause confusion. For instance, replacing "/" symbol with the word "or" would render the construction too broad, and replacing "/" symbol with the word "and" would render the construction too narrow. Further, as acknowledged by Liberty during the oral hearing, "a combination/ group/groupings" may simply be read as "grouping." Tr. 79:9-80:6.

On the other hand, Progressive's proposed construction would render the claim limitation "having a similar risk characteristic" recited in claim 1 insignificant, if not wholly superfluous. Progressive's proposed construction also would redefine the term "risks" as "insureds" to exclude a grouping of vehicles. Such an interpretation would be inconsistent with the claim language "generating [actuarial] classes of insurance, which group operators or vehicles," and inconsistent with the specification of the '970 patent. *See, e.g.*, Ex. 1001, 1:28-35 (the "current system of insurance creates

9

Case CBM2012-00002
Patent 6,064,970

groupings of vehicles and drivers (actuarial classes) based on the following
types of classifications.  Vehicle:  Age, manufacturer, model; and value.");
*id*. at 4:30-52 ("Examples of possible actuarial classes developed from
vehicle provided data.")

Progressive, through its arguments regarding the asserted grounds of
unpatentability based in part on Herrod, attempts to import limitations into
the construction of the claim term "actuarial class"—requiring *homogeneity*
as pertaining to acceleration data from different *locations*, and the risk
characteristics of all drivers resident in the *household*.  PO Resp. 25-33.
We decline to accept those additional requirements as part of the broadest
reasonable interpretation, because it would import limitations into the
claims, and it would be inconsistent with the specification of the '970 patent.
For instance, some of the actuarial classes provided in the specification are
based on data that are not associated with any location or household—
e.g., "driving time in minutes by each driver of the insured vehicle,"
"number of minutes driving at high/low risk times," and "number of sudden
acceleration situations."  Ex. 1001, 4:30-52.  It is well established that if a
feature is not necessary to give meaning to what the inventor means by a
claim term, it would be "extraneous" and should not be read into the claim.
*Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249
(Fed. Cir. 1998); *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*,
849 F.2d 1430, 1433 (Fed. Cir. 1988).

Moreover, we decline to import those limitations into the claims in
absence of a special definition set forth in the specification.  An inventor

10

Case CBM2012-00002
Patent 6,064,970

may rebut the presumption that a claim term be given its ordinary meaning by providing a definition of the term in the specification with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). Here, the parties have not alleged that the inventor of the '970 patent acted as his own lexicographer and provided a special definition in the specification for the claim term "actuarial class" that is different from its recognized meaning to one with ordinary skill.

In light of the claims and specification of the '970 patent, we construe the claim term "actuarial class" broadly, but reasonably, as "a grouping related to expected loss, which is determined from motor vehicle characteristics or driving characteristics."

2. *"initial operator profile" (claim 4)*

Liberty proposes to construe the claim term "initial operator profile" as "initial files or information with respect to the operator or the insuring thereof." Pet. 21 (citing Ex. 1003, 756). Progressive counters that Liberty's proposed construction is overly broad and fails to give meaning to the word "profile." PO Resp. 13-14. According to Progressive, the claim term should be construed as "an initial collection of actual driving data associated with a driver that distinguishes that driver from other drivers and is related to insurance." *Id*.

We note that the specification of the '970 patent does not assign or suggest a particular definition for the term "initial operator profile." In fact, that claim term, in its entirety, does not appear in the specification other than

11

Case CBM2012-00002
Patent 6,064,970

in the claims.  Progressive cites, instead, to a discussion of "operator

profiles" in the specification (*id*):

> It is yet another object of the present invention to generate
> actuarial classes and *operator profiles* relative thereto based
> upon actual driving characteristics of the vehicle and driver, as
> represented by the monitored and recorded data elements for
> providing a more knowledgeable, enhanced insurance rating
> precision.

Ex. 1001, 5:28-33 (emphasis added).

The plain and ordinary meaning of the term "profile" is "a set

of characteristics or qualities that identify a type or category of person

or thing."[5]  Nothing in the specification or the plain and ordinary

meaning of the term "profile" precludes two drivers having the same

initial operator profile.  Therefore, we decline to import the limitation

"that distinguishes that driver from other drivers" into the claims, as

suggested by Progressive.  *See Renishaw*, 158 F.3d at 1249.

In the light of the specification, we construe the claim term

"initial operator profile" broadly, but reasonably, as "an initial

collection of information associated with an operator that is related to

motor vehicle characteristics or driving characteristics."

   3.  *"insured profile"* (claim 4)

Claim 4 recites "wherein the *insured profile* comprises coverage

information, including limits and deductibles, *for determining a base cost of*

_____

[5] RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 1053 (9th ed. 1999).

12

Case CBM2012-00002
Patent 6,064,970

*vehicle insurance for the vehicle operator*."  Claim 5 recites "determining an *initial insured profile* for the operator of the vehicle prior to any monitoring of any data elements representative of an operating state of the vehicle or an action of the operator of the vehicle."

Liberty proposes to construe the claim term "initial insured profile" the same as "initial operator profile" to mean "initial files or information with respect to the operator or the insuring thereof."  Pet. 20 (citing Ex. 1003, 756).  Although both terms are similar, we nevertheless decline to give two different claim terms the same construction.  *See CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use [of] different terms in the claims connotes different meanings.").

Progressive argues that the claim term "insured profile" should be construed as "basic insurance information pertaining to the insured *from which an initial insurance cost is determined*."  PO Resp. 14 (emphasis added).  Progressive's proposed construction, however, would render the claim limitation "for determining a base cost of vehicle insurance" recited in claim 4, and the word "initial" in the claim term "*initial* insured profile" recited in claim 5 insignificant, if not wholly superfluous.

Consistent with the language of claim 4, the specification of the '970 patent provides:  "This insured profile includes the information about [insurance] coverages including limits and deductibles, which are necessary for establishing the appropriate cost of insurance of the subject insured." Ex. 1001, 10:36-39.

13

Case CBM2012-00002
Patent 6,064,970

In the light of the claims and specification, we construe the claim term "insured profile" broadly, but reasonably, as "insurance information pertaining to the insured and the insured vehicle," which includes, for example, insurance coverage information, such as limits and deductibles.

   4. *"cost of insurance" and "base cost of insurance" (claims 1, 4, and 5)*

Liberty contends that the claim term "cost of insurance" should be construed as "a/one or more or all cost(s) associated with insurance of the vehicle, including, but not limited to, a cost to the insured and/or insurer/underwriter associated with the insurance." Pet. 22 (citing Ex. 1003, 758-61). On the other hand, Progressive argues that, in the context of the claim, the word "cost" refers to the *insured's* cost (i.e., the premium), and not the *insurer's* cost. PO Resp. 14-15. We agree with Progressive, as such a construction would be more consistent with the specification and claims of the '970 patent.

The specification of the '970 patent provides that "the following information would produce a unique *vehicle insurance cost*. . . . A change to any of this information would result in a different *premium* being charged, if the change resulted in a different actuarial class for that variable." Ex. 1001, 1:56-2:16 (emphases added). Claim 5 recites "identifying a surcharge or discount to be applied to the base cost [of vehicle insurance]," and "producing a final cost of vehicle insurance for the selected period from the base cost and the surcharge or discount." In the context of the specification and claims, "cost of insurance" is the premium paid by the policyholder for

14

Case CBM2012-00002
Patent 6,064,970

the insurance coverage.  The plain and ordinary meaning of the term
"premium" is the amount paid in installment by a policyholder for coverage
under a contract.[6]

Therefore, in light of the specification and claims, we construe the
claim term "cost of insurance" as "the amount paid or to be paid by the
policyholder for insurance coverage of a selected time period under the
policy contract."  Similarly, in the light of the specification, *see, e.g.*,
Ex. 1001, Abs., we construe the claim term "base cost of insurance" as
"the *initial* amount paid or to be paid by the policyholder for insurance
coverage under the policy contract, during a time period, before any
surcharge or bonus is applied."

   5. *"safety standard" (claims 5, 10, 11, 13, 14, and 16-18)*

Liberty proposes that the claim term "safety standard" be construed
as "value/criteria associated with the promotion of safety/prevention of
risk/loss/injury."  Pet. 22 (citing Ex. 1003, 761).  Progressive does not
dispute Liberty's proposed construction.  The specification of the '970
patent does not provide a special definition.

The ordinary meaning of the claim term "safety standard" includes
a measure or criterion of exemption from injury, danger, or loss.[7]  In the
context of the vehicle insurance, Liberty's proposed interpretation is broad,

---

[6] RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 1041 (9th ed. 1999).

[7] RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 1157 (9th ed. 1999).

15

Case CBM2012-00002
Patent 6,064,970

consistent with that ordinary meaning, and consistent with the specification as it would be understood by one of ordinary skill in the art. *See, e.g.*, Ex. 1001, 8:44-46 ("Select[ed] ones of the plurality of data elements are recorded when the ones are determined to have an identified relationship to the safety standards.").

We, therefore, adopt Liberty's proffered construction as the broadest reasonable construction consistent with the specification. But we further clarify that the "/" symbol should be replaced with the word "or"—"value or criteria associated with the promotion of safety or prevention of risk, loss, or injury."

## B. *The Level of Ordinary Skill in the Art*

On the record before us, the evidence shows that the level of ordinary skill in the art is high.[8] We also note that a hypothetical person of ordinary skill in the art possesses ordinary skill both in the determination of insurance premiums and in telematics. PO. Resp. 20-22. Notably, conventional insurance schemes that use *actuarial classes* to determine vehicle insurance

---

[8] For instance, Liberty submits that a person of ordinary skill in the art as to insurance pricing would have at least a Bachelor of Science ("B.S.") in Mathematics, or equivalent, with at least five years of experience in the insurance industry setting premiums for auto insurance, and as an associate in the Casualty Actuarial Society. Ex. 1009 ¶ 17. Liberty also provides that a person of ordinary skill in the art as to telematics data would have at least a B.S. degree in electrical engineering, computer engineering, computer science, or the equivalent thereof, and at least one to two years of experience with vehicle telematics systems. Ex. 1012 ¶ 17.

16

Case CBM2012-00002
Patent 6,064,970

costs were well known in the art at the time of the invention.  *See, e.g.*,
Prelim. Resp. 13-14; 39; PO Resp. 22 (stating one of ordinary skill in the art
"would have had knowledge of multi-variant analysis of risk classifications
. . . [and] actuarial standards applicable to risk classification systems").

We agree with Progressive that the Florida Guide and New York
Guide, cited by Liberty, reflect conventional or basic knowledge of one with
ordinary skill in the art, and include the conventional insurance
determination methods disclosed in the background section of the '970
patent.  Prelim. Resp. 13-14 (stating the Florida and New York Guides
"discuss the same subject matter (*i.e.*, the existence of traditional actuarial
classes) that . . . is disclosed in the background section of the '970 patent");
*id.* at 39 (stating the cited portions of the Florida Guide are "essentially
identical to the prior art knowledge disclosed in columns 1 and 2 of the '970
patent").  We conclude that the background section of the '970 patent
(Ex. 1001, 1:17-2:37) reflects the level of ordinary skill in the art.
Therefore, one with ordinary skill in the art would have had a thorough
understanding of using the principle of *actuarial classes* to determine
vehicle insurance costs.

The '970 patent also indicates that the electronic motor vehicle control
and operating systems were known in the art at the time of invention, and
those systems could be modified readily to obtain the desired types of
information relevant to determine the cost of insurance.  Ex. 1001, 3:25-28.
Indeed, Liberty's expert, Mr. Scott Andrew, testifies that "several companies
had developed vehicle telematics systems that measured vehicle data, such

17

Case CBM2012-00002
Patent 6,064,970

as speed, acceleration, time of day, etc.," and these "systems commonly included in-vehicle data monitoring devices that would monitor the data, store it, and/or transmit it to a remote location outside of the vehicle." Ex. 1012 ¶ 20. As noted in the '970 patent, vehicle tracking systems— those that used communication links with satellite navigation systems for providing information describing a vehicle's location based upon navigation signals—were also well known in the art. Ex. 1001, 3:28-32. The '970 patent further provides that it was known in the art to detect and record seatbelt usage to assist in determination of the vehicle insurance costs. Ex. 1001, 2:66-3:2 (citing U.S. Patent No. 4,667,336, Abs. ("a system for detecting and recording each time a seat belt is used [and depending] on the level of seat belt usage the driver earns discounts on car insurance premiums.")). Therefore, one with ordinary skill in the art would have possessed the knowledge of determining insurance premiums using monitored vehicle data.

In determining the knowledge level of one with ordinary skill in the art, we note that various factors may be considered, including "type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field." *In re GPAC, Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995) (citing *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.,* 807 F.2d 955, 962 (Fed. Cir. 1986)). We also recognize that the knowledge of one with ordinary skill in the art would have included the basic principles, standards, and practices of insurance premium

18

Case CBM2012-00002
Patent 6,064,970

determination—e.g., Risk Classification Statement of Principles of the
American Academy of Actuaries (Ex. 2012), Actuarial Standard of Practice
No. 12, Concerning Risk Classification, issued by the Actuarial Standards
Board (Ex. 2020), Interpretative Opinion 3:  Professional Communications
of Actuaries and Interpretative Opinion 4:  Actuarial Principles and Practices
(Ex. 1023).  Ex. 2010 ¶ 16; Ex. 2020 ¶ 5.

### C. Principles of Law

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the
differences between the claimed subject matter and the prior art are such that
the subject matter, as a whole, would have been obvious at the time the
invention was made to a person having ordinary skill in the art to which said
subject matter pertains.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406
(2007).  The question of obviousness is resolved on the basis of underlying
factual determinations including:  (1) the scope and content of the prior art;
(2) any differences between the claimed subject matter and the prior art;
(3) the level of skill in the art; and (4) where in evidence, so-called
secondary considerations.  *Graham v. John Deere Co.*, 383 U.S. 1, 17-18
(1966).

We analyze the instituted grounds of unpatentability in accordance
with the above-stated principles.  We also recognize that prior art references
must be "considered together with the knowledge of one of ordinary skill in
the pertinent art."  *Paulsen*, 30 F.3d at 1480.  Moreover, "it is proper to take
into account not only specific teachings of the reference but also the

19

Case CBM2012-00002
Patent 6,064,970

inferences which one skilled in the art would reasonably be expected to draw therefrom." *In re Preda*, 401 F.2d 825, 826 (CCPA 1968). That is because an obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, 550 U.S. at 418; *see also Translogic*, 504 F.3d at 1259.

### D. Claims 4, 5, 16, and 17

Liberty asserts that claims 4, 5, 16, and 17 are unpatentable under 35 U.S.C. § 103(a) over the combination of Kosaka and Florida Guide. Pet. 28, 41-51, 65, 66. In support of that asserted ground of unpatentability, Liberty provides explanations as to how each claim limitation is met by the combination of the cited prior art references and a rationale for combining the references. *Id*. Liberty also submits declarations of Ms. Mary L. O'Neil (Ex. 1009) and Mr. Andrews (Ex. 1012) to support its positions.

Upon review of Liberty's petition and supporting evidence, as well as Progressive's response and supporting evidence, we determine that Liberty has demonstrated, by a preponderance of the evidence, that claims 4, 5, 16, and 17 are unpatentable over the combination of Kosaka and Florida Guide.

### 1. Florida Guide

The Florida Guide is an automobile insurance shoppers' guide that is designed to help insurance policyholders control the cost associated with

20

Case CBM2012-00002
Patent 6,064,970

automobile insurance.  Ex. 1008, 2.[9]  According to the Florida Guide, all drivers in the state of Florida must carry a minimum amount of property damage liability coverage in addition to the required personal injury protection coverage.  *Id.* at 3.  The cost of auto insurance for the policyholder may vary, based on factors such as the type of coverage the policyholder selects, the liability limits and deductibles, and the resident location of the policyholder's car.  *Id.* at 11, 13.  For example, if the policyholder selects a high liability limit and a low deductible, the auto insurance premium is likely to be higher.  *Id.* at 11.  Different premiums are charged in different areas because of variation in frequency of accidents, medical expenses, and repair cost.  *Id.* at 13.

   *2. Kosaka*

   Kosaka discloses an insurance premium determination device that increases or decreases insurance premiums by determining premium changes continually "through the detection of [vehicle and driver] states that lead to risk in the insurance customer."  Ex. 1004, p. 2; col. 1:54-col. 2:3; col. 2:43-52.[10]  Kosaka's insurance premium determination device employs a risk evaluation device for evaluating risk associated with the vehicle and driver.

---

[9] All references to the page numbers in Florida Guide refer to the original page numbers in the bottom, right corner.

[10] Kosaka is a Japanese Patent Application Publication.  The citations to Kosaka are to the Certified English-Language Translation provided by Liberty in Exhibit 1004.  All references to the page numbers in Kosaka refer to those numbers that appear on the top center of each page.

21

Case CBM2012-00002
Patent 6,064,970

It also "allows risk evaluations that change from hour to hour during travel to be reflected in the insurance premium." *Id*. at p. 7, col. 2:23-25.

Figure 1 of Kosaka, reproduced below, illustrates one of Kosaka's embodiments directed to an insurance premium determination system:



As shown in Figure 1, external sensor 1 and internal sensor 2 detect the states of the driver and vehicle that contribute to risk (e.g., excessive speed). *Id*. at p. 3, col. 1:4-18; p. 4, col. 2:4-17. Fuzzy logic part 3 evaluates risk based on the detected states of the driver and vehicle. *Id*. at p. 3, col. 2:23-30; p. 4, col. 2:18-20. Specifically, the outputs from sensors 1 and 2 are used as input values to fuzzy logic part 3. *Id*. at p. 4, col. 2:18-19. Risk evaluation values determined by the fuzzy logic may be stored in fuzzy memory 4. *Id*. at p. 4, col. 2:24-26. The detection, by sensors 1 and 2 of the states that contribute to risk, and the evaluation of risk by fuzzy logic 3, both are carried out in real-time. *Id*. at p. 4, col. 1:30-34.

Kosaka's system also includes premium calculation part 6 that uses the risk evaluation values to determine insurance premiums. *Id*. at p. 4, col. 2:26-30. Premium calculation part 6 performs temporal integration and computation of risk evaluation values, and calculates insurance premiums. *Id*. System 5 is connected to premium calculation part 6 to perform time

22

Case CBM2012-00002
Patent 6,064,970

integration.  *Id*. at p. 4, col. 2:31-33.  A determination of the premium also is performed in real-time.  *Id*. at p. 4, col. 1:30-34.  Kosaka's system further includes:  (1) output interface 7 that has an electronic currency transfer request means or a prepayment amount erasing means; and (2) monetary amount file part 8 that stores prepayment balance.  *Id*. at p. 4, col. 2:33-38.

### 3.  Discussion

Based on our review of Liberty's petition and supporting evidence, we determine that Liberty has provided sufficient evidence to show that the combination of Kosaka and Florida Guide renders obvious each claim limitation of claims 4, 5, 16, and 17.

Claim 4 recites "generating an *initial operator profile*."  Further, claims 4, 5, 16, and 17 each require the determination of a *base cost of insurance*.  As discussed above, we construe the claim term "initial operator profile" broadly, but reasonably, as "an initial collection of information associated with an operator that is related to motor vehicle characteristics or driving characteristics."  As to the claim term "base cost of insurance," we construe it as "the *initial* amount paid or to be paid by the policyholder for insurance coverage under the policy contract, during a time period, before any surcharge or bonus is applied."

In its petition, Liberty asserts that Florida Guide, in combination with Kosaka, discloses that "the cost to a driver for auto insurance will depend on an initial collection (profile) of information about the insured driver, including the driver's selected coverage limits and deductibles, together with

23

Case CBM2012-00002
Patent 6,064,970

other profile information about the driver."  Pet. 44 (citing Ex. 1005, 3, 6, 11, 12).

Liberty further asserts that the combination of Kosaka and Florida Guide discloses determining a *base cost of vehicle insurance* for the vehicle operator, as recited in claims 4 and 5.  Pet. 41-42, 44-45, 47-48 (citing Ex. 1004, p. 4, col. 2:24-31; p. 5, col. 2:45-p. 6, col. 1:2; p. 7, col. 1:34-44; *see also id.* at p. 4, col. 2:26-29 (*e.g.*, "The premium calculation part 6 . . . calculates insurance premiums"); *id.* at p. 7, col. 1:39-41  ("monetary amount file part 46 has a memory that stores the prepayment balance"). In support of Liberty's contention, Ms. O'Neil testifies that "Kosaka explicitly explains that the 'prepayment amount' is a base [premium] amount that is eventually adjusted to reflect the calculation of a premium for the period in which operating data is actually monitored."  Ex. 1009 ¶ 24 (citing Ex. 1004, p. 3).

> Liberty also provides a rationale to combine the cited references:

> [A person of ordinary skill in the art] would have been motivated to implement Kosaka's teachings of using monitored driving characteristics to determine insured risk and premiums with Florida Guide's teachings that insurers are required, in issuing policies, to generate an insured profile comprising coverage information, including limits and deductibles, for determining a base cost of vehicle insurance, because insurance companies are required, in issuing policies, to do so.

Pet. 28.

Progressive disagrees and argues that Kosaka fails to disclose or suggest generating an *initial operator profile*.  PO Resp. 45-48.

24

Case CBM2012-00002
Patent 6,064,970

In particular, Progressive argues that Kosaka does not disclose *a profile* of information for an operator. *Id*. at 45. According to Progressive, Kosaka actually discloses a "monetary amount file *part*," which is not a profile of information, but rather "a component that debits funds from a prepayment money balance." *Id*. Progressive also contends that Kosaka's prepayment amount is not a base cost of insurance, but rather "a prepaid amount that funds any additional premium charges that are determined to be owed by the insured using Kosaka's device," similar to "an EZ Pass payment mechanism." *Id*. at 47. In support of its position, Progressive proffers the declaration of Mr. Michael J. Miller. Ex. 2010.

We are not persuaded by Progressive's argument and supporting evidence, as they are based on an overly narrow reading of the prior art references without sufficient consideration of the knowledge of one with ordinary skill in the art. *Paulsen*, 30 F.3d at 1480.

As we discussed above, we regard the conventional insurance cost determination techniques, noted in the background section of the '970 patent, as basic knowledge within the level of ordinary skill in the art. Ex. 1001, 1:17-2:37. In particular, the background section of the '970 patent discloses that conventional insurance cost determination methods involve generating *an insured profile* for the vehicle operator by gathering relevant historical data from a personal interview and public motor vehicle driving records. *Id*. Based on the information in the insured profile (e.g., the value of the vehicle, driver's record, and type of coverage), a vehicle insurance cost is determined. *Id*. at 1:56-2:12. Additionally, conventional insurance

25

Case CBM2012-00002
Patent 6,064,970

rating systems provide discounts and surcharges for certain types of use of the vehicle, equipment on the vehicle, and type of driver.  *Id*. at 2:22-24. For example, discounts are provided to safe drivers, such as those who have a low number of accidents.  *Id*. at 2:21-37.

Hence, a person of ordinary skill in the art would have appreciated that when a vehicle operator is applying for an insurance policy from an insurance company, *an insured profile* for the vehicle operator would be generated to determine *a base cost* (i.e., the initial premium), and such an insured profile would include coverage information such as limits and deductibles.  We also observe that a person of ordinary skill in the art would have recognized that the base cost is the amount that the insurance company charges *prior to applying any discounts or surcharges*, and the total cost is calculated based on the base cost and any applicable discounts or surcharges associated therewith.

As noted above, Liberty contends that Kosaka, in combination with Florida Guide, discloses a *base cost* of vehicle insurance for the vehicle operator, as recited in claims 4 and 5.  Pet. 41-42, 47-48 (citing Ex 1004, p. 4, col. 2:24-31; p. 5, col. 2:45-p. 6, col. 1:2; p. 7, col. 1:34-44).  Liberty's expert, Ms. O'Neil, testifies that Kosaka discloses a "prepayment amount" which is "a base cost of insurance or premium specified by the insurer and deposited or paid by the policyholder."  Ex. 1009 ¶ 24 (citing Ex. 1004, 1-2, 4).  Ms. O'Neil also testifies that "Kosaka explicitly explains that the 'prepayment amount' is a base [premium] amount that is eventually adjusted

26

Case CBM2012-00002
Patent 6,064,970

to reflect the calculation of a premium for the period in which operating data is actually monitored." *Id.* (citing Ex. 1004, 3).

Progressive's expert, Mr. Miller, disagrees and testifies that a person of ordinary skill in the art "reading Kosaka would not have [associated] it with any traditional means for determining automobile insurance premiums," but rather "would have understood that the prepayment amount of Kosaka was simply a deposit from which Kosaka's charges could be drawn." Ex. 2010 ¶¶ 45-46; PO Resp. 47-48.

In that regard, however, Liberty's expert, Ms. O'Neil, asserts that it is not Kosaka's goal "to require payment of a random 'deposit' number determined out of the blue." Ex. 1022 ¶ 40 (citing Ex. 1004, 2). Ms. O'Neil testifies that "Kosaka's derivation of the risk evaluation values attempts to create a more fair insurance system" and, to achieve the goal of fairness, a person of ordinary skill in the art would have understood that "Kosaka has presented a base premium, which will be modified based on a risk evaluation value determined from the driver's actual driving data to derive a more fair premium." *Id.*

Upon review of the evidence on record, we credit the testimony of Ms. O'Neil over that of Mr. Miller. *See Yorkey v. Diab*, 601 F.3d 1279, 1284 (Fed. Cir. 2010) (holding that Board has discretion to give more weight to one item of evidence over another "unless no reasonable trier of fact could have done so"). We find that Ms. O'Neil's explanations are supported by Kosaka, which discusses the conventional way of calculating insurance premiums and the unfairness of such a system. *See* Ex. 1004, p. 2, col. 2:15-

27

Case CBM2012-00002
Patent 6,064,970

19 (stating "conventional insurance premium determination systems have
involved on-line implementation of paper-based *insurance agreements*, and
thus rates have been determined based on risk evaluation using *static
attributes of the agreement customer*") (emphasis added); *id.* at p. 2,
col. 2:36-40 (stating "with automobile liability insurance[,] which is a type
of paper-based insurance agreement, it is normal for there be no difference
in insurance premiums between operators who always operate safely, and
operators who occasionally take risks.  However, it is considered unfair to
apply the same insurance premium to both.").

We further are not persuaded by Progressive's argument regarding an
EZ Pass payment mechanism.  Unlike toll fees for roads that are required
only when the driver utilizes the toll road, insurance premiums are required
even if the driver is not using his or her vehicle during the coverage period.
More significantly, Kosaka expressly describes that premium calculation
part 6 calculates *insurance premiums*, Ex. 1004, p. 4, col. 2:26-30, and that
the prepayment amount is the initial amount paid by the policyholder for
insurance coverage, *id.* at p. 5, col. 2:45-46.  As noted by Liberty, a person
of ordinary skill in the art would have known that "an insurance company
would gather initial information from an insured and, based on that data,
require prepayment (before starting coverage) of the entire expected
premium as a base amount, all before any actual discounts or surcharge are
applied."  Reply 8.

Given the evidence of the state of the art at the time of the invention,
and the knowledge of one with ordinary skill in the art discussed above, we

28

Case CBM2012-00002
Patent 6,064,970

observe that a person of ordinary skill in the art would have understood that insurance companies would want to make the prepayment amount the same as the base cost of insurance when utilizing Kosaka's insurance premium determination device. This is so, because the base cost is the amount that the policyholder is obligated to pay the insurance company initially before any monitoring of the vehicle operator's driving characteristics. *See KSR,* 550 U.S. at 421 ("A person of ordinary skill is also a person of ordinary creativity, not an automaton.").

For the foregoing reasons, we conclude that Liberty has demonstrated, by a preponderance of evidence, that claims 4, 5, 16, and 17 are unpatentable over Kosaka and Florida Guide.

### E. Claims 1, 3, 11, 12, 14, and 15

Liberty asserts that claims 1, 3, 11, 12, 14, and 15 are unpatentable under 35 U.S.C. § 103(a) over Kosaka, Black Magic, and Herrod. Pet. 23-41, 60-65. In support of that asserted ground of unpatentability, Liberty provides detailed explanations as to how each claim limitation is met by the combination of the cited prior art references and rationales for combining the references. *Id.* Liberty also relies upon declarations of Ms. O'Neil (Ex. 1009) and Mr. Andrews (Ex. 1012) to support its positions.

Upon review of Liberty's petition and supporting evidence, as well as Progressive's response and supporting evidence, we determine that Liberty has demonstrated, by a preponderance of the evidence, that claims 1, 3, 11, 12, 14, and 15 are unpatentable over Kosaka, Black Magic, and Herrod.

29

Case CBM2012-00002
Patent 6,064,970

   *1. Generating actuarial classes*

      Claims 1, 3, 11, 12, 14, and 15 each require generating or using

actuarial classes.  As we articulated above in the claim construction section,

we construe the claim term "actuarial class" as "a grouping related to

expected loss, which is determined from motor vehicle characteristics or

driving characteristics."

      Liberty asserts that Herrod, in combination with Kosaka and Black

Magic, discloses that, Pet. 35-36, 55-56, 70-71 (citing Ex. 1007, Abs., 1-2):

> generating classes associated with different levels of risk, which
> group operators or vehicles having a similar risk characteristic,
> from actual monitored driving characteristics (e.g., acceleration
> applied by a driver) during a selected time period as represented
> by recorded data elements representative of an operating state
> of the vehicles or an action of the operators.

      Herrod discloses a computer-based monitoring and reporting device

that is used in a vehicle to measure driver acceleration patterns and report

associated accident risks.  Ex. 1007, 1-2.[11]  In that regard, Herrod describes

that its device can be used for measuring safety-related features of driving,

and the monitored data can be useful to insurance companies.  *Id.*  Herrod

further discloses classifying drivers into *groups, each of which is associated*

*with a different level of accident risk, based on actual monitored data*, such

as "levels of acceleration," that represent driver behavior and vehicle

operating characteristics.  Ex. 1007, Abs., 1-2.

_____

[11] The page numbers used herein to refer to Herrod (Ex. 1007) are the
original page numbers of the reference on the top, center of each page.

                              30

Case CBM2012-00002
Patent 6,064,970

a. <u>Generating groups of risk based on actual monitored driving data</u>

Progressive argues that one of ordinary skill in the art would not have understood the "behavioral groups" of Herrod to be actuarial classes. PO Resp. 23-30.  In particular, Progressive argues, and Mr. Miller testifies, that Herrod's accident statistics obtained from a national survey of drivers using the device "would be unreliable for purposes of establishing an actuarial class," and a person of ordinary skill in the art would not "have created an actuarial class based on survey data."  *Id.* at 26-28; Ex. 2010 ¶ 51. Progressive alleges that Herrod's behavioral groups would not suggest actuarial classes to one of ordinary skill in the art, because "Herrod suggests looking at accident statistics (no loss data) in creating its behavioral groups." *Id.* at 28.

Liberty disagrees and argues that Herrod discloses using actual driving data.  Reply 13-14 (citing Ex. 1007, 1-2 ("Measurements made on many drivers over a long period are used to establish these levels of accident risk."); Ex. 1022 ¶ 56).  Liberty specifically establishes that Herrod discloses:

> [A computer] read[s] the recorded acceleration patterns and the time history of driver group and advice codes.  This information is added to a database, which is used to update the algorithms used for analyzing the acceleration patterns and the accident statistics.

*Id.* (citing Ex. 1007, 1-2).  Liberty maintains that Herrod discloses creating actuarial classes using actual monitored acceleration data.  Reply 2, 9-10 (citing Ex. 1007, Abs., 1-2; Ex. 1022 ¶¶ 49, 53-54).  We agree with Liberty.

31

Case CBM2012-00002
Patent 6,064,970

We are not persuaded by Progressive's arguments and supporting evidence, as they incorrectly characterize Herrod as disclosing mere usage of *survey data*, and fail to discuss Herrod's disclosure, as a whole. A prior art reference must be considered for everything it teaches by way of technology and is not limited to the particular invention it is describing and attempting to protect. *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985).

Notably, Progressive's arguments and Mr. Miller's testimony narrowly focus on Herrod's disclosure of obtaining additional accident statistics from a national survey of drivers using the device, and ignore Herrod's disclosure of generating groups of accident risk based on *actual monitored driving data*. In particular, Herrod discloses:

> This invention concerns an electronic device for *measuring and recording the levels of acceleration* applied by the drivers of road vehicles. These accelerations include forward acceleration, backward acceleration (braking) and left and right accelerations (cornering). The device contains a computer, which processes accumulated *acceleration data* to determine to which of several behavioural groups the driver belongs. *Each group is associated with a significantly different level of accident risk. Measurements made on many drivers over a long period are used to establish these levels of accident risk.*

Ex. 1007, 1 (emphases added).

Therefore, we are unpersuaded by Progressive's arguments (PO Resp. 26-27), and Mr. Miller's testimony (Ex. 2010 ¶ 51), that are based on an incomplete reading of Herrod: (1) that it merely discloses the usage of *accident statistics* obtained from a national survey, and (2) that it does not

32

Case CBM2012-00002
Patent 6,064,970

disclose generating groups of accident risk based on *actual monitored acceleration data*.

b. Pertaining to insurance

Progressive alleges that a person of ordinary skill in the art "would not have considered Herrod to be of interest or value to the insurance field or to the determination of insurance premium." PO Resp. 28-29 (citing Ex. 2010 ¶ 48). Progressive also argues that Herrod's device is used for driver training and performance assessment, and to detect "reckless drivers." PO Resp. 24. As support, Mr. Miller testifies that one of ordinary skill in the art, at best, might have understood that Herrod's disclosure concerning a demonstration of competence "meant that the data could have been used by an insurer to determine a driver's eligibility to be offered insurance coverage." Ex. 2010 ¶ 48. Mr. Miller concludes that a person of ordinary skill in the art would have recognized that Herrod's data was not suitable for that purpose as the data is incomplete and unreliable for the purposes of determining insurance premiums. *Id*.

Progressive's argument and Mr. Miller's testimony narrowly focus on only certain aspects of Herrod—"safe drivers [would be able] to demonstrate their competence to insurance companies"—but fail to discuss Herrod's disclosure, as a whole, in a meaningful way from the perspective of one with ordinary skill in the art. *Id*. For instance, Progressive and Mr. Miller do not explain adequately why Herrod's groups of accident risks generated based on monitored driving data, and the database of the recorded acceleration data would not be of interest or value to insurance companies. To the contrary,

33

Case CBM2012-00002
Patent 6,064,970

Herrod expressly states that the monitored driving data could be useful to insurers and the "database might also be used by . . . *insurance companies, who wish to monitor the standard of driving of certain vehicles*." Ex. 1007, Abs., 1-2 (emphasis added). As noted in the background section of the '970 patent, one with ordinary skill in the art would have possessed the knowledge of determining insurance premiums based on monitored vehicle data. *See, e.g.*, Ex. 1001, 2:66-3:2 (citing U.S. Patent No. 4,667,336, Abs. (disclosing "a system for detecting and recording each time a seat belt is used[, and depending] on the level of seat belt usage[,] the driver earns discounts on car insurance premiums.")).

Therefore, we determine that Mr. Miller's testimony focusing on, and discussing only a selected portion of, Herrod's disclosure is not meaningful and does not account for other relevant portions of Herrod's disclosure. As such, it is entitled to little weight. *See Velander v. Garner*, 348 F.3d 1359, 1371 (Fed. Cir. 2003) ("In giving more weight to prior publications than to subsequent conclusory statements by experts, the Board acted well within [its] discretion.").

For the foregoing reasons, we agree with Liberty that a person of ordinary skill in the art would have considered Herrod to be of interest or value to the insurance field.

c. Homogeneity and household data

Progressive submits that one of ordinary skill in the art would have understood that Herrod's driver-specific data would not be suitable for establishing an actuarial class. PO Resp. 29. According to Progressive, one

34

Case CBM2012-00002
Patent 6,064,970

of ordinary skill in the art would have recognized that, to determine auto insurance premiums accurately, an insurer needs to understand the risk characteristics of all drivers resident in the household.  *Id.* (citing Ex. 1007, 3; Ex. 2010 ¶ 49).  Progressive also maintains that Herrod fails the homogeneity requirement, because Herrod groups drivers who have acceleration data collected from different driving location settings (e.g., urban and rural settings), creating different degrees of insurance risk.  *Id.* (citing Ex. 2010 ¶ 41).  In support of Progressive's position, Mr. Miller testifies that Herrod does not disclose that all of the drivers in the household would be monitored and that Herrod's data are incomplete and would fail the actuarial standard for homogeneity.  Ex. 2010 ¶¶ 41, 49-50.

Liberty responds that applying those homogeneity and household data requirements to *each risk characteristic* is contrary to the usage of the claim term "actuarial class" in the '970 patent.  Reply 14-15 (citing Ex. 1022 ¶¶ 43-47, 49, 51, 53-54, 56).  Liberty notes that some of the actuarial classes disclosed in the '970 patent are based on data that are not associated with any location or household—"driving time in minutes by each driver of the insured vehicle," "number of minutes driving at high/low risk times," and "number of sudden acceleration situations."  *Id.*; Ex. 1001, 4:30-52.

We agree with Liberty.  Indeed, as we have explained in our claim construction analysis above, we decline to add the alleged homogeneity and household data requirements to the broadest reasonable interpretation of the claim term "actuarial class."  Progressive's arguments are not commensurate with the scope of the claims.  *See In re Self*, 671 F.2d 1344, 1348 (CCPA

35

Case CBM2012-00002
Patent 6,064,970

1982) ("It is well established that limitations not appearing in the claims cannot be relied upon for patentability.").

Further, Liberty's expert, Ms. O'Neil, testifies that there is "no requirement that a *single risk characteristic* completely measures all insurance risk," because "conventional insurance rating depends on the evaluation and actuarial grouping utilizing many separate risk characteristics, including age, location, mileage, etc." Ex. 1022 ¶ 53 (citing Ex. 1001, 1:28-2:20) (emphasis added). Ms. O'Neil explains that classifications based on driving experience—drivers with less than three years of driving experience and those with greater than three years driving experience—do not depend on driving location. Ex. 1022 ¶ 54. Ms. O'Neil also explains that "Herrod's measured risk characteristics do not have to measure *all* risk distinctions in order to form the basis of valid actuarial classes." *Id.* As to the household issue, Ms. O'Neil testifies that "Herrod discusses providing a programmable monitoring card to any driver of any equipped vehicle[;] any driver with a suitable card or disk can be monitored whilst driving any equipped vehicle." Ex. 1022 ¶ 51 (citing Ex. 1007, 2 (internal quotations omitted)).

On this record, we credit the testimony of Ms. O'Neil over that of Mr. Miller. *See, e.g.*, *Yorkey*, 601 F.3d at 1284. We find Ms. O'Neil's explanations to be more consistent with the level of one with ordinary skill in the art as disclosed in the background section of the '970 patent, as well as with Herrod. In contrast, Mr. Miller does not explain adequately why homogeneity and household data are required. We observe that not every

36

Case CBM2012-00002
Patent 6,064,970

actuarial class known at the time of invention depends on driving location or household data, such as those disclosed in the background of the '970 patent (Ex. 1001, 1:28-52).

For the foregoing reasons, we agree with Liberty that Herrod's data would be suitable for establishing an actuarial class.

d. Expected loss data

Progressive argues that "in order to be an actuarial class, a group of risks should predict insurance losses or costs," and that Herrod's behavioral groups would not be predictive of insurance claims losses (or premiums). PO Resp. 9-10 (citing Ex. 2010 ¶¶ 16-17), 24-28 (citing Ex. 2010 ¶ 48). Progressive submits that Herrod's behavioral groups would not have differentiated *expected loss costs*. *Id*. at 26. Progressive also alleges that Herrod's *accident statistics* "may help to indicate how safe a driver is, but they are not part of the expected loss determination." *Id*. at 28 (citing Ex. 2010 ¶ 51).

However, Progressive's argument does not account for certain teachings of Herrod, including its device can be used for measuring safety-related features of driving, and *the monitored data can be useful to insurance companies*. Ex. 1007, 1-2. Further, as explained by Liberty, "risk characteristics need not be *direct or complete* predictors of future losses to form the basis of an actuarial class," as confirmed by Actuarial Standards of Practice No. 12 (Ex. 2020, ASOP No. 12 ¶ 5.2) and the examples provided by the '970 patent (Ex. 1001, 1:27-2:47). Reply 13 (emphasis added) (citing Ex. 1022 ¶¶ 7-13, 43, 45-47). Liberty submits that a driver's age or marital

37

Case CBM2012-00002
Patent 6,064,970

status, or a vehicle's value or age, does not predict losses or costs *directly*, nor do these risk characteristics result in actual insurance claims. *Id*. (citing Ex. 1022 ¶¶ 11-12, Ex. 1001, 1:27-2:47, Ex. 2020, ASOP No. 12 ¶ 5.2, Ex. 2012, 15). In support of Liberty's position, Ms. O'Neil testifies:

> Herrod teaches monitoring and gathering acceleration data and accident statistics to group drivers in "behavioural groups" reflecting different levels of accident risk. A [person of ordinary skill in the art] would know that, in order to create such behavioural groups relevant to insurance rating—which a [person of ordinary skill in the art] would interpret as actuarial classes—would involve analyzing the data collected in Herrod to determine any associated expected loss costs with such data.

Ex. 1022 ¶ 43.

Ms. O'Neil explains that "[i]t is *the job of an actuary* to determine how risk characteristics, such as number of accidents or sudden braking events, correlate to predicted future insurance losses so that an insurer can charge an individual the proper premium," and "[t]his can be done—as explained, for example, in Standard of Practice No. 12—using 'actual experience' (actual frequency and severity claims data) or '*any reliable source*, including statistical or other mathematical analysis of available data.'" Ex. 1022 ¶ 12 (citing Ex. 2020, ASOP No. 12, pp. 3-4). Ms. O'Neil also testifies that a person of ordinary skill in the art would have the knowledge to calculate expected loss costs associated with monitored driving data. Ex. 1022 ¶¶ 45-47.

We credit Ms. O'Neil's testimony (Ex. 1022 ¶¶ 12, 43, 45-47), because her explanations are consistent with Herrod, the disclosure of the

38

Case CBM2012-00002
Patent 6,064,970

'970 patent, and other evidence on record with respect to the level of ordinary skill in the art. In a proper obviousness analysis, we note that Herrod's disclosure must be "considered together with the knowledge of one of ordinary skill in the pertinent art." *Paulsen*, 30 F.3d at 1480. Such analysis must include reading the prior art in context, taking into account "demands known to the design community," "the background knowledge possessed by a person having ordinary skill in the art," and "the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, 550 U.S. at 418.

As noted above, generating actuarial classes of insurance, which group operators or vehicles having a similar risk characteristic, was well known in the art. The background section of the '970 patent describes:

> *Conventional methods for determining costs of motor vehicle insurance* involve gathering relevant historical data from a personal interview with the applicant for the insurance and by referencing the applicant's public motor vehicle driving record that is maintained by a governmental agency, such as a Bureau of Motor Vehicles. *Such data results in a classification of the applicant to a broad actuarial class for which insurance rates are assigned based upon the empirical experience of the insurer*. Many factors are relevant to such classification in a particular actuarial class, such as age, sex, marital status, location of residence and driving record.
>
> *The current system of insurance creates groupings of vehicles and drivers (actuarial classes) based on the following types of classifications*.
>
> Vehicle: Age; manufacturer, model; and value.
>
> Driver: Age; sex; marital status; driving record (based on government reports), violations (citations); at fault accidents; and place of residence.

39

Case CBM2012-00002
Patent 6,064,970

> Coverage:    Types of losses covered, liability, uninsured
> motorist, comprehensive, and collision; liability limits; and
> deductibles.

Ex. 1001, 1:17-52 (emphases added).

Actuarial Standard of Practice No. 12 expressly states that "[r]isk classification has been a fundamental part of actuarial practice since the beginning of the profession." Ex. 2020 ¶ 5, ASOP No. 12 § 3. Risk classification is defined as the "process of grouping risks with similar risk characteristics so that differences in costs may be recognized." Ex. 2020, ASOP No. 12 ¶ 2.8. The design of risk classification systems requires "the actuary to exercise professional judgment as well as to use statistical tools." Ex. 2020, ASOP No. 12 § 5. For example, the "actuary can rely on actual or reasonably anticipated experience," and relevant "information from any reliable source, including statistical or other mathematical analysis of available data, may be used." *Id.* § 5.1. Furthermore, in the absence of actual experience, "an actuary may rely on clear actuarial evidence that differences in costs are related to a particular risk characteristic." *Id.* Therefore, one with ordinary skill in the art would have known to analyze the monitored vehicle data collected by Herrod's device to determine any associated expected loss costs with such data, in order to classifying drivers into groups relevant to insurance rating.

For the foregoing reasons, we determine that, in light of Herrod's disclosure, it would have been obvious to one with ordinary skill in the art to generate actuarial classes of insurance by grouping operators having a similar risk characteristic using actual monitored driving data.

40

Case CBM2012-00002
Patent 6,064,970

    *2. Recording time and a corresponding log of vehicle speed*

    Because Kosaka does not disclose expressly "a time and location of vehicle operation and a corresponding log of vehicle speed for the time and location," as required by claims 1, 3, 11, 12, 14, and 15, Liberty relies upon Black Magic, in combination of Kosaka and Herrod, to meet this disputed limitation. Pet. 33-34, 39, 61-64 (citing Ex. 1008, 1). Specifically, Liberty relies upon the following disclosures of Black Magic:

> The black box is a computerized unit installed near the dashboard of a vehicle . . . . The unit records information such as driving speed, time and distance travelled and fuel consumption.

Ex. 1008, 1.

> [Global Positioning Systems ("GPS")] technology has wider implications for the insurance industry, as it can produce all the data a black box can and record the vehicle's location.

Ex. 1008, 2.

> The fleet manager can then use the information to assess operating efficiency and to analyze the performance of drivers in terms of exceeding maximum speeds, engine idling time and harsh deceleration.

Ex. 1008, 1.

    Progressive counters that Black Magic does not disclose recording time of day or a corresponding log of vehicle speed for the time and location. PO Resp. 42-45. In particular, Progressive alleges that a sentence in Black Magic—"The unit records information such as driving speed, *time and distance travelled* and fuel consumption"—indicates that the unit records "time and distance travelled." *Id*. at 43-44. Progressive contends

41

Case CBM2012-00002
Patent 6,064,970

that a person of ordinary skill in the art would have understood that Black
Magic's "black box" records both the "time travelled" (duration of a trip)
and the distance travelled, rather than the time of day. *Id*. at 44.

Upon review of the evidence of record, we are not persuaded by
Progressive's argument. Progressive's argument narrowly focuses on one
sentence of the disclosure of Black Magic—whether there should be a
comma between the words "time" and "and," in the phrase "driving speed,
*time and* distance travelled." Progressive fails to consider Black Magic, as a
whole, from the perspective of one of ordinary skill in the art. *See Paulsen*,
30 F.3d at 1480. For example, Progressive does not take into account the
knowledge of a person with ordinary skill in the art at the time of the
invention regarding the functionality of *black box* recorders.

Black Magic describes several latest developments in motor vehicle
technology at the time of 1994. Ex. 1008, p. 1. According to Black Magic,
black box data recorders—similar to those that were used commonly in
aircraft—were starting to be installed in vehicles during this time period. *Id*.
The black box computerized unit "records information such as driving
speed, time and distance travelled and fuel consumption." *Id*. One
insurance company was known to offer an upfront premium discount for
vehicles using a black box unit, and most insurers agreed that the black box
unit is an invaluable aid to risk management. *Id*. Black Magic also
describes using satellite technology, such as GPS technology, to produce "all
the data a black box can and record the vehicle's location." *Id*. at 2. One of
the electronic experts stated that "[t]he information could be used to

42

Case CBM2012-00002
Patent 6,064,970

accurately rate premiums according to styles of driving and locality of use."
*Id*. (emphasis added).

A person of ordinary skill in the art at the time of the invention would have had a basic knowledge of the functionality of black box data recorders and GPS satellite technology, as they widely were used in aircrafts and in shipping for precise navigation. *See* Ex. 1008, p. 1 ("Black box data recorders, better known for their use in aircraft," and GPS "widely used in shipping for precise navigation."). As explained by Liberty's expert, Mr. Andrews, a person of ordinary skill in the art would have understood from reading Black Magic that the data points captured in the black box would need to "monitor speed linked to [absolute] time (as well as location) in order to derive 'deceleration' or determine whether a car was 'idling' based on recorded 'speed' values, to determine whether a car was exceeding a particular location's posted speed limit, and 'to accurately rate premiums according to styles of driving and locality of use.'" Ex. 1019 ¶ 13 (citing Ex. 1008, 1-2). We credit Mr. Andrews's testimony, because his explanation is consistent with the disclosure of Black Magic and consistent with the knowledge of a person with ordinary skill in the art regarding the functionality of black box recorders (e.g., a reconstruction of accidents requires recorded speed, time of day, and location data) and GPS satellite technology.

For the foregoing reasons, we conclude that Liberty has demonstrated, by a preponderance of the evidence, that claims 1, 3, 11, 12, 14, and 15 are unpatentable over Kosaka, Black Magic, and Herrod.

43

Case CBM2012-00002
Patent 6,064,970

*F. Claims 6, 9, 10, 13, and 18*

Liberty alleges that claims 6, 9, 10, 13, and 18 are unpatentable under 35 U.S.C. § 103(a) over the combination of Kosaka and Herrod.  Pet. 31-34, 52-56, 59-60, 62-63, and 66-71.  In support of that asserted ground of unpatentability, Liberty provides explanations as to how each claim limitation is met by the combination of the cited prior art references and a rationale for combining the references.  *Id*.  Liberty also proffers declarations of Ms. O'Neil (Ex. 1009) and Mr. Andrews (Ex. 1012) to support its positions.

We have reviewed the parties' arguments and supporting evidence, and determined that Liberty has demonstrated, by a preponderance of the evidence, that claims 6, 9, 10, 13, and 18 are unpatentable over Kosaka and Herrod.

Progressive argues that the combination of Kosaka and Herrod does not disclose or suggest actuarial classes and the "correlating" step.  PO Resp. 22-30, 39-41.  Progressive also asserts that Kosaka and Herrod are not combinable.  PO Resp. 30-39.  As discussed above, we have addressed Progressive's arguments with respect to generating actuarial classes based on actual monitored driving data (PO Resp. 22-30), and determined those arguments to be unavailing.  We now address the merits of Progressive's remaining arguments.

44

Case CBM2012-00002
Patent 6,064,970

*1. The "correlating" step*

Claims 6, 9, 10, 13, and 18 each require a "correlating" step. For instance, claim 18 recites "correlating the group data values to *preset values* related to *safety standards* in a second memory and generating an *output data value* based on the correlation." Ex. 1001, Reexam. Cert., 3:1-3 (emphases added).

Progressive argues that Kosaka does not disclose that limitation. PO Resp. 39-41. According to Progressive, Kosaka's disclosure of a threshold value that activates the risk assessment and premium adjustment device does not describe the "correlating" step, because: (1) Kosaka does not produce an *output data value* based upon the correlation between the vehicle speed and the threshold value; and (2) Kosaka's "set value" is not related to *safety standards*. PO Resp. 40-41.

We are not persuaded by Progressive's arguments, because they narrowly focus on one sentence in Kosaka, and fails to consider Kosaka's disclosure, as a whole, from the perspective of one of ordinary skill in the art. For instance, Progressive's arguments do not take into account Kosaka's disclosure of correlating vehicle speed and other monitored data with output risk values. Ex. 1004, *e.g.*, at pp. 2, 6-7 ("risk evaluation unit operating on $V_0$, and its 'control operation detection part 44 detects clearly intentional operations, for example, when there is a deviation in the rudder operation mechanism that is at or above a set value'").

Kosaka's insurance premium determination device uses a risk evaluation device for evaluating risk in the vehicle and driver. Ex. 1004,

45

Case CBM2012-00002
Patent 6,064,970

p. 2; col. 1:54-col. 2:3; col. 2:43-52.  As noted by Liberty in its petition, Kosaka explains that "comprehensive evaluation of the states of the vehicle and the operator is carried out, and a *risk evaluation value* is obtained that is matched to empirical evaluation of an individual." Pet. 54 (citing Ex. 1004, p. 3, col. 2:43-47) (emphasis added).  More specifically, Kosaka's risk evaluation unit 42 performs real-time evaluation of the *degree of risk* during operation from the state signals of the automobile using signal processing. Ex. 1004, p. 7, col. 1:19-22.  Kosaka describes monitoring the *ground speed* of the automobile, and forwarding the output of the speed detector to the signal preprocessing unit and the system activation control part. *Id*. at 7, col. 1:1-9.  Kosaka's system *compares the speed with a set value* to determine whether it exceeds the set value. *Id*. at 7, col. 1:5-11.  Clearly, Kosaka's system produces a *risk evaluation value* (i.e., an *output data value*) based upon the correlation between the vehicle speed and the threshold value.

In the claim construction section above, we construed the claim term "safety standard" as "value or criteria associated with the promotion of safety or prevention of risk, loss, or injury."  In the context of monitoring driving behavior and evaluating risk of the vehicle and driver, Kosaka's *speed threshold value,* used to activate risk assessment device, would have been understood by a person of ordinary skill in the art *as related to safety standards*.  Based on Kosaka's disclosure, we agree with Liberty that "Kosaka's disclosure of correlating the group data values to present values (i.e., 'set value' for speed) explicitly teaches . . . that the preset values are related to safety standards." Pet. 69.

46

Case CBM2012-00002
Patent 6,064,970

### 2. Whether there is a rationale to combine Kosaka and Herrod

Progressive argues that one with ordinary skill in the art would not have combined the teachings of Kosaka and Herrod. PO Resp. 30-39. In particular, Progressive asserts that a person with ordinary skill in the art would have no experience in determining insurance premiums using fuzzy logic. PO Resp. 31. Progressive maintains that Kosaka and Herrod cannot be combined without fundamentally changing their operation. PO Resp. 30. Progressive also alleges that Kosaka teaches away from determining insurance ratings or insurance premiums based on actuarial classes. PO Resp. 31. In support of its arguments, Progressive proffers declarations of Mr. Miller and Mr. Mark Ehsani. Exs. 2010, 2016.

Upon reviewing the parties' arguments and supporting evidence, we hold that Liberty's rationale for modifying Kosaka with the teachings of Herrod constitutes an articulated reason with a rational underpinning to justify the legal conclusion of obviousness. That is, as stated by Liberty:

> [A person with ordinary skill in the art] would have been motivated to implement Kosaka's teachings of using monitored driving characteristics to determine insured risk and premiums with Herrod's teachings of generating actuarial classes of insurance based on the monitored data of many drivers for determining an insured risk, so that, *e.g.*, an insurer can advantageously adjust premiums for a particular vehicle or operator based upon a broader pool of data from other operators and their vehicles as monitored by the system in Kosaka.

Pet. 31-32.

As noted above, generating actuarial classes of insurance, which group operators or vehicles having a similar risk characteristic, was well

47

Case CBM2012-00002
Patent 6,064,970

known in the art at the time of the invention.  Also one of ordinary skill in
the art would have possessed the knowledge of determining insurance
premiums using vehicle monitored data.

    Liberty relies on Herrod to show that actuarial classes can be
generated based on *actual monitored driving characteristics*.  Pet. 35-36, 55-
56.  For the reasons stated below, Progressive has not provided sufficient
evidence or explanation that the mere substitution of *actual monitored*
driving characteristics, for *traditional reported* driving characteristics, would
have been beyond the level of an ordinary skilled artisan, in light of the
collective teachings of Kosaka and Herrod.  *See KSR*, 550 U.S. at 416
("The combination of familiar elements according to known methods is
likely to be obvious when it does no more than yield predictable results.");
*Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1161 (Fed. Cir.
2007) ("Accommodating a prior art mechanical device that accomplishes [a
desired] goal to modern electronics would have been reasonably obvious to
one of ordinary skill in designing children's learning devices").

    a.  Level of ordinary skill in the art

    Progressive asserts that one of ordinary skill in the art would not have
had *any experience in determining insurance premiums using fuzzy logic*.
PO Resp. 31-33 (citing Exs. 2010, 2016).  In support of that argument,
Progressive's expert, Mr. Ehsani, testifies that Kosaka's approach would
have been beyond the level of a person of ordinary skill in the art, who
"would not likely have training or understanding of fuzzy logic."  Ex. 2016
¶ 28.  Another Progressive expert, Mr. Miller, testifies that one of ordinary

48

Case CBM2012-00002
Patent 6,064,970

skill in the art of determining insurance premiums would have had *no experience with fuzzy logic*. Ex. 2010 ¶ 38; *see also id. at* ¶ 14.

Progressive's argument is inapposite. Progressive's argument and the testimony of its experts are contradicted by Kosaka's disclosure, which includes teachings of *using fuzzy logic to determine insurance premiums*, and other evidence in the record that shows the state of the art at the time of invention. Progressive's argument and supporting evidence fail to appreciate that a person of ordinary skill in the art is a hypothetical person who is presumed to know the relevant prior art, and the level of ordinary skill in the art may be evidenced by the references themselves. *GPAC*, 57 F.3d at 1579.

More importantly, Progressive's experts fail to explain meaningfully the skill level of a person with ordinary skill in the art with regard to *fuzzy logic as it applies to insurance premium determination*. As Liberty explains, Progressive's experts ignore that insurers were using fuzzy logic, at the time of the invention, to determine insurance premium. Reply 5 (citing Ex. 1022 ¶¶ 24-26, 30, 37 (discussing Exs. 1024-28)). Indeed, the publications submitted by Liberty regarding fuzzy logic, confirm that applying fuzzy logic to insurance classification rating and underwriting was well known at the time of the invention. Exs. 1024-28; *see, e.g.*, Ex. 1024 (Shapiro Article) (providing a history of the application of fuzzy logic in insurance since 1982; providing an extensive list of references at pages 57

49

Case CBM2012-00002
Patent 6,064,970

through 61,[12] many predating 1996; and demonstrating the application of
fuzzy logic to rating territories and classifications based on age groupings)).
Therefore, the testimony of Progressive's experts regarding the skill level of
a person with ordinary skill in the art, pertaining to using fuzzy logic to
determine insurance premiums is entitled to little weight. *Rohm and Haas
Co. v. Brotech Corp*., 127 F.3d 1089, 1092 (Fed. Cir. 1997) ("Nothing in the
rules or in our jurisprudence requires the fact finder to credit the
unsupported assertions of an expert witness.").

For the foregoing reasons, we agree with Liberty that a person of
ordinary skill in the art would have had experience in determining insurance
premiums using fuzzy logic.

b. Enabling prior art

Progressive argues that Kosaka is deficient and one of ordinary skill
in the art would not have understood how Kosaka's risk evaluation values
are generated using *fuzzy logic*.  PO Resp. 32-33 (citing Ex. 2016 ¶ 30-32).
In support of Progressive's contention, Mr. Ehsani testifies that, due to the
deficiencies in Kosaka's disclosure, a person of ordinary skill in the art
would not have understood how the fuzzy risk evaluation values are
generated.  Ex. 2016 ¶ 30.

Prior art publications and patents are presumed to be enabled.  *In re
Antor Media Corp.,* 689 F.3d 1282, 1287-88 (Fed. Cir. 2012); *Amgen Inc. v.*

_____

[12] The page numbers in the Shapiro Article refer to the page numbers in the
top, right corner.

50

Case CBM2012-00002
Patent 6,064,970

*Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1355 (Fed. Cir. 2003).
Once specific, concrete reasons as to why the cited prior art reference is not
enabling have been identified, we conduct an analysis by reviewing the
argument and supporting evidence to determine whether the prior art is
enabling. *Antor*, 689 F.3d at 1292; *see also In re Morsa*, 713 F.3d 104, 110
(Fed. Cir. 2013). To that end, we will determine whether a person with
ordinary skill in the art could *make or use the claimed invention without
undue experimentation* based on the disclosure of the cited prior art
reference. *Morsa*, 713 F.3d at 110.

    We have reviewed Progressive's argument and supporting evidence,
but we are not persuaded that Kosaka is non-enabling prior art in light of the
level of ordinary skill in the art at the time of the invention.

    Progressive fails to recognize that Kosaka explicitly states that *fuzzy
logic need not be used*. Ex. 1004, p. 6, col. 1:45-51. Even if fuzzy logic is
used, Progressive has not demonstrated that a person of ordinary skill in the
art could not have made or used the claimed invention *without undue
experimentation* based on Kosaka's disclosure.

    Although Mr. Ehsani discusses certain portions of Kosaka's
disclosure, he does not explain sufficiently why one with ordinary skill in
the art could not have determined insurance premiums using fuzzy logic,
*without undue experimentation*. Neither Progressive nor Mr. Ehsani
identifies with sufficient specificity what undue experimentation would be
needed. In fact, Progressive's argument and the testimony of Mr. Ehsani do
not make any assessment of the level of experimentation that would be

51

Case CBM2012-00002
Patent 6,064,970

required for one of ordinary skill in the fuzzy logic art to make and use
Kosaka's device.  The complexity of experimentation does not make it
undue necessarily, if the art typically engages in such experimentation.
*See In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).  Moreover, on the
record before us, the evidence of the level of ordinary skill in the art shows
that,  prior to Progressive's invention, insurers were using fuzzy logic to
determine insurance premium.  Exs. 1024-28.[13]

For the foregoing reasons, Progressive has not demonstrated
adequately that Kosaka is non-enabling prior art.

c.  Does not require changing operation fundamentally

Progressive maintains that Kosaka and Herrod cannot be combined
without fundamentally changing their operation.  PO Resp. 30.  In particular,
Progressive argues that "Kosaka's fuzzy logic and Herrod's crisp logic

---

[13] Arnold F. Shapiro, *An Overview of Insurance Uses of Fuzzy Logic*, in II
COMPUTATIONAL INTELLIGENCE IN ECONOMICS AND FINANCE 25 (Paul P.
Wang, et al., ed., Springer Berlin Heidelberg 2007) (Ex. 1024); Luis A.
Carreno, *et al.*, *A Fuzzy Expert System Approach to Insurance Risk
Assessment Using FuzzyCLIPS*, in WESCON CONFERENCE RECORD 536
(1993) (reference no. 13 from Shapiro Article at 58) (Ex. 1025); Jean
Lemaire, *Fuzzy Insurance*, in 20 ASTIN BULLETIN INTERNATIONAL
ACTUARIAL ASSOCIATION 33 (1990) (Ex. 1026); Richard A. Derrig, *et al.*,
*Fuzzy Techniques of Pattern Recognition in Risk and
Claim Classification*, in 62 J. OF RISK AND INS., 447 (Sept.
1995) (Ex. 1027); Virginia R. Young, *Adjusting Indicated Insurance Rates:
Fuzzy Rules that Consider Both Experience and Auxiliary Data*, in
PROCEEDINGS OF THE CASUALTY ACTUARIAL SOCIETY CASUALTY
ACTUARIAL SOCIETY - ARLINGTON, VIRGINIA 734 (1997) (Ex. 1028).

52

Case CBM2012-00002
Patent 6,064,970

approaches are diametrically opposed." *Id*. at 36. According to Progressive, an actuarial class approach cannot generate multiple fuzzy values and, therefore, a fundamental change in operation is required to implement fuzzy logic to achieve an actuarial class approach or to apply the actuarial class approach in place of fuzzy logic. *Id*. 36-37 (citing Ex. 2016 ¶ 34). As support, Mr. Ehsani testifies that "use of actuarial classes is a crisp approach and generates only a single crisp value (i.e., a single assignment) for a particular risk category," yet fuzzy logic "uses multiple, partial values to show degrees of membership a variable of interest might have for its membership functions." Ex. 2016 ¶ 34. Mr. Miller testifies that "fuzzy logic relies on a fuzzy-set mathematical theory that results in data sets that are not mutually exclusive," and a person with ordinary skill in the art could not have ascertained that "there was any true difference in risk between two Kosaka risk values produced via fuzzy logic." Ex. 2010 ¶ 39.

In response to Progressive's argument, Liberty proffers additional explanation and rebuttal evidence. Reply 3-7, Exs. 1019, 1022. Liberty asserts that "Kosaka explicitly states that *fuzzy logic need not be used*, even in the embodiment where it is disclosed." Reply 3 (citing Ex. 1004, p. 6, col. 1:45-51 ("determination [of risk evaluation values] may be carried out *without using fuzzy logic*. Calculation may also be carried out using a *common insurance table*."); Ex. 1019 ¶ 10; Ex. 1022 ¶¶ 24-30, 37 (emphases added)).

Liberty explains that, even if Kosaka's fuzzy logic feature is used in the process, the result is to generate *crisp risk evaluation values*, "which are

53

Case CBM2012-00002
Patent 6,064,970

distinct and easily fit within a 'crisp' logic system." Reply 3 (citing Ex. 1022 ¶ 37); Ex. 1019 ¶ 9. Liberty's expert, Mr. Andrews, testifies that after the data is processed through the fuzzy logic unit, a person of ordinary skill in the art would have understood that "it must be converted into a crisp value through a process call defuzzification, a standard part of basic fuzzy logic implementation," to provide a usable, actionable output. Ex. 1019 ¶ 9. Mr. Andrews also explains that Kosaka explicitly describes using *defuzzification*. Ex. 1019 ¶ 9 (citing Ex. 1004, 8).

Liberty also maintains that a person of ordinary skill in the art would have possessed the knowledge of using Kosaka's *crisp risk evaluation values* to create actuarial classes in light of Herrod's disclosure. Reply 3-7 (citing Ex. 1022 ¶¶ 24-37). In support of that position, Liberty submits several publications, as well as Ms. O'Neil's testimony, to demonstrate that it was well known in the art at the time of invention to apply fuzzy logic in insurance and classification rate making. *See* Exs. 1024-28; Ex. 1022 ¶ 31 (citing Ex. 1025 and 27, as examples).

Upon consideration of the parties' arguments and supporting evidence, we credit the testimony of Liberty's experts over those of Progressive's experts. *See, e.g.*, *Yorkey*, 601 F.3d at 1284. We find that the testimony of Liberty's experts—regarding defuzzification, crisp risk evaluation values, and the application of fuzzy logic in insurance and classification rate making—are consistent with Kosaka's disclosure and the publications that demonstrate the level of ordinary skill in the art at the time of invention. Ex. 1024, 28; *see also* Ex. 1004, p. 8, col. 1:40-43 ("This first

54

Case CBM2012-00002
Patent 6,064,970

fuzzy logic part has a function whereby it carries out defuzzification subsequent to balancing the MIN-MAX outputs"); Ex. 1027 (Derrig Article) (describing an application of fuzzy techniques to derive Massachusetts automobile rating territories; the resulting rating territories conform to the required criteria for rating classifications such as non-overlap between classes); Ex. 1025 (Carreno Article) (describing an insurance system that combines "fuzzy processing with [a] rule-based expert system" and outputs a "crisp value for Risk in the range [0,1]").  In contrast, Progressive's experts fail to discuss meaningfully what Kosaka's disclosure, as a whole, would have reasonably conveyed to one with ordinary skill in the art, including Kosaka's defuzzification and non-fuzzy logic disclosures. Moreover, as we discussed above, Progressive's experts narrowly define the skill level of a person with ordinary skill in the art.

To support its position, Progressive also cites *Ex parte Acharya*, App. No. 2010-3919, slip op. at 6 (BPAI June 19, 2012) (Ex. 2004) for the premise that prior art references cannot be combined "where one used an approach that crisply placed an item in a group and the other used an approach that involved *varying degrees of assignment within groups*." PO Resp. 37.  Progressive's reliance on *Acharya* is misplaced.  Generally, each case before the Board is limited to its particular facts and does not purport to govern determinations involving a different invention, different prior art, and different level of ordinary skill in the art.  Progressive does not provide any meaningful explanation as to how the particular facts in *Acharya* are similar to the facts in the instant trial, such that the same

55

Case CBM2012-00002
Patent 6,064,970

conclusion must be reached here.  Progressive fails to recognize that Kosaka's fuzzy logic feature need not be used, and even if fuzzy logic feature is used, the result is to generate *crisp risk evaluation values*, instead of *fuzzy* data sets.  Moreover, Progressive does not explain adequately how combining Kosaka's disclosure of *crisp* risk evaluation values with Herrod's disclosure of generating actuarial classes of insurance based on actual monitored vehicle data would have required a substantial reconstruction and redesign of Kosaka's device, or a change in the basic principles of operation under which Kosaka's device was designed to operate.

For the foregoing reasons, we are not persuaded by Progressive's arguments that Kosaka and Herrod cannot be combined without fundamentally changing their operation, or that it is beyond the skill level of a person of ordinary skill in the art to modify Kosaka, with the teachings of Herrod, to generate actuarial classes from actual monitored driving data.

d. <u>Teaching away argument</u>

Progressive argues that Kosaka teaches away from determining insurance ratings or insurance premiums based on *actuarial classes*. PO Resp. 38-39.  In particular, Progressive submits that Kosaka criticizes the conventional approach of using actuarial classes to determine insurance premiums.  *Id*.  Liberty responds that "Kosaka explicitly states *fuzzy logic need not be used* with its vehicle sensors to evaluate driver safety and set insurance costs and premiums."  Reply 1, 3 (citing Ex. 1004, 6) (emphasis in original).  Liberty further maintains that, with or without fuzzy processing, Kosaka's device generates results in *crisp evaluation values*.  *Id*.

56

Case CBM2012-00002
Patent 6,064,970

To constitute a proper "teaching away," the teaching of the applicable prior art reference must be evaluated from a technological perspective, not merely a comparative perspective.  For instance, it is not a "teaching away" unless one with ordinary skill in the art would have understood that teaching as conveying that the method or structural configuration at issue reasonably cannot be expected to achieve what it is required to achieve according to the claimed invention.  *See, e.g.*, *Syntex (U.S.A) LLC v. Apotex, Inc.*, 407 F.3d 1371, 1380 (Fed. Cir. 2005) ("Under the proper legal standard, a reference will teach away when it suggests that the developments flowing from its disclosures are unlikely to produce the objective of the applicant's invention." (citing *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994))).  Further, "just because better alternatives exist in the prior art does not mean that an inferior combination is inapt for obviousness purposes."  *In re Mouttet*, 686 F.3d 1322, 1334 (Fed. Cir. 2012).  In that regard, one is not significantly "taught away" from a "particularly preferred embodiment" by the suggestion that something else may be even better.  *In re Susi*, 440 F.2d 442, 446 n.3 (CCPA 1971).

We are not persuaded by Progressive's argument, as it is premised on the incorrect notion that Kosaka's *fuzzy logic feature must be used* and Kosaka's result is a *fuzzy data set*, which we found unpersuasive above.

Progressive also reads incorrectly, and without support, Kosaka's statement—the "invention thus has the advantage of being a more equitable insurance system" (Ex. 1004, p. 9, col. 2:1-2)—as criticizing actuarial classes.  PO Resp. 38.  That statement in Kosaka has little to do with

57

Case CBM2012-00002
Patent 6,064,970

actuarial classes.  In fact, in the next sentence, Kosaka explains how its
device can be used *without the fuzzy logic feature*.  Ex. 1004, p. 9, col. 2:2-3
("In this case, the risk evaluation means *need not contain* an evaluation part
that operates by *fuzzy logic*.") (Emphasis added.).  That discussion in Kosaka
merely shows how its device—with or without using the fuzzy logic
feature—could provide an equitable insurance system.  That goal also is
consistent with the risk classification system that uses actuarial classes.
*See, e.g.*, Ex. 2020, ASOP No. 12 § 5 ("there are three primary purposes of
risk classification:  1. *to be fair*, . . .") (Emphasis added).  Progressive does
not explain meaningfully how Kosaka's disclosure, as a whole, would have
discouraged one of ordinary skill in the art from using actuarial classes or
risk classification.  *In re Gurley*, 27 F.3d at 553.

 Progressive also reads incorrectly, and without support, Kosaka's
discussion concerning conventional paper-based insurance agreements
(Ex. 1004, p. 2, col. 2:15-52) as criticizing actuarial classes.  PO Resp. 39.
Again, that discussion has little to do with actuarial classes.  Kosaka merely
highlights the advantage of using *monitored driving data*, by comparing the
conventional *paper-based* insurance agreements that determine a premium
based on using *static attributes* of the driver with Kosaka's automated
device that *monitors driving characteristics* and calculates a premium based
on the *monitored driving data*.  Ex. 1004, p. 2, col. 2:15-52.  Therefore, we
do not discern that Kosaka criticizes, discredits or otherwise discourages the
approach of using actuarial classes to determine insurance premiums.

58

Case CBM2012-00002
Patent 6,064,970

For the foregoing reasons, we are not persuaded by Progressive's
arguments, and hold that Liberty has demonstrated, by a preponderance of
the evidence, that claims 6, 9, 10, 13, and 18 of the '970 patent are
unpatentable over Kosaka and Herrod.

### G. Liberty's Motion to Exclude

Liberty seeks to exclude certain testimony of Mr. Ehsani (Ex. 2016
¶¶ 28-34).  Paper 48 ("Mot.") at 5-6.  As the movant, Liberty has the burden
of proof to establish that it is entitled to the requested relief.  *See* 37 C.F.R.
§ 42.20(c).  To that end, Liberty argues that Mr. Ehsani "lacks the necessary
'scientific, technical, or other specialized knowledge' on insurance issues
pertinent to the '970 patent to provide testimony on this subject."  Mot. 5.
Pursuant to Federal Rule of Evidence 702[14], Liberty alleges that Mr. Ehsani
fails to provide sufficient underlying facts or data upon which his opinions
regarding insurance matters and telematics matters are based.  *Id*. at 6-7.

Progressive counters that, in forming his opinion, Mr. Ehsani relied on
Mr. Miller's description of an actuarial class.  Paper 56 ("Opp.") at 3 (citing
Ex. 2016 ¶ 33, in which Mr. Ehsani declares that "I have been asked to
assume that an 'actuarial class' has the following characteristics . . .").
According to Progressive, Mr. Ehsani applied his own expertise as to fuzzy
logic and crisp logic using Mr. Miller's description of actuarial classes,
pursuant to Federal Rule of Evidence 703.  Opp. 3-4 (citing Federal Rule of

---

[14] As stated in 37 C.F.R. § 42.62, the Federal Rules of Evidence generally
apply to a covered business method patent review.

Case CBM2012-00002
Patent 6,064,970

Evidence 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.")).

We agree with Progressive. Mr. Ehsani may rely upon Mr. Miller's opinion on actuarial classes or other insurance aspects to formulate his opinion as to fuzzy logic, based on his education, experience, and skills, as outlined in his curriculum vitae (Ex. 2016 ¶¶ 1-12). We also are cognizant of Mr. Ehsani's qualifications and have weighed his testimony accordingly.

With respect to whether Mr. Ehsani's testimony should be excluded for lack of supporting facts or data, Liberty has not explained adequately why the Board should exclude Mr. Ehsani's testimony. There is a strong public policy for making all information filed in a non-jury, quasi-judicial administrative proceeding available to the public, especially in an *inter partes* review which determines the patentability of claim in an issued patent. It is within the Board's discretion to assign the appropriate weight to be accorded to evidence. *See, e.g., In re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d 1359, 1368 (Fed. Cir. 2004) ("[T]he Board is entitled to weigh the declarations and conclude that the lack of factual corroboration warrants discounting the opinions expressed in the declarations."); *Velander*, 348 F.3d at 1371 ("In giving more weight to prior publications than to subsequent conclusory statements by experts, the Board acted well within [its] discretion."); *Yorkey*, 601 F.3d at 1284 (holding the Board has discretion to give more weight to one item of evidence over another "unless no reasonable trier of fact could have done so"). As Liberty points out, it is better to have a complete record of the evidence submitted by the parties

60

Case CBM2012-00002
Patent 6,064,970

than to exclude particular pieces. Mot. 2 (citing *e.g., Donnelly Garment Co. v. NLRB*, 123 F.2d 215, 224 (8th Cir. 1942) ("One who is capable of ruling accurately upon the admissibility of evidence is equally capable of sifting it accurately after it has been received.")).

Accordingly, Liberty's motion to exclude is *denied*.

### H. Progressive's Motion to Exclude

Progressive seeks to exclude certain evidence submitted in support of Liberty's reply. Paper 51 ("PO Mot."). Liberty opposes Progressive's motion to exclude. Paper 57 ("Opp."). For the reasons stated below, Progressive's motion is *denied*.

As the movant, Progressive has the burden of proof to establish that it is entitled to the requested relief. *See* 37 C.F.R. § 42.20(c). A motion to exclude must explain why the evidence is not admissible (e.g., relevance or hearsay), but may not be used to challenge the sufficiency of the evidence to prove a particular fact. Office Patent Trial Practice Guide, 77 Fed. Reg. 48765, 48767 (Aug. 14, 2012). A motion to exclude evidence also must:

(a) Identify where in the record the objection originally was made;
(b) Identify where in the record the evidence sought to be excluded was relied upon by an opponent;
(c) Address objections to exhibits in numerical order; and
(d) Explain each objection.

*Id*. Progressive's motion to exclude does not identify where in the record the objection originally was made, and does not address objections to exhibits in numerical order.

61

Case CBM2012-00002
Patent 6,064,970

While a motion to exclude may raise issues related to admissibility of evidence, it is not an opportunity to file a sur-reply, and also is not a mechanism to argue that a reply contains new arguments or relies on evidence necessary to make out a prima facie case. Here, Progressive's motion to exclude contains such improper arguments, and is in the nature of a sur-reply. PO Mot. 1-15. Moreover, as discussed below, Progressive's arguments also are without merit.

*1. Evidence concerning the level of skill in the art and Kosaka*

Progressive seeks to exclude several publications (Exs. 1020, 1021, 1024-1028) and the declarations addressing those publications (Ex. 1019 ¶¶ 5-10; Ex. 1022 ¶¶ 24, 26, 28, 29, 31, 37). PO Mot. 4-14, Paper 62 ("PO Reply") at 3-5. According to Progressive, Liberty submitted those publications to combine with Kosaka as new grounds of unpatentability. *Id*. Progressive alleges that the declarations assert new prior art and new arguments for unpatentability based on new portions of Kosaka. *Id*. Progressive also argues that the evidence discussed above is unreliable. *Id*.

Liberty counters that the Board instituted the instant trial based on Liberty's arguments and evidence submitted with its petition and, therefore, its rebuttal evidence should not be excluded as "new evidence" that should have been submitted with the petition to make out a prima facie case. Opp. 2 (citing Decision on Institution, Paper 10 at 2). Liberty also maintains that its rebuttal evidence was submitted properly to respond to the issues raised in Progressive's response, as it continues to urge unpatentability on

62

Case CBM2012-00002
Patent 6,064,970

the same grounds instituted by the Board. *Id*. In particular, Liberty argues that its experts properly responded to Progressive's arguments—Kosaka's fuzzy logic approach would have been beyond the skill level of one of ordinary skill in the art, and Kosaka would not have enabled a person of ordinary skill in the art to understand or use the fuzzy logic approach. Opp. 3 (citing PO Resp. 32-33, Ex. 2016 ¶¶ 28-32). According to Liberty, its experts specifically countered Progressive's arguments by directing the Board's attention to the publications as evidence confirming that applying fuzzy logic to insurance is within the level of ordinary skill in the art. Opp. 3-4 (citing Ex. 1019 ¶¶ 5-8; Ex. 1022 ¶¶ 24, 26, 28, 31).

Having considered the parties' arguments and supporting evidence, we are not persuaded by Progressive's arguments. Rather, we agree with Liberty that the publications and declaration evidence addressing those publications were submitted to confirm the level of ordinary skill in the art—an issue that was raised by Progressive in its patent owner response (PO Resp. 30-38). More importantly, we do not agree with Progressive's argument that Liberty attempted to combine those publications with Kosaka as one or more new grounds of unpatentability. Liberty has not relied upon any of the publications to meet the claim limitations. Instead, the publications merely constitute evidence of the knowledge of a person with ordinary skill in the art. *Randall Mfg. v. Rea*, No. 2012-1611, 2013 WL 5813334, at *4 (Fed. Cir. Oct. 30, 2013) (When considering whether a claimed invention would have been obvious, "the knowledge of [an ordinarily skilled] artisan is part of the store of public knowledge that must

63

Case CBM2012-00002
Patent 6,064,970

be consulted."). Such evidence does not change the combination that
formed the basis of the grounds of unpatentability. *Id.*; *see also In re
Donohue*, 766 F.2d 531, 534 (Fed. Cir. 1985).

   With respect to Progressive's argument that Liberty's expert relied
upon new portions of Kosaka (PO Mot. 7-10), it would be unreasonable to
prohibit rebuttal testimony from referring to the same figures or portions of
the reference discussed by Progressive's expert in support of its patent
owner response. The testimony of Liberty's expert, Mr. Andrews (Ex. 1019
¶¶ 5-9), was submitted in response to Mr. Ehsani's testimony concerning
Kosaka's Figures 10 and 11 (Ex. 2016 ¶¶ 28-29, 31). To rebut Mr. Ehsani's
assertions regarding Kosaka's Figures 10 and 11, it would be reasonable for
Mr. Andrews's rebuttal testimony to address those same figures. Therefore,
we do not agree with Progressive's position that Mr. Andrews's testimony
should be excluded.

   We also are not persuaded by Progressive's argument that
Mr. Andrews's testimony is unreliable for relying upon "after-the-fact
disclosures." PO Mot. 9-10. Mr. Andrews does not rely on the 1997 and
1999 publications (Ex. 1020-1021) as prior art against Progressive's claims.
It is well settled that references that have publication dates after the critical
date may be cited to show the state of the art at or around the time of the
invention. *Eli Lilly and Co. v. Barr Labs., Inc.*, 251 F.3d 955, 969-70 (Fed.
Cir. 2001); *see also In re Wilson*, 311 F.2d 266, 268-269 (CCPA 1962).
Mr. Andrews's testimony (Ex. 1019 ¶¶ 5, 6, 8, 9) was submitted to rebut
Mr. Ehsani's assertion that a person of ordinary skill in the art *would not*

64

Case CBM2012-00002
Patent 6,064,970

*have had training or understanding of fuzzy logic* in 1996 (Ex. 2016 ¶¶ 28, 31, 32).  Mr. Andrews's testimony directed our attention to:   (1) the 1997 paper, authored by Mr. Ehsani, that cites an existing 1994 book on fuzzy logic (Ex. 1020); and (2) the 1999 text book that states—"fuzzy logic has finally been accepted as an emerging technology since the late 1980s" (Ex. 1021, 3[15]).  Mr. Andrews's testimony is consistent with those publications.  Notably, the 1997 paper authored by Mr. Ehsani (Ex. 1020) cites to several fuzzy logic publications with publication dates that are *1994 or earlier*.  Consequently, we disagree with Progressive's position that Mr. Andrews's testimony with respect to those publications is unreliable.

As to Progressive's argument that Mr. Andrews is not qualified as a person of ordinary skill in the *insurance aspects* of the '970 patent (PO Mot. 9-10 (citing Ex. 1019 ¶¶ 5, 8)), we agree with Liberty that Mr. Andrews's testimony in those paragraphs contains no opinion on the "insurance aspect of Kosaka."  *See* Opp. 7-8, Ex. 1019 ¶¶ 5, 8.  In fact, Mr. Andrews declined to testify on the insurance issue—"In Kosaka, the particular parameter values associated with this classification would be a question of insurance underwriting, which is something that neither Dr. Ehsani nor myself are qualified to determine–rather, this would be determined by a person of ordinary skill in the insurance aspects of the '970 patent."  Ex. 1019 ¶ 8.  Therefore, we disagree with Progressive's position that Mr. Andrews is not

---

[15] All references to the page numbers in the 1999 text book refer to the original page numbers in the bottom, right corner.

65

Case CBM2012-00002
Patent 6,064,970

qualified to testify with regard to the subject matter in paragraphs 5 and 8 of
his declaration (Ex. 1019 ¶¶ 5, 8).

We also are not persuaded by Progressive's arguments that the
testimony of Liberty's experts regarding the defuzzification, crisp values,
and non-fuzzy logic disclosures of Kosaka is improper rebuttal evidence.
PO Mot. 10-14 (citing Ex. 1019 ¶¶ 9-10; Ex. 1022 ¶¶ 26, 28, 29, 31, 37;
Exs. 1021, 1025).  Rather, we determine that Liberty properly submitted the
evidence to rebut Progressive's arguments that Kosaka's device generates
*fuzzy* values rather than *crisp* values, and that Kosaka is *nonenabling*, both
of which are issues raised by Progressive in its patent owner response
(PO Resp. 30-38).  As Liberty points out, its experts "responded by
explaining that the use of both 'fuzzy' interim values and 'crisp' results in
Kosaka's disclosure would, to the contrary, have been understood by a
[person of ordinary skill in the art], including the conversion of 'fuzzy'
values to 'crisp' values through standard 'defuzzification.'"  Opp. 10 (citing
Ex. 1019 ¶¶ 9-10; Ex. 1021; Ex. 1022 ¶¶ 26, 28, 29, 31, 37; Ex. 1025).
Moreover, merely pointing to the non-fuzzy logic disclosure of Kosaka in
response to Progressive's non-enabling argument does not constitute a new
theory to support a ground of unpatentability.  We, thus, disagree with
Progressive's position that the testimony of Liberty's experts should be
excluded.

Progressive further alleges that Ms. O'Neil's testimony as to Kosaka's
fuzzy logic disclosure is unreliable, because Ms. O'Neil is not qualified as
an expert in fuzzy logic, but rather an insurance expert.  PO Mot. 12 (citing

66

Case CBM2012-00002
Patent 6,064,970

Ex. 1022 ¶¶ 26, 37).  We are not persuaded by Progressive's argument.
Instead, we agree with Liberty (Opp. 11) that Ms. O'Neil may respond to the
testimony of Progressive's expert, Mr. Miller (Ex. 2010 ¶¶ 36, 43), who also
is not a fuzzy logic expert, but rather is an insurance expert (Ex. 2010,
Ex. 2015).  We also observe that Ms. O'Neil cited, in her testimony, several
fuzzy logic publications (Exs. 1025-1028) and Kosaka for support
(Ex. 1004, 1, 8, Fig. 11).  Moreover, we are cognizant of the qualifications
of Ms. O'Neil in her field of expertise and have weighed her testimony on
the specific subject, accordingly, with the underlying facts on which the
opinion is based.  It is not necessary to exclude any portion of her testimony.
For these reasons, we do not agree with Progressive that Ms. O'Neil's
testimony should be excluded.

Progressive also alleges that another portion of Ms. O'Neil's
declaration is unreliable.  PO Mot. 14 (citing Ex. 1022 ¶ 29).  According to
Progressive, Ms. O'Neil's statement made in her reply declaration—
"fuzzy logic is not the key point in the Kosaka reference" (Ex. 1022 ¶ 29)—
contradicts her cross examination testimony—"all of the embodiments that
are actually disclosed and described in the Kosaka patent use fuzzy logic,"
the "patent is presented using fuzzy logic," and "tout[s] the advantage of
using fuzzy logic" (Ex. 2022, 90:3-7, 90:23-91:2).  PO Mot. 14.  However,
Ms. O'Neil's statement made in her reply declaration does not contradict
Kosaka's disclosure, as a whole.  Kosaka explicitly states that *fuzzy logic
need not be used*, even in the embodiment where it is disclosed.  Ex. 1004,
p. 6, col. 1:45-51.  Furthermore, any inconsistency simply would affect the

67

Case CBM2012-00002
Patent 6,064,970

weighing of the evidence. Therefore, we do not agree with Progressive that
Ms. O'Neil's testimony should be excluded.

### 2. Rebuttal evidence concerning Herrod

Progressive seeks to exclude Ms. O'Neil's rebuttal testimony
concerning Herrod. Mot. 14-15 (citing Ex. 1022 ¶¶ 43, 45-47, 49, and 51).
Progressive argues that Ms. O'Neil improperly relied on different portions of
Herrod's disclosure than those cited in Liberty's petition. Mot. 15
(*comparing* Ex. 1022 ¶¶ 43 and 51 *with* Pet. 36-37, 55-56, and 70-71).
Progressive further contends that Ms. O'Neil introduced new opinions as to
the knowledge of a person of ordinary skill in the art with respect to Herrod.
Mot. 5 (citing Ex. 1022 ¶¶ 43, 45-47, 49). Liberty counters that
Ms. O'Neil's testimony merely was submitted to rebut Progressive's
arguments—"Herrod is too technical and has no 'relevance' to insurance
premium determination or Progressive's redefinition of 'actuarial classes.'"
Opp. 13 (citing PO Resp. 24-25, Ex. 2010 ¶ 48).

We are not persuaded by Progressive's argument. Rather, we
determine that Ms. O'Neil's testimony (Ex. 1022 ¶¶ 43, 45-47, 49) is proper
rebuttal evidence that responds to the issues raised by Progressive in its
patent owner response—Progressive's newly proposed construction of claim
term "actuarial class" and Progressive's arguments related the skill level of a
person of ordinary skill in the art (PO Resp. 23-30). Notably, each section
of Ms. O'Neil's testimony (Ex. 1022 ¶¶ 42, 48) first directs our attention to
the testimony of Progressive's expert, Mr. Miller (Ex. 2010 ¶ 48), and then

68

Case CBM2012-00002
Patent 6,064,970

presents her rebuttal testimony as to Mr. Miller's assertions (Ex. 1022 ¶¶ 43, 45-47, 49).  For instance, to rebut Progressive's argument, and Mr. Miller's corresponding testimony, that a person of ordinary skill in the art "would have had no reason to think that the disclosure of Herrod had any relevance to . . . the determination of auto insurance premiums" (PO Resp. 25, Ex. 2010 ¶ 48), Ms. O'Neil testifies that such a contention is based on an unreasonably narrow reading of Herrod's disclosure.  Ex. 1022 ¶ 43.  Ms. O'Neil points out that Herrod's disclosure, on its face, explicitly and repeatedly describes using its system for insurance purposes.  *Id.* (citing Ex. 1007, 1, 2).

For the reasons stated above, Progressive has not demonstrated that Ms. O'Neil's testimony exceeds the proper scope of reply evidence.

### 3. *Evidence concerning actuarial classes*

Progressive seeks to exclude Ms. O'Neil's rebuttal testimony as to actuarial classes as unreliable, irrelevant, and highly prejudicial, pursuant to Federal Rules of Evidence 702, 402, and 403.  Mot. 15 (citing Ex. 1022 ¶¶ 8, 13, 45, 50, and 56).  Progressive alleges that Ms. O'Neil "claimed repeatedly that Progressive's expert required using only 'actual claims data' to generate actuarial classes even though he did not so testify."  Mot. 15 (citing Ex. 2022, 31:11-13, 39:8-9, 39:21-24).

Progressive further states that its argument is set forth more fully in its motion to exclude in CBM2012-00004 at pages 8-11.  Progressive attempts to circumvent the page limit set forth in 37 C.F.R. § 42.24(a)(v),

69

Case CBM2012-00002
Patent 6,064,970

and also violates the prohibition of incorporation by reference (37 C.F.R.

§ 42.6(a)(3)). We decline to consider Progressive's arguments, because they

are not sufficiently explained or made in this proceeding.

We also agree with Liberty that "the Board, sitting as a non-jury

tribunal with administrative expertise, is well-positioned to determine and

assign appropriate weight to the evidence presented in this trial, without

resorting to formal exclusion that might later be held reversible error."

Opp. 1 (citing *e.g.*, *S.E.C. v. Guenthner*, 395 F. Supp. 2d 835, 842 n.3 (D.

Neb. 2005)).

For the foregoing reasons, we decline to exclude any of Liberty's

evidence filed in support of its reply. Accordingly, Progressive's motion to

exclude evidence is *denied*.


### III.  CONCLUSION

Liberty has met its burden of proof, by a preponderance of the

evidence, in showing that claims 1, 3-6, and 9-18 of the '970 patent are

unpatentable based on the following grounds:

- A. Claims 4, 5, 16, and 17 are unpatentable under 35 U.S.C. § 103(a)
  over Kosaka and Florida Guide;

- B. Claims 1, 3, 11, 12, 14, and 15 are unpatentable under 35 U.S.C.
  § 103(a) over Kosaka, Black Magic, and Herrod; and

- C. Claims 6, 9, 10, 13, and 18 are unpatentable under 35 U.S.C. § 103(a)
  over Kosaka and Herrod.

70

Case CBM2012-00002
Patent 6,064,970

## IV.  ORDER

In consideration of the foregoing, it is

ORDERED that claims 1, 3-6, and 9-18 of the '970 patent are CANCELLED;

FURTHER ORDERED that Liberty's Motion to Exclude Evidence is *denied*; and

FURTHER ORDERED that Progressive's Motion to Exclude Evidence is *denied*.

71

Case CBM2012-00002
Patent 6,064,970


PETITIONER:

J. Steven Baughman
James R. Myers
Nicole M. Jantzi
ROPES & GRAY LLP
steven.baughman@ropesgray.com
james.myers@ropesgray.com
nicole.jantzi@ropesgray.com

PATENT OWNER:

Calvin P. Griffith
James L. Wamsley, III
John V. Biernacki
JONES DAY
cpgriffith@jonesday.com
jlwamsleyiii@jonesday.com

72

Exhibit 1001 Case: 14-1466   Document: 4



US006064970A

# United States Patent [19]

McMillan et al.

[11] **Patent Number:** 6,064,970

[45] **Date of Patent:** *May 16, 2000

[54] **MOTOR VEHICLE MONITORING SYSTEM FOR DETERMINING A COST OF INSURANCE**

[75] Inventors: **Robert John McMillan**, Tampa, Fla.; **Alexander Dean Craig**, Moreland Hills, Ohio; **John Patrick Heinen**, Tampa, Fla.

[73] Assignee: **Progressive Casualty Insurance Company**, Mayfield Village, Ohio

[ * ] Notice: This patent is subject to a terminal disclaimer.

[21] Appl. No.: **09/135,034**

[22] Filed: **Aug. 17, 1998**

**Related U.S. Application Data**

[63] Continuation of application No. 08/592,958, Jan. 29, 1996, Pat. No. 5,797,134.

[51] **Int. Cl.** $^7$ ..................................................... **G06F 17/60**

[52] **U.S. Cl.** ......................... **705/4**; 340/439; 340/870.01; 360/5; 702/1; 705/400

[58] **Field of Search** .............................. 340/439, 870.01; 360/5; 701/1.7; 702/1; 705/4, 400

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,504,337 | 3/1970 | Ekman ..................................... 340/439 |
| 4,067,061 | 1/1978 | Juhasz ........................................ 360/5 |
| 4,234,926 | 11/1980 | Wallace et al. ......................... 702/188 |
| 4,258,421 | 3/1981 | Juhasz et al. ........................... 701/35 |
| 4,533,962 | 8/1985 | Decker et al. ........................... 360/5 |
| 4,608,638 | 8/1986 | Tsikos ...................................... 364/424 |
| 4,638,295 | 1/1987 | Middlebrook et al. ................. 340/465 |
| 4,667,336 | 5/1987 | Best .......................................... 377/15 |
| 4,745,564 | 5/1988 | Tennes et al. ........................... 702/141 |
| 4,763,745 | 8/1988 | Eto et al. ................................. 180/143 |
| 4,807,179 | 2/1989 | Clere et al. ............................. 360/5 X |
| 4,829,434 | 5/1989 | Karmel et al. ......................... 72/866 X |
| 4,843,463 | 6/1989 | Michetti ................................... 358/108 |

| | | |
|---|---|---|
| 4,843,578 | 6/1989 | Wade ........................................ 364/565 |
| 4,853,720 | 8/1989 | Onari et al. ......................... 364/431.07 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

9002388   8/1989   WIPO .

OTHER PUBLICATIONS

"The Safest Cars of 91", Baig, Edward U.S. News & World Report v109, n22, p.71;Dec. 3, 1990.

"Vendor's Spice Up Services", Robert Deierlein, Beverage-World, v109, n1467, p.82; Jun. 1990.

Rosenberg, Martin; Alexander, Stephen A. ; Rate Classification Reform in New Jersey. Best's Review (Prop/Casualty) vo. 92. No. 12, pp. 30–32, Apr. 1992.

Kaneko, Tetsuya; Jovanis, Paul P. Multiday driving patterns and motor carrier accident risk. A disaggregate analysis. Accident Analysis and Prevention, vol. 24, No. 5, pp. 437–456, Jan. 1, 1992.

*Primary Examiner*—Edward R. Cosimano
*Attorney, Agent, or Firm*—Fay, Sharpe, Fagan Minnich & McKee, LLP

[57] **ABSTRACT**

A method and system of determining a cost of automobile insurance based upon monitoring, recording and communicating data representative of operator and vehicle driving characteristics. The cost is adjustable retrospectively and can be prospectively set by relating the driving characteristics to predetermined safety standards. The method comprises steps of monitoring a plurality of raw data elements representative of an operating state of the vehicle or an action of the operator. Selected ones of the raw data elements are recorded when the ones are determined to have an identified relationship to safety standards. The selected ones are consolidated for processing against an insurer profile and for identifying a surcharge or discount to be applied to a base cost of automobile insurance. A final cost is produced from the base costs and the surcharges or discounts.

**15 Claims, 6 Drawing Sheets**



**Liberty Mutual
Exhibit 1001**

**6,064,970**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,939,652 | 7/1990 | Steiner | 364/424.04 |
| 4,987,541 | 1/1991 | Levente et al. | 364/424.04 |
| 4,992,943 | 2/1991 | McCracken | 364/424.04 |
| 5,055,851 | 10/1991 | Sheffer | 342/457 |
| 5,111,289 | 5/1992 | Lucas et al. | 358/108 |
| 5,189,621 | 2/1993 | Onari et al. | 364/431.04 |
| 5,223,844 | 6/1993 | Mansell et al. | 342/357 |
| 5,319,374 | 6/1994 | Desai et al. | 342/387 |
| 5,365,451 | 11/1994 | Wang et al. | 364/449 |
| 5,430,432 | 7/1995 | Camhi et al. | 340/438 |
| 5,499,182 | 3/1996 | Ousborne | 701/35 |
| 5,500,806 | 3/1996 | Bellin et al. | 364/528.33 |
| 5,548,273 | 8/1996 | Nicol et al. | 340/439 |
| 5,550,551 | 8/1996 | Alesiu | 342/457 |
| 5,638,273 | 6/1997 | Coiner et al. | 364/424.04 |
| 5,694,322 | 12/1997 | Westerlage et al. | 705/417 |
| 5,797,134 | 8/1998 | McMillan et al. | 705/400 |

**A87**



FIG.1

FIG. 2





FIG. 3



FIG. 4



FIG. 5

| INFORMATION DATABASE<br><br>- MAPS<br>- SPEED LIMITS<br>- TRAFFIC SIGNS<br>- HIGHWAY CONDITIONS<br>- (FUTURE TBD) | INTERFACE<br><br>-COMPUTER STORAGE | SAMPLE RATE<br><br>- ON DEMAND |
|---|---|---|
| VEHICLE SOURCES<br><br>- ENGINE DATA<br>- BODY DATA<br>- ELECTRICAL DATA | INTERFACE<br><br>- SAE J1978 CONNECTOR | SAMPLE RATE<br><br>- 10 - 15HZ |
| OTHER SOURCES<br><br>- IVHS DATA<br>- GPS DATA<br>- SECURITY SYSTEM<br>- ADDITIONAL SYSTEM(S) | INTERFACE<br><br>- VARIOUS I/O PORTS<br>(eg, RS-232/422, ETC.) | SAMPLE RATE<br><br>- VARIES |

FIG. 6

MOTOR VEHICLE INSURANCE PROCESS
VEHICLE DATA ACQUISITION PROCESS FLOW

6,064,970

**1**

# MOTOR VEHICLE MONITORING SYSTEM FOR DETERMINING A COST OF INSURANCE

This application is a continuation application of U.S. Ser. No. 08/592,958, filed Jan. 29, 1996, now U.S. Pat. No. 5,797,134.

## BACKGROUND OF THE INVENTION

The present invention relates to data acquisition and processing systems, and particularly to a system for monitoring motor vehicle operational characteristics and driver behavior to obtain increased amounts of data relating to the safety of use for purposes of providing a more accurate determination of a cost of insurance for the vehicle.

Conventional methods for determining costs of motor vehicle insurance involve gathering relevant historical data from a personal interview with the applicant for the insurance and by referencing the applicant's public motor vehicle driving record that is maintained by a governmental agency, such as a Bureau of Motor Vehicles. Such data results in a classification of the applicant to a broad actuarial class for which insurance rates are assigned based upon the empirical experience of the insurer. Many factors are relevant to such classification in a particular actuarial class, such as age, sex, marital status, location of residence and driving record.

The current system of insurance creates groupings of vehicles and drivers (actuarial classes) based on the following types of classifications.

Vehicle:

Age;

manufacturer, model; and

value.

Driver:

Age;

sex;

marital status;

driving record (based on government reports), violations (citations);

at fault accidents; and

place of residence.

Coverage:

Types of losses covered,

liability,

uninsured motorist,

comprehensive, and

collision;

liability limits; and

deductibles.

The classifications, such as age, are further broken into actuarial classes, such as 21 to 24, to develop a unique vehicle insurance cost based on the specific combination of actuarial classes for a particular risk. For example, the following information would produce a unique vehicle insurance cost.

Vehicle:

Age 1993 (three years old)

manufacturer, model Ford, Explorer XLT

value $ 18,000.

Driver:

Age 38 years old

sex male

marital status single

**2**

driving record (based on government reports)

violations 1 point (speeding)

at fault accidents 3 points (one at fault accident)

place of residence 33619 (zip code)

Coverage:

Types of losses covered

liability yes

uninsured motorist no

comprehensive yes

collision yes

liability limits $100,000./$300,000./$50,000.

deductibles $500./$500.

A change to any of this information would result in a different premium being charged, if the change resulted in a different actuarial class for that variable. For instance, a change in the drivers' age from 38 to 39 may not result in a different actuarial class, because 38 and 39 year old people may be in the same actuarial class. However, a change in driver age from 38 to 45 may result in a different premium because of the change in actuarial class.

Current insurance rating systems also provide discounts and surcharges for some types of use of the vehicle, equipment on the vehicle and type of driver. Common surcharges and discounts include:

Surcharges:

Business use.

Discounts:

Safety equipment on the vehicle

airbags, and

antilock brakes;

theft control devices

passive systems (e.g. "The Club"), and

alarm system; and

driver type

good student, and

safe driver (accident free).

A principal problem with such conventional insurance determination systems is that much of the data gathered from the applicant in the interview is not verifiable, and even existing public records contain only minimal information, much of which has little relevance towards an assessment of the likelihood of a claim subsequently occurring. In other words, current rating systems are primarily based on past realized losses. None of the data obtained through conventional systems necessarily reliably predicts the manner or safety of future operation of the vehicle. Accordingly, the limited amount of accumulated relevant data and its minimal evidential value towards computation of a fair cost of insurance has generated a long-felt need for an improved system for more reliably and accurately accumulating data having a highly relevant evidential value towards predicting the actual manner of a vehicle's future operation.

Many types of vehicle operating data recording systems have heretofore been suggested for purposes of maintaining an accurate record of certain elements of vehicle operation. Some are suggested for identifying the cause for an accident, others are for more accurately assessing the efficiency of operation. Such systems disclose a variety of conventional techniques for recording vehicle operation data elements in a variety of data recording systems. In addition, it has also been suggested to provide a radio communication link for such information via systems such as a cellular telephone to provide immediate communication of certain types of data elements or to allow a more immediate response in cases such as theft, accident, break-down or emergency. It has even been suggested to detect and record seatbelt usage to

6,064,970

3

assist in determination of the vehicle insurance costs (U.S. Pat. No. 4,667,336).

The various forms and types of vehicle operating data acquisition and recordal systems that have heretofore been suggested and employed have met with varying degrees of success for their express limited purposes. All possess substantial defects such that they have only limited economical and practical value for a system intended to provide an enhanced acquisition, recordal and communication system of data which would be both comprehensive and reliable in predicting an accurate and adequate cost of insurance for the vehicle. Since the type of operating information acquired and recorded in prior art systems was generally never intended to be used for determining the cost of vehicle insurance, the data elements that were monitored and recorded therein were not directly related to predetermined safety standards or the determining of an actuarial class for the vehicle operator. For example, recording data characteristics relevant to the vehicle's operating efficiency may be completely unrelated to the safety of operation of the vehicle. Further, there is the problem of recording and subsequently compiling the relevant data for an accurate determination of an actuarial profile and an appropriate insurance cost therefor.

Current motor vehicle control and operating systems comprise electronic systems readily adaptable for modification to obtain the desired types of information relevant to determination of the cost of insurance. Vehicle tracking systems have been suggested which use communication links with satellite navigation systems for providing information describing a vehicle's location based upon navigation signals. When such positioning information is combined with roadmaps in an expert system, vehicle location is ascertainable. Mere vehicle location, though, will not provide data particularly relevant to safety of operation unless the data is combined with other relevant data in an expert system which is capable of assessing whether the roads being driven are high-risk or low-risk with regard to vehicle safety.

The present invention contemplates a new and improved motor vehicle monitoring, recording and communication system, which primarily overcomes the problem of determining cost of vehicle insurance based upon data which does not take into consideration how a specific vehicle is operated. The subject invention will base insurance charges with regard to current material data representative of actual driving characteristics of the vehicle and driver operation to provide a classification rating of the operator and the vehicle in an actuarial class which has a vastly reduced rating error over conventional insurance cost systems. Additionally, the present invention allows for frequent (monthly) adjustment to the cost of coverage because of the changes in operator behavior and driving patterns. This can result in automobile insurance charges that are readily controllable by the individual operators. The system is adaptable to current electronic operating systems, tracking systems and communication systems for the improved extraction of selected insurance related data.

BRIEF SUMMARY OF THE INVENTION

In accordance with the present invention, there is disclosed a method of determining a cost of automobile insurance based upon monitoring, recording and communicating data representative of operator and vehicle driving characteristics, whereby the cost is adjustable by relating the driving characteristics to predetermined safety standards. The method is comprised of steps of monitoring a plurality

4

of raw data elements representative of an operating state of a vehicle or an action of the operator. Selected ones of the plurality of raw data elements are recorded when they are determined to have an identified relationship to the safety standards. The recorded elements are consolidated for processing against an insured profile and for identifying, a surcharge or discount to be applied to a base cost of automobile insurance. The total cost of insurance obtained from combining the base cost and surcharges or discounts is produced as a final cost to the operator.

In accordance with another aspect of the present invention, the recording comprises identifying a trigger event associated with the raw data elements which has an identified relationship to the safety standards so that trigger information representative of the event is recorded.

In accordance with a more limited aspect of the present invention, the method comprises a step of immediately communicating to a central control station via an uplink, information representative of the trigger event and recording response information generated by the control station.

In accordance with yet another aspect of the present invention, the method comprises steps of generating calculated data elements and derived data elements from the raw data elements, and accumulating the calculated and derived data elements in a recording device.

The present invention will use information acquired from the vehicle to more accurately assess vehicle usage and thereby derive insurance costs more precisely and fairly. Examples of possible actuarial classes developed from vehicle provided data include:

Driver:

Total driving time in minutes by each driver of the insured vehicle;

number of minutes driving in high/low risk locations (high/low accident areas);

number of minutes of driving at high/low risk times (rush hour or Sunday afternoon);

safe driving behavior,
  using seat belts,
  use of turn signals,
  observance of speed limits, and
  observance of traffic control devices;

number of sudden braking situations; and

number of sudden acceleration situations.

Vehicle:

Location vehicle is parked at night (in garage, in driveway, on street); and

location vehicle is parked at work (high theft locations, etc.).

These new and more precise actuarial classes are considered to be better predictors of loss because they are based on actual use of the vehicle and the behaviors demonstrated by the driver. This will allow the consumers unprecedented control over the ultimate cost of their vehicle insurance.

In accordance with the present invention, additional discounts and surcharges based on data provided by the insured vehicle will be available. Examples of surcharges and discounts based on vehicle provided data include:

Surcharges:

Excessive hard braking situations occurring in high risk locations; and

intermittent use of a safety device, such as seat belts.

Discounts:

Regular selection of low/high risk routes of travel;

6,064,970

5

regular travel at low/high risk times;

significant changes in driving behavior that results in a lower risk;

vacation discount when the vehicle is not used;

regular use of safety devices; and

unfailing observance of speed limits.

There is some overlap between the use of actuarial classes and discounts and surcharges. Until data has been gathered and analyzed it is not possible to determine which vehicle provided data will be used to determine actuarial classes and which will be used for surcharges or discounts.

One benefit obtained by use of the present invention is a system that will provide precise and timely information about the current operation of an insured motor vehicle that will enable an accurate determination of operating characteristics, including such features as miles driven, time of use and speed of the vehicle. This information can be used to establish actual usage based insurance charges, eliminating rating errors that are prevalent in traditional systems and will result in vehicle insurance charges that can be directly controlled by individual operators.

It is another benefit of the subject invention that conventional motor vehicle electronics are easily supplemented by system components comprising a data recording, a navigation system and a communications device to extract selected insurance relevant data from the motor vehicle.

It is yet another object of the present invention to generate actuarial classes and operator profiles relative thereto based upon actual driving characteristics of the vehicle and driver, as represented by the monitored and recorded data elements for providing a more knowledgeable, enhanced insurance rating precision.

The subject new insurance rating system retrospectively adjusts and prospectively sets premiums based on data derived from motor vehicle operational characteristics and driver behavior through the generation of new actuarial classes determined from such characteristics and behavior, which classes heretofore have been unknown in the insurance industry. The invention comprises an integrated system to extract via multiple sensors, screen, aggregate and apply for insurance rating purposes, data generated by the actual operation of the specific vehicle and the insured user/driver.

Other benefits and advantages of the subject new vehicle insurance cost determination process will become apparent to those skilled in the art upon a reading and understanding of the specification.

## BRIEF DESCRIPTION OF THE DRAWINGS

The invention may take physical form in certain parts and steps and arrangements of parts and steps, the preferred embodiments of which will be described in detail in this specification and illustrated in the accompanying drawings which form a part hereof and wherein:

FIG. 1 is a flowchart generally describing a data gathering process from a vehicle;

FIG. 2 is a flowchart detailing the gathering and consolidating of appropriate information for determining a cost of insurance and the resulting insurance billing process;

FIG. 3 is a suggestive perspective drawing of a vehicle including certain data element monitoring, recording and communicating devices;

FIG. 4 is a block diagram of a vehicle on-board computer and recording system implementing the subject invention for selective communication with a central control center and a global positioning navigation system;

6

FIG. 5 is a flowchart generally illustrating a method for acquiring and recording vehicle insurance related data; and

FIG. 6 is a tabular illustration of various sources of insurance-related data, a necessary interface for acquiring the data and an exemplary sample rate therefor.

## DETAILED DESCRIPTION OF THE INVENTION

Referring now to the drawings, wherein the showings are for purposes of illustrating the preferred embodiments of the invention only and not for purposes of limiting same, the FIGURES show an apparatus and method for monitoring, recording and communicating insurance related data for determination of an accurate cost of insurance based upon evidence relevant to the actual operation and in particular the relative safety of that operation. Although described with specific reference to automobiles, this invention is also applicable to other operator controlled motor vehicles normally requiring insurance. Generally, a vehicle user is charged for insurance based upon statistical averages related to the safety of operation based upon the insurer's experience with other users who drive similar vehicles in a similar geographic area. The invention allows for the measure of the actual data while the motor vehicle is being driven. Such data measurement will allow the vehicle user to directly control his/her insurance costs by operating the vehicle in a manner which he/she will know will evidence superior safety of operation and a minimal risk of generation of an insurance claim. Examples of data which can be monitored and recorded include:

1. Actual miles driven;

2. Types of roads driven on (high risk vs. low risk); and,

3. Safe operation of the vehicle by the vehicle user through:

   A. speeds driven,

   B. safety equipment used, such as seat belt and turn signals,

   C. time of day driven (high congestion vs. low congestion),

   D. rate of acceleration,

   E. rate of braking,

   F. observation of traffic signs.

With reference to FIG. 3, an exemplary motor vehicle is shown in which the necessary apparatus for implementing the subject invention is included. An on-board computer 300 monitors and records various sensors and operator actions to acquire the desired data for determining a fair cost of insurance. Although not shown therein, a plurality of operating sensors are associated with the motor vehicle to monitor a wide variety of raw data elements. Such data elements are communicated to the computer through a connections cable which is operatively connected to the vehicle data bus 304 through an SAE-J1978 connector, or OBD-II connector or other vehicle sensors 306. A driver input device 308 is also operatively connected to the computer 300 through connector 307 and cable 302. The computer is powered through the car battery 310 or a conventional generator system (not shown). Tracking of the vehicle for location identification can be implemented by the computer 300 through navigation signals obtained from a GPS (global positioning system) antenna or other locating system 312. The communications link to a central control station is accomplished through the cellular telephone, radio, satellite or other wireless communication system 314.

FIG. 4 provides the block diagram of the in-vehicle computer system. The computer 300 is comprised of four

6,064,970

**7**

principal components, an on-board data storage device **402**, an input/output subsystem **404** for communicating to a variety of external devices, a central processing unit and memory device **406** and a real time operating kernel **408** for controlling the various processing steps of the computer **300**. The computer **300** essentially communicates with three on-board vehicle devices for acquisition of information representative of various actual vehicle operating characteristics. A driver input console **410** allows the driver to input data representative of a need for assistance or for satisfaction of various threshold factors which need to be satisfied before the vehicle can be operated. The physical operation of the vehicle is monitored through various sensors **412** in operative connection with the vehicle data bus, while additional sensors **414** not normally connected to the data bus can be in direct communication with the computer **300** as will hereinafter be more fully explained.

The vehicle is linked to an operation control center **416** by a communications link **418**, preferably comprising a conventional cellular telephone interconnection. A navigation sub-system **420** receives radio navigation signals from a GPS **422**.

The type of elements monitored and recorded by the subject invention comprise raw data elements, calculated data elements and derived data elements. These can be broken down as follows:

Raw Data Elements:
  Power train sensors
    RPM,
    transmission setting (Park, Drive, Gear, Neutral),
    throttle position,
    engine coolant temperature,
    intake air temperature,
    barometric pressure;
  Electrical sensors
    brake light on,
    turn signal indicator,
    headlamps on,
    hazard lights on,
    back-up lights on,
    parking lights on,
    wipers on,
    doors locked,
    key in ignition,
    key in door lock,
    horn applied;
  Body sensors
    airbag deployment,
    ABS application,
    level of fuel in tank,
    brakes applied,
    radio station tuned in,
    seat belt on,
    door open,
    tail gate open,
    odometer reading,
    cruise control engaged,
    anti-theft disable;
  Other sensors
    vehicle speed,
    vehicle location,
    date,
    time,
    vehicle direction,
    IVHS data sources.
Calculated Data Elements:
  rapid deceleration;

**8**

  rapid acceleration;
  vehicle in skid;
  wheels in spin;
  closing speed on vehicle in front;
  closing speed of vehicle in rear;
  closing speed of vehicle to side (right or left);
  space to side of vehicle occupied;
  space to rear of vehicle occupied;
  space to front of vehicle occupied;
  lateral acceleration;
  sudden rotation of vehicle;
  sudden loss of tire pressure;
  driver identification (through voice recognition or code or
    fingerprint recognition);
  distance travelled; and
  environmental hazard conditions (e.g. icing, etc.).
Derived Data Elements:
  vehicle speed in excess of speed limit;
  observation of traffic signals and signs;
  road conditions;
  traffic conditions; and
  vehicle position.
This list includes many, but not all, potential data elements.

With particular reference to FIG. **1**, a flowchart generally illustrating the data gathering process of the subject invention is illustrated. Such a process can be implemented with conventional computer programming in the real time operating kernel **408** of the computer **300**. The process is identified with initially a begin step **100** (key in ignition?) and a check of whether the vehicle is operating at step **102**. If the vehicle is not operating a reverification occurs every two (2) minutes as shown at step **104**. It should be noted that the computer is continually powered by at least the vehicle battery **310** (FIG. **3**), but it can be appreciated that during operation the generator (not shown) will supply the energy. If the vehicle is operating, then there is a step of recording sensor information **106**. The recording comprises monitoring a plurality of raw data elements, calculated data elements and derived data elements as identified above. Each of these is representative of an operating state of the vehicle or an action of the operator. Select ones of the plurality of data elements are recorded when the ones are determined to have an identified relationship to the safety standards. For example, vehicle speed in excess of a predetermined speed limit will need to be recorded but speeds below the limit need only be monitored and stored on a periodic basis. The recording may be made in combination with date, time and location. Other examples of data needed to be recorded are excessive rates of acceleration or frequent hard braking.

The recording process would be practically implemented by monitoring and storing the data in a buffer for a selected period of time, e.g., thirty seconds. Periodically, such as every two minutes, the status of all monitored sensors for the data elements is written to a file which is stored in the vehicle data storage **402**. The raw, calculated and derived data elements listed above comprise some of the data elements to be so stored.

Certain of the recorded sensor information may comprise a trigger event of which inquiry is identified at step **108**. "Trigger events" are defined as a combination of sensor data requiring additional action or which may result in a surcharge or discount during the insurance billing process. Certain trigger events may require immediate upload **110** to a central control **112** which will then be required to take

6,064,970

9

appropriate action **114**. For example, a trigger event would be rapid deceleration in combination with airbag deployment indicating a collision, in which case the system could notify the central control of the vehicle location. Alternatively, if the operator were to trigger on an emergency light, similarly the system could notify the central control of the vehicle location indicating that an emergency is occurring. Alternatively, if the trigger information is not so serious as to require immediate upload (i.e., the inquiry is "NO") then, the trigger information is recorded, as at step **116**. For upload information, whatever response is taken by the central control is also recorded at step **118**. The trigger information recording step **116** and the recording sensor information step **106** may impart recording of information in the on-board data storage device **402** or memory **406**. The event response information recording at step **118** will usually occur in the central control station. Such acquisition information could be the dispatch of an emergency vehicle, or the telephoning of police or an EMS unit. The "NO" response to the trigger event inquiry **108** indicates that the system remains in a wait loop with the recording sensor information step **106**.

Trigger events are divided into two groups: those requiring immediate action and those not requiring immediate action, but necessary for proper billing of insurance. Those required for proper billing of insurance will be recorded in the same file with all the other recorded vehicle sensor information. Those trigger events requiring action will be uploaded **110**, **112** to a central control center which can take action **114** depending on the trigger event. Some trigger events will require dispatch of emergency services, such as police or EMS, and others will require the dispatch of claims representatives from the insurance company.

The following comprises an exemplary of some, but not all, trigger events:

Need for Assistance:

These events would require immediate notification of the central control center.

1. Accident Occurrence. An accident could be determined through the use of a single sensor, such as the deployment of an airbag. It could also be determined through the combination of sensors, such as a sudden deceleration of the vehicle without the application of the brakes.

2. Roadside assistance needed. This could be through the pressing of a "panic button" in the vehicle or through the reading of a sensor, such as the level of fuel in the tank. Another example would be loss of tire pressure, signifying a flat tire.

3. Lock-out assistance needed. The reading of a combination of sensors would indicate that the doors are locked but the keys are in the ignition and the driver has exited the vehicle.

4. Driving restrictions. The insured can identify circumstances in which he/she wants to be notified of driving within restricted areas, and warned when he/she is entering a dangerous area. This could be applied to youthful drivers where the parent wants to restrict time or place of driving, and have a record thereof.

Unsafe Operation of the Vehicle

These events would be recorded in the in-vehicle recording device for future upload. Constant trigger events would result in notification of the driver of the exceptions.

1. Excessive speed. The reading of the vehicle speed sensors would indicate the vehicle is exceeding the speed limit. Time would also be measured to determine if the behavior is prolonged.

10

2. Presence of alcohol. Using an air content analyzer or breath analyzer, the level of alcohol and its use by the driver could be determined.

3. Non-use of seatbelt. Percent of sample of this sensor could result in additional discount for high use or surcharge for low or no use.

4. Non-use of turn signals. Low use could result in surcharge.

5. ABS application without an accident. High use could indicate unsafe driving and be subject to a surcharge.

With particular reference to FIG. **2**, a general flowchart describing the steps of the gathering of appropriate information for billing insurance on a periodic basis is illustrated.

At the initiation of the vehicle insurance billing process, the central billing system of the insurer will acquire **202** the vehicle sensor record file from the sensor record file **204** from each vehicle to be billed. This process of data acquisition will involve a periodic uploading of the vehicle file **204**. This file will be uploaded to the central system when the storage device **402** in the vehicle approaches capacity, on command, or when the billing process starts. All the information from the combination of files stored in the vehicle will be used to determine the bill for the insurance on the vehicle for the prior insurance period. Data acquisition is also made from the trigger event response file **206** in the acquisition step **208**. This data is stored in the central control center, and includes information for response activities listed above which require additional billing for services rendered to the insured.

At step **210**, the vehicle sensor record file and the trigger event response file are consolidated. Such files will include all the activity for which the insured is to be billed for the prior period. At step **212**, all the information comprising the insured profile, which is already maintained and stored in other insurance files, is applied to the consolidated activity files for the immediately prior period. This insured profile includes the information about coverages including limits and deductibles, which are necessary for establishing the appropriate cost of insurance for the subject insured. At step **214**, the acquired consolidated file information from step **210** and the overall insured profile acquired at step **212** are combined and processed against a surcharge or discount algorithm file, which include the specific factors for the various usage patterns and trigger events. The surcharges and discounts are continuously adjusted based on the loss results associated with driving behaviors demonstrated. Finally at step **216**, the appropriate billing is produced showing the charges for insurance and other services for the prior period. The billing can be sent electronically or in printed form to the insured for payment.

With particular reference to FIG. **5**, a general diagram of the process for acquiring and recording vehicle insurance related data is illustrated. At step **502**, the raw data elements are collected from the vehicle sensors that provide the raw data elements identified above. Calculated data elements are generated in step **504** and derived data elements are generated at step **508**. As noted, it is necessary to collect certain database information elements at step **506** prior to generating the derived data elements. A sample of all the data elements is stored in the vehicle at step **510**. The sample rate or the recording of the information is controlled based upon the particular insurance billing recording needs predetermined by an algorithm developed by the insurance company. The algorithm will change depending on the particular type of insurance related requirements for the information. At step **512**, if a certain incident, for example collision, occurs then a snapshot is generated of all the relevant data elements

6,064,970

11

at the time of the incident, **514**. If no such incident occurs (i.e., the condition inquiry is "NO"), the system remains in the data collection loop.

With reference to FIG. **6**, various examples of sources of insurance related data, the interface required to acquire the data and an example of the sample rate are illustrated for a preferred embodiment of the subject invention. Accordingly, it can be seen that for a certain information database comprised of maps, speed limits, traffic signs, and highway conditions is stored in the data storage device of the computer and can be obtained on demand therefrom. Acquiring data from vehicle sources such as engine data, body data and electrical data is obtained through a conventional SAEJ 1978 connector with an exemplary sample rate of 10–15 Hz. The other sources of relevant data, such as IVHs, GPS, security system or any additional systems are obtained through various I/O ports and the sample rate can be varied in accordance with the desired goals of the insurer.

One of the useful consequences of the subject invention is that other products could be marketed to a particular vehicle operator based on information provided from the subject invention from the operator's motor vehicle. Since the invention includes processes for gathering, extracting and analyzing information provided by the vehicle, a more informed judgment can be made about a determination of when and which products could be marketed to that motor vehicle operator. For example, by knowing that a vehicle operator travels on vacation in that vehicle to a certain resort location may give rise to a marketing of a package of products particular to the type of travel or the location. Another example would relate to the knowledge that the vehicle operator attends particular types of sporting events which may give rise to certain types of products catered to fans of that sporting event.

The invention has been described with reference to preferred embodiments. Obviously, modifications and alterations will occur to others upon a reading and understanding of the specification. It is our intention to include all such modifications and alterations insofar as they come within the scope of the appended claims or the equivalents thereof.

What is claimed is:

**1**. A method of generating a database comprising data elements representative of operator or vehicle driving characteristics, the method comprising:

monitoring a plurality of the data elements representative of an operating state of a vehicle or an action of the operator during a selected time period; and,

recording selected ones of the plurality of data elements into the database when said ones are determined to be appropriate for recording relative to determining a cost of insurance for the vehicle during the selected time period, said ones including, a time and location of vehicle operation and a corresponding log of vehicle speed for the time and location.

**2**. A database comprising data elements representative of operator or vehicle driving characteristics for a selected time period including a time and location of vehicle operation and a corresponding log of vehicle speed for the time and location, the database then being used to determine an insurance charge for the vehicle operation for said selected time period.

**3**. The database as defined in claim **2** wherein the data elements comprise raw data elements, derived data elements and calculated data elements.

**4**. A method of insuring a vehicle operator for a selected period based upon operating driving characteristics during the period, comprising, steps of:

12

generating an initial operator profile;

monitoring operator driving characteristics during the selected period; and

deciding a cost of vehicle insurance for the period based upon the operating characteristics monitored in that period.

**5**. A method of determining a cost of vehicle insurance for a selected period based upon monitoring, recording and communicating data representative of operator and vehicle driving characteristics during said period, whereby the cost is adjustable by relating the driving characteristics to predetermined safety standards, the method comprising:

determining an initial insured profile and a base cost of vehicle insurance based on said insured profile;

monitoring a plurality of data elements representative of an operating state of a vehicle or an action of the operator during the selected period;

recording selected ones of the plurality of data elements when said ones are determined to have a preselected relationship to the safety standards;

consolidating said selected ones for identifying a surcharge or discount to be applied to the base cost; and,

producing a final cost of vehicle insurance for the selected period from the base cost and the surcharge or discount.

**6**. A method of monitoring a human controlled power source driven vehicle, the method comprising:

extracting one or more data elements from at least one sensor wherein the one or more elements are of at least one operating state of the vehicle and the at least one human's actions during a data collection period;

analyzing, grouping, and storing the one or more data elements as group data values in a first memory related to a predetermined group of elements; and,

correlating the group data values to preset values in a second memory and generating an output data value based on the correlation wherein the output data value is used to compute an insurance rating for the vehicle FOR the data collection period.

**7**. The method according to claim **6**, further including the steps of:

determining if the one or more data elements indicate one or more predetermined triggering events, where if the determination is positive, correlating the one or more data elements to one or more types of triggering events stored in a third memory; and,

storing and transmitting a signal corresponding to the determined triggering event to a receiving system.

**8**. The method according to claim **6**, further including the steps of:

determining if the one or more data elements indicate one or more predetermined triggering events, where if the determination is positive, correlating the one or more data elements to one or more types of triggering events stored in a third memory; and,

storing or transmitting a signal corresponding to the determined triggering event to a receiving system.

**9**. The method as defined in claim **6** wherein the output data value is additionally used for computing an insurance rating for the vehicle for a future data collection period.

**10**. The method according to claim **6**, further comprising the steps of:

using safety or other actuarial standard values as the preset values; and,

generating an adjusted insurance cost as the output data value.

6,064,970

13

**11**. The method according to claim **10**, further comprising the steps of:

using location and time as the one or more data elements which are compared to the safety or other actuarial standard values to generate the adjusted insurance cost.

**12**. The method according to claim **11** wherein:

the adjusted insurance cost can be for a prospective or retrospective basis.

**13**. The method according to claim **6**, further comprising the steps of:

using safety or other actuarial standard values as the preset values; and,

14

generating an adjusted underwriting cost as the output data value.

**14**. The method according to claim **13**, further comprising the steps of:

using location and time as the one or more data elements which are compared to the safety or other actuarial standard values to generate the adjusted underwriting cost.

**15**. The method according to claim **14** wherein:

the adjusted underwriting cost can be for a prospective or retrospective basis.

\*    \*    \*    \*    \*



US006064970C1

## (12) EX PARTE REEXAMINATION CERTIFICATE (8789th)
# United States Patent
McMillan et al.

(10) **Number:**           **US 6,064,970 C1**
(45) **Certificate Issued:**        *Jan. 10, 2012

(54) **MOTOR VEHICLE MONITORING SYSTEM FOR DETERMINING A COST OF INSURANCE**

(75) Inventors: **Robert John McMillan**, Tampa, FL (US); **Alexander Dean Craig**, Moreland Hills, OH (US); **John Patrick Heinen**, Tampa, FL (US)

(73) Assignee: **Progressive Casualty Insurance Company**, Mayfield Village, OH (US)

Reexamination Request:
No. 90/011,252, Sep. 22, 2010

Reexamination Certificate for:
Patent No.:    **6,064,970**
Issued:         **May 16, 2000**
Appl. No.:      **09/135,034**
Filed:           **Aug. 17, 1998**

( * ) Notice:    This patent is subject to a terminal disclaimer.

### Related U.S. Application Data

(63) Continuation of application No. 08/592,958, filed on Jan. 29, 1996, now Pat. No. 5,797,134.

(51) **Int. Cl.**
*G06Q 40/00*        (2006.01)

(52) **U.S. Cl.** ...................... **705/4**; 340/439; 340/870.01; 360/5; 702/1; 705/400

(58) **Field of Classification Search** ....................... None
See application file for complete search history.

(56)                  **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/011,252, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner*—Karin Reichle

(57)                  **ABSTRACT**

A method and system of determining a cost of automobile insurance based upon monitoring, recording and communicating data representative of operator and vehicle driving characteristics. The cost is adjustable retrospectively and can be prospectively set by relating the driving characteristics to predetermined safety standards. The method comprises steps of monitoring a plurality of raw data elements representative of an operating state of the vehicle or an action of the operator. Selected ones of the raw data elements are recorded when the ones are determined to have an identified relationship to safety standards. The selected ones are consolidated for processing against an insurer profile and for identifying a surcharge or discount to be applied to a base cost of automobile insurance. A final cost is produced from the base costs and the surcharges or discounts.



US 6,064,970 C1

# 1

## EX PARTE
## REEXAMINATION CERTIFICATE
## ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

Claim **2** is cancelled.

Claims **1**, and **3-6** are determined to be patentable as
amended.

Claims **7-15**, dependent on an amended claim, are deter-
mined to be patentable.

New claims **16-18** are added and determined to be patent-
able.

**1**. A method of generating a database comprising data
elements representative of operator or vehicle driving char-
acteristics, the method comprising:
  *generating acturial classes of insurance, which group
  operators or vehicles having a similar risk
  characteristic, from actual monitored driving charac-
  teristics during a selected time period as represented by
  recorded data elements representative of an operating
  state of the vehicles or an action of the operators; and*
  monitoring a plurality of the data elements representative
  of an operating state of a vehicle or an action of [the] *an*
  operator during a *latter* selected time period; and,
  recording selected ones of the plurality of data elements
  into the database when said ones are determined to be
  appropriate for recording relative to determining a cost
  of insurance for the vehicle during the *latter* selected
  time period, said ones including, a time and location of
  vehicle operation and a corresponding log of vehicle
  speed for the time and location.
**3**. The [database] *method* as defined in claim [**2**] *1* wherein
the data elements comprise raw data elements, derived data
elements and calculated data elements.
**4**. A method of insuring a vehicle operator for a selected
period based upon operator driving characteristics during the
period, comprising, steps of:
  generating an initial operator profile;
  *generating an insured profile for the vehicle operator
  prior to any monitoring of any of the vehicle operator's
  driving characteristics wherein the insured profile com-
  prises coverage information, including limits and
  deductibles, for determining a base cost of vehicle
  insurance for the vehicle operator;*
  monitoring [operator] *the vehicle operator's* driving char-
  acteristics during the selected period; and deciding a
  *total* cost of vehicle insurance for the *selected* period
  based upon the [operating] *vehicle operator's driving*
  characteristics monitored in that *selected* period *and the
  base cost of insurance*.
**5**. A method of determining a cost of vehicle insurance for
a selected period based upon monitoring, recording and

# 2

communicating data representative of operator and vehicle
driving characteristics during said period, whereby the cost
is adjustable by relating the driving characteristics to prede-
termined safety standards *that are related to a safe operation
of a vehicle*, the method comprising:
  determining an initial insured profile *for the operator of
  the vehicle prior to any monitoring of any data ele-
  ments representative of an operating state of the vehicle
  or an action of the operator of the vehicle* and deter-
  mining a base cost of *the* vehicle insurance based on
  said *initial* insured profile *wherein the initial insured
  profile comprises coverage information, including lim-
  its and deductibles*;
  monitoring a plurality of *the* data elements representative
  of [an] *the* operating state of [a] *the* vehicle or [an] *the*
  action of the operator *of the vehicle* during the selected
  period;
  recording selected ones of the plurality of data elements
  when said ones are determined to have a preselected
  relationship to the safety standards;
  consolidating said selected ones for identifying a sur-
  charge or discount to be applied to the base cost; and,
  producing a final cost of vehicle insurance for the selected
  period from the base cost and the surcharge or discount.
**6**. A method of monitoring a human *operator* controlled
power source driven vehicle, the method comprising:
  extracting one or more data elements *by a computer pro-
  grammed to monitor sensor data* from at least one sen-
  sor wherein the one or more elements are *actual driving
  characteristics* of at least one operating state of the and
  [the] at least one [human's] *human operator's* actions
  during a data collection period;
  analyzing, grouping, and storing the one or more data
  elements as group data values in a first memory related
  to a predetermined group of elements; and,
  correlating the group data values to preset values in a
  second memory and generating an output data value
  based on the correlation wherein the output data value
  is used to compute an insurance rating for the vehicle
  [FOR the data collection period] *for the data collection
  period that is based on an actuarial class of insurance
  which groups other human operator controlled power
  source driven vehicles having a similar operator or
  vehicle risk characteristic and which also represents
  the actual driving characteristics of the vehicle moni-
  tored and recorded from the at least one sensor*.
  *16. The method of claim 5, wherein the surcharge or dis-
  count comprises a discount, and wherein producing the final
  cost of vehicle insurance comprises applying the discount to
  the base cost of vehicle insurance.*
  *17. The method of claim 5, wherein the surcharge or dis-
  count comprises a surcharge, and wherein producing the
  final cost of vehicle insurance comprises applying the sur-
  charge to the base cost of vehicle insurance.*
  *18. A method of monitoring a human operator controlled
  power source driven vehicle, the method comprising:*
    *extracting one or more data elements by an on-board
    computer from at least one sensor wherein the one or
    more elements are actual driving characteristics of at
    least one operating state of the vehicle and at least one
    human operator's actions during a data collection
    period;*
    *analyzing, grouping, and storing the one or more data
    elements as group data values in a first memory related
    to a predetermined group of elements;*

US 6,064,970 C1

**3**

*correlating the group data values to preset values related to safety standards in a second memory and generating an output data value based on the correlation; and computing an insurance rating based upon the output data value for the vehicle for the data collection period, in which the insurance rating is also based on an actu-arial class of insurance wherein said actuarial class of insurance groups other human operator controlled power source driven vehicles having a similar operator*

5

**4**

*or vehicle risk characteristic as well as represents the actual driving characteristics of the vehicle monitored and recorded from the at least one sensor, and setting prospective insurance premiums based on the actuarial class of insurance.*

\* \* \* \* \*

Trials@uspto.gov                                                    Paper 10
571-272-7822                                          Entered:  January 25, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE
————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————

**LIBERTY** MUTUAL INSURANCE CO.
Petitioner,

v.

**PROGRESSIVE** CASUALTY INSURANCE CO.
Patent Owner.

————————

Case CBM2012-00002 (JL)
Patent 6,064,970

————————

Before JAMESON LEE, JONI Y. CHANG, and MICHAEL R. ZECHER,
*Administrative Patent Judges*.

CHANG, *Administrative Patent Judge*

**DECISION**
**Institution of Covered Business Method Review**
***37 C.F.R. § 42.208***

Case CBM2012-00002
Patent 6,064,970

## I. BACKGROUND

On September 16, 2012, Liberty Mutual Insurance Company
("Liberty") filed a petition requesting a review under the transitional
program for covered business method patents of U.S. Patent 6,064,970 ("the
'970 patent"). The patent owner, Progressive Casualty Insurance Company
("Progressive"), filed a preliminary response on December 21, 2012. (Paper
No. 8.) We have jurisdiction under 35 U.S.C. § 324. *See* section 18(a) of
the Leahy-Smith America Invents Act, Pub. L. 112-29, 125 Stat. 284, 329
(2011) ("AIA").

The standard for instituting a covered business method review is set
forth in 35 U.S.C. § 324(a), which provides as follows:

> THRESHOLD --The Director may not authorize a post-grant
> review to be instituted unless the Director determines that the
> information presented in the petition filed under section 321, if
> such information is not rebutted, would demonstrate that it is
> more likely than not that at least 1 of the claims challenged in
> the petition is unpatentable.

Liberty challenges the patentability of claims 1 and 3-18 of the
'970 patent. Taking into account Progressive's preliminary response, we
determine that the information presented in the petition demonstrates that it
is more likely than not that the challenged claims are unpatentable. Pursuant
to 35 U.S.C. § 324 and section 18(a) of the AIA, we hereby authorize a
cover business method review to be instituted as to claims 1, 3-6, and 9-18
of the '970 patent.

2

Case CBM2012-00002
Patent 6,064,970

### A. Liberty's standing

Liberty certifies that the '970 patent was asserted against it in Case No. 1:10-cv-01370, *Progressive Cas. Ins. Co. v. Safeco Ins. Co. of Ill. et al.,* pending in the U.S. District Court for the Northern District of Ohio.  (Pet. 5.) Progressive does not dispute that certification.

### B. Covered Business Method Patent

Under section 18(a)(1)(E) of the AIA, the Board may institute a transitional proceeding only for a patent that is a covered business method patent.  Section 18(d)(1) of the AIA defines the term "covered business method patent" to mean:

> a patent that claims a method or corresponding apparatus for performing data processing or other operations used in the practice, administration, or management of a financial product or service, except that the term does not include patents for technological inventions.

The legislative history explains that the definition of covered business method patent was drafted to encompass patents "claiming activities that are financial or complementary to financial activity."  157 Cong. Rec. S5432 (daily ed. Sept. 8, 2011) (statement of Sen. Schumer).

Section 18(d)(2) of the AIA provides that "the Director shall issue regulations for determining whether a patent is for a technological invention."  The legislative history points out that the regulation for this determination should only exclude "those patents whose novelty turns on a technological innovation over the prior art and are concerned with a

3

Case CBM2012-00002
Patent 6,064,970

technical problem which is solved with a technical solution and which requires the claims to state the technical features which the inventor desires to protect." 157 CONG. REC. S1364 (daily ed. Mar. 8, 2011) (statement of Sen. Schumer).

Pursuant to that statutory mandate, the Office promulgated 37 C.F.R. § 42.301(b) to define the term "technological invention" for the purposes of the Transitional Program for Covered Business Method Patents. Therefore, for determining whether a patent is for a technological invention in the context of the Transitional Program for Covered Business Method Patents, 37 C.F.R. § 42.301(b) identifies the following for consideration:

> whether the claimed subject matter as a whole recites a technological feature that is novel and unobvious over the prior art; and solves a technical problem using a technical solution.

In the petition, Liberty asserts that the '970 patent is a covered business method patent because the '970 claimed invention is related to the administration and management of an insurance policy to adjust insurance premiums based on monitored vehicle data. (Pet. 3.) Liberty further contends that the claimed invention of the '970 patent is not a "technological invention" as defined in 37 C.F.R. § 42.301(b). (Pet. 4.) According to Liberty, the prosecution history of the prior reexamination shows that there was no "technological feature" that was novel and unobvious, and the subject matter as a whole does not solve a "technical problem." (Pet. 4-5.)

Progressive counters that the claimed invention of the '970 patent is a "technological invention" and, therefore, the '970 patent is ineligible for

4

Case CBM2012-00002
Patent 6,064,970

covered business method review.  (PR 50.)  More specifically, Progressive argues that the claimed invention is similar to the credit card reader example provided in the Office Patent Trial Practice Guide,[1] which the Office indicates would not be eligible for a covered business method review.  (PR 52-55.)  Progressive also asserts that the claimed invention is more technical than a credit card reader since it includes physical sensors for sensing actual vehicle operation data.  (*Id*.)  Progressive further argues that the claimed subject matter as a whole recites a technological feature that is novel and unobvious over the prior art citing to the reasons for patentability provided by the Examiner in the prior *ex parte* reexamination (NIIRC at pages 9-22).  (PR 56-63.)  Additionally, Progressive contends that the claimed subject matter as a whole solves a technical problem using a technical solution because sensor data representing actual monitored driving characteristics of an operating state of vehicles or actions of operators is used to determining an insurance rating, solving the problem of the unavailability of such data.  (PR 54-58.)

We are not persuaded by Progressive's arguments.  Rather, we determine that Liberty has demonstrated that the '970 patent is a covered business method patent and the claimed invention is not a "technological invention" within the meaning of 37 C.F.R. § 42.301(b).

The determination of whether a patent is eligible for covered business method review is based on what the patent claims.  In other words, a patent

---

[1] *Office Patent Trial Practice Guide*, 77 *Fed. Reg.* 48756, 48764 (Aug. 14, 2012).

5

Case CBM2012-00002
Patent 6,064,970

having one claim directed to a covered business method is eligible for review even if the patent includes additional claims.[2]

Here, the '970 patent discloses an invention that is related to a method of determining a cost of automobile insurance based upon monitoring, recording and communicating data representative of operator and vehicle driving characteristics.  (Abs.)  Claim 4, reproduced below, is illustrative of the claimed subject matter:

> A method of insuring a vehicle operator for a selected period based upon operator driving characteristics during the period, comprising, steps of:
>
> generating an initial operator profile;
>
> generating an insured profile for the vehicle operator prior to any monitoring of any of the vehicle operator's driving characteristics wherein the insured profile comprises coverage information, including limits and deductibles, for determining a base cost of vehicle insurance for the vehicle operator;
>
> monitoring the vehicle operator's driving characteristics during the selected period; and
>
> deciding a total cost of vehicle insurance for the selected period based upon the vehicle operator's driving characteristics monitored in that selected period and the base cost of insurance.[3]

---

[2] *Transitional Program for Covered Business Method Patents – Definitions of Covered Business Method Patent and Technological Invention; Final Rule*, 77 *Fed. Reg.* 48734, 48736 (Aug. 14, 2012) (Response to Comment 8).
[3] Reexam. Cert. at col. 1:50-65 (original emphases and bracketed matters omitted).

6

Case CBM2012-00002
Patent 6,064,970

For the issue of whether the claimed invention is a technological invention under 37 C.F.R. § 42.301(b), we focus our analysis on claim 4. We first note that Progressive's contentions are not commensurate with the scope of claim 4.  Notably, the sensors for monitoring the vehicle operator's driving characteristics are described in the '970 specification, but are not recited in claim 4.  In fact, claim 4 does not recite any technological element (*e.g.*, a computer or electrical sensors), but rather only recites method steps that can be completed by a person.  For example, a passenger sitting in the vehicle when the vehicle operator is driving can monitor the vehicle operator's driving characteristics during the selected time period (*e.g.*, the passenger can observe whether the vehicle operator is driving over the speed limit or fails to stop at a red traffic light).  Progressive fails to point out any specific novel and non-obvious technological element recited in claim 4. Therefore, Progressive's arguments related to the credit card reader example in the Office Patent Trial Practice Guide are misplaced.

As to Progressive's contentions regarding the Examiner's reasons for patentability for claim 4 in the prior *ex parte* reexamination, Progressive merely relies upon the Examiner's statements that the prior art cited in the reexamination does not disclose the insured-profile claim limitation (generating an insured profile prior to any monitoring of any of the vehicle operator's driving characteristics).  (PR 49-50.)  However, that claim limitation does not require a technological feature.  Indeed, a person can generate an insured profile by writing down on a paper the value of the

7

Case CBM2012-00002
Patent 6,064,970

vehicle, insurance coverage limits, and deductibles, before a passenger monitors the vehicle operator's driving characteristics.

We are also not convinced by Progressive's argument that the claimed subject matter as a whole solves a technical problem using a technical solution. The '970 specification expressly states that the motor vehicle control and operating systems that were known in the art at the time of the invention could readily be modified to obtain the desired types of information relevant to determination of the cost of insurance. (Col. 3:25-28.) Determining a cost of vehicle insurance is a financial problem rather than a technical problem.

For the foregoing reasons, the subject matter of claim 4 is not a "technological invention" under 37 C.F.R. § 42.301(b). Accordingly, the '970 patent is eligible for a covered business method review.

*C. Prior Art Relied Upon*

Liberty relies upon the following prior art references:

| Kosaka | JP-H4/182868 | June 30, 1992 | (Ex. 1004) |
| Herrod | GB-2 286 369 A | Aug. 16, 1995 | (Ex. 1007) |

1988 Automobile Insurance Shoppers' Guide, published in 1988 ("Florida Guide") (Ex. 1005)

1995 Consumers Guide on Automobile Insurance (Downstate), published in 1995 ("New York Guide") (Ex. 1006)

"An Interest in Black Magic – Motor Technology," Jan. 1, 1994 in *Insurance Age* Magazine ("Black Magic") (Ex. 1008)

8

Case CBM2012-00002
Patent 6,064,970

*D. Grounds of Challenge*

Claims 1, 4, 5, 6, and 18 are independent claims.  Liberty seeks
cancelation of claims 1 and 3-18 based on the following grounds:

A. Claims 4, 5, 16, and 17 are anticipated under 35 U.S.C. § 102 by
   Kosaka;

B. Claims 4, 5, 16, and 17 are unpatentable under 35 U.S.C. § 103(a)
   over Kosaka in view of Florida Guide or New York Guide;

C. Claims 1, 3, 11-12, and 14-15 are unpatentable under 35 U.S.C.
   § 103(a) over Kosaka and Black Magic in view of Herrod or New
   York Guide.

D. Claims 6-10, 13, and 18 are unpatentable under 35 U.S.C. § 103(a)
   over Kosaka in view of Herrod or New York Guide.

II. FINDINGS OF FACTS

The findings of fact in this decision including those in the analysis are
supported by a preponderance of the evidence.

*A. Background of The '970 Patent*

The background section of the '970 patent describes conventional
insurance schemes that use actuarial classes to determine vehicle insurance
costs.  (Col. 1:17-2:37.)  In particular, the background section of the '970
patent discloses that conventional insurance cost determination methods
involve generating an insured profile for the vehicle operator by gathering
relevant historical data from a personal interview and public motor vehicle

9

Case CBM2012-00002
Patent 6,064,970

driving records. (Col. 1:17-col. 2:37.) The data results in a classification of the vehicle operator to a broad actuarial class for which insurance rates are assigned based upon the empirical experience of the insurer. (Col. 1:22-24.) The conventional insurance system creates groupings of vehicles and drivers (actuarial classes) based on certain types of classifications (*e.g.*, speeding or other traffic violations and number of accidents). (Col. 1:21-27; col. 2:1-4.) The classifications are further broken into actuarial classes to develop a unique vehicle insurance cost based on the specific combination of actuarial classes for a particular risk. (Col. 1:53-56.) Based on the information in the insured profile (*e.g.*, the value of the vehicle, driver's record, and type of coverage), a unique vehicle insurance cost is determined. (Col. 1:56-col. 2:12.) Additionally, conventional insurance rating systems provide discounts and surcharges for certain types of use of the vehicle, equipment on the vehicle, and type of driver. (Col. 2:22-24.) For example, discounts are provided to safe drivers, such as those that have low number of speeding violations or accidents. (Col. 1:17-col. 2:37.)

### B. Kosaka

Kosaka's invention is related to an insurance premium determination device that increases or decreases insurance premiums by continually determining insurance premium changes through the detection of states that lead to risk in the insurance customer. (P. 2, col. 1:54-col. 2:1-3; col. 2:43-

10

Case CBM2012-00002
Patent 6,064,970

52.[4]) Kosaka's insurance premium determination device employs a risk
evaluation device for evaluating risk in the vehicle and driver. *Id.* Kosaka's
insurance premium determination system "allows risk evaluations that
change from hour to hour during travel to be reflected in the insurance
premium." (P. 7, col. 2:21-25.) Figure 1 of Kosaka, reproduced below,
illustrates one of Kosaka's embodiments:



Figure 1 shows a configuration diagram of Kosaka's system

Referring to figure 1, the external sensor 1 and internal sensor 2 detect
the states of the driver and vehicle that contribute to risk (*e.g.*, speed). (P. 3,
col. 1:4-18; p. 4, col. 2:4-17.) The fuzzy logic part 3 evaluates risk based on
the states of the driver and vehicle. (P. 3, col. 2:23-30; p. 4, col. 2:18-20.)
Specifically, the outputs from sensors 1 and 2 are used as input values to the
fuzzy logic part 3. (P. 4, col. 2:18-19.) The risk evaluation values

---

[4] As Kosaka is a Japanese Unpublished Application, the citations to Kosaka
are to the Certified English-Language Translation provided by Liberty in
Exhibit 1004. The page numbers refer to those that appear on the top center
of each page, and not the exhibit page numbers that appear on the bottom
right corner.

11

Case CBM2012-00002
Patent 6,064,970

determined by the fuzzy logic may be stored in the fuzzy memory 4. (P. 4, col. 2:24-26.) The detection of the states that contribute to risk and the evaluation of risk are carried out in real time. (P. 4, col. 1:30-34.)

Kosaka's system further includes a premium calculation part 6 that uses the risk evaluation values to determine and insurance adjustments. (P.4, col. 2:26-30.) The premium calculation part 6 performs temporal integration and computation of risk evaluation values, and calculates insurance premiums. (P. 4, col. 2:26-29.) System 5 is connected to the premium calculation part 6 to perform time integration. (P. 4, col. 2:31-33.) A determination of the insurance adjustment is also performed in real time. (P. 4, col. 1:30-34.) Kosaka's system further includes: (1) an output interface 7 that has an electronic currency transfer request means or a prepayment amount erasing means; and (2) a monetary amount file part 8 that stores prepayment balance. (P. 4, col. 2:33-38.)

### C. Herrod

Herrod discloses a computer-based monitoring and reporting device that is used in a vehicle to measure driver acceleration patterns and report associated accident risks. (P. 1-2[5].) Herrod's device uses the measured acceleration data to classify the driver into one of several groups, each of which associates with a different level of accident risk. (*Id.*) According to Herrod, safe drivers can use the measured acceleration data to demonstrate

---

[5] The page numbers refer to the original page numbers of the references, and not the exhibit page numbers on the bottom right corner.

Case CBM2012-00002
Patent 6,064,970

their competence to insurance companies.  (P. 1.)

### D. Florida Guide

The Florida Guide is an automobile insurance shoppers' guide that is designed to help insurance policy holders control some of the costs associated with automobile insurance.  (Title and Comm. Message.)  According to the Florida Guide, all drivers in the state of Florida must carry a minimum amount of property damage liability coverage in addition to the required personal injury protection coverage.  (P. 3.)  Further, auto insurance premium may vary based on many factors such as the type of coverage the policy holder selects, including liability limits and deductibles (p. 11), and the area where the policy holder garages their car (p. 13).  For example, if the policy holder selects high liability limits and low deductibles, the policy holder is likely to pay more for auto insurance.  (P. 11.)  Different premiums are charged in different areas because of frequency of accidents, medical expenses and repair coast.  (P. 13.)

### E. New York Guide

The New York Guide is a consumer guide on automobile insurance.  In particular, the New York Guide provides ways that the insurance holders may save money on auto insurance, such as increasing the deductibles on physical damage coverage.  (P. 17-19.)

### F. Black Magic

Black Magic discloses a computer-implemented unit installed in a

13

Case CBM2012-00002
Patent 6,064,970

vehicle to record information such as driving speed, time, and distance
travelled.  (P1.)  When the unit is used with a Global Positioning System that
can also record the vehicle's location, the information could be utilized to
calculate insurance premiums according to styles of driving and locality of
use.  (P2.)

## III. PRINCIPLES OF LAW

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the
differences between the claimed subject matter and the prior art are such that
the subject matter as a whole would have been obvious at the time the
invention was made to a person having ordinary skill in the art to which said
subject matter pertains.  *KSR Int'l Co. v. Teleflex Inc*., 550 U.S. 398, 406
(2007).  The question of obviousness is resolved on the basis of underlying
factual determinations including:  (1) the scope and content of the prior art,
(2) any differences between the claimed subject matter and the prior art,
(3) the level of skill in the art, and (4) where in evidence, so-called
secondary considerations.  *Graham v. John Deere Co. of Kansas City*, 383
U.S. 1, 17-18 (1966).

14

Case CBM2012-00002
Patent 6,064,970

## IV. ANALYSIS

### A. Claim Construction

In a covered business method patent review, claim terms are given their broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.300(b). Thus, we determine the scope of the claims by giving claim terms their broadest reasonable construction in light of the specification as it would be interpreted by one of ordinary skill in the art. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc).

Here, Liberty states that for the sole purposes of this proceeding, it construes the claim language such that claim terms are given their broadest reasonable interpretation, based upon the interpretation given by the Office during the prior *ex parte* reexamination of the '970 patent (Control No. 90/011,252). (Pet. 20.) Specifically, Liberty lists several key terms and their constructions (reproduced in the table below) as applied during the prior reexamination. (Pet. 21-23.)

Progressive does not oppose those claim constructions. Upon review of the record, Liberty's claim constructions seem to be consistent with the specification. Further, in the prior reexamination, the Office gave the claim terms their broadest reasonable construction consistent with the specification. *See e.g.*, Ex. 1003 at 755, 3/7/11 OA at 6. Based on the record before us, we therefore adopt the constructions provided by Liberty in the petition.

15

Case CBM2012-00002
Patent 6,064,970

| Claim Term | Construction |
|---|---|
| Vehicle (claims 1, 3-18) | Operator controlled motor vehicles normally requiring insurance, including, but not limited to, automobiles |
| Initial operator profile/ initial insured profile (claims 4-5, 16-17) | Initial files or information with respect to the operator or the insuring thereof |
| Actuarial class (claims 1,3, 6-15, 18) | A combination/group/groupings related to loss/risk/safety which are determined from classifications/characteristics representative of motor vehicle operational characteristics and driver behavior for which data is gathered |
| Cost of insurance/cost of vehicle insurance (claims 1, 3-5, 16-17) | A/one or more or all cost(s) associated with insurance of the vehicle, including, but not limited to, a cost to the insured and/or insurer/underwriter associated with the insurance |
| Safety standard (claims 5, 10-11, 13-14, 16-18) | Value/criteria associated with the promotion of safety/prevention of risk/loss/injury |
| Base cost (claims 4-5, 16-17) | A/one or some cost(s), e.g., not all costs or the final or total cost or gross premium, associated with insurance of the vehicle, e.g., a cost to the insured and/or insurer/underwriter associated with the insurance |
| Extracting (claims 6-15, 18) | Collecting, deriving, generating or calculating |
| Insurance rating (claims 6, 9, 18) | A/some value/cost used to determine an overall cost associated with insurance of the vehicle |

16

Case CBM2012-00002
Patent 6,064,970

| Storing and transmitting a signal corresponding to the determined triggering event to a receiving system (claim 7) | Storing of information corresponding to the event and transmitting of a signal/information corresponding to the event to a receiving system which system may or may not be remote. |
|---|---|

### B.  Claims 4, 5, 16, and 17

Claims 4 and 5 are independent claims, and claims 16 and 17 depend from claim 5.  Claim 4, reproduced below, is representative:

A method of insuring a vehicle operator for a selected period based upon operator driving characteristics during the period, comprising, steps of:

generating an initial operator profile;

*generating an insured profile for the vehicle operator prior to any monitoring of any of the vehicle operator's driving characteristics wherein the insured profile comprises coverage information, including limits and deductibles, for determining a base cost of vehicle insurance for the vehicle operator;*

monitoring [operator] *the vehicle operator's* driving characteristics during the selected period; and

deciding a *total* cost of vehicle insurance for the selected period based upon the [operating] *vehicle operator's driving* characteristics monitored in that selected period *and the base cost of insurance*.[6]

Liberty alleges that claims 4, 5, 16, and 17 are unpatentable under 35 U.S.C. § 103(a) over Kosaka in view of Florida Guide or New York Guide.

---

[6] Reexam. Cert. at col. 1:50-65.

17

Case CBM2012-00002
Patent 6,064,970

(Pet. 41-51, 65, and 66.)  In particular, Liberty contends that the cited prior
art references describe all of the claim elements.  (Pet. 34-38.)  Liberty
further provides the rationales for combining the references.  (Pet. 28-34.)

Progressive disagrees and counters that the cited prior art references
fail to describe the insured-profile claim limitation ("generating an *insured
profile* for the vehicle operator prior to any monitoring of any of the vehicle
operator's driving characteristics wherein the insured profile comprises
coverage information, including limits and deductibles, for determining a
*base cost* of vehicle insurance for the vehicle operator"), and the total-cost
claim limitation ("*deciding a total cost* of vehicle insurance for the selected
period *based upon* the vehicle operator's driving characteristics monitored in
that selected period and the *base cost* of insurance"), as recited in claim 4.
(PR 33-38.)  Specifically, Progressive argues that "the Kosaka prepayment
amount is not a base cost of insurance but a deposit amount from which
future insurance charges are subtracted."  (PR 35.)

We do not agree with Progressive since its arguments are based on an
overly narrow reading of the prior art references without sufficient
consideration of the knowledge of one with ordinary skill in the art.  We
note that an obviousness analysis "need not seek out precise teachings
directed to the specific subject matter of the challenged claim, for a court
can take account of the inferences and creative steps that a person of
ordinary skill in the art would employ."  *KSR*, 550 U.S. at 418; *In re
Translogic Tech.*, 504 F.3d 1249, 1259 (Fed. Cir. 2007).  Prior art references
must be "considered together with the knowledge of one of ordinary skill in

18

Case CBM2012-00002
Patent 6,064,970

the pertinent art." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

Moreover, "it is proper to take into account not only specific teachings of the

references but also the inferences which one skilled in the art would

reasonably be expected to draw therefrom." *In re Preda*, 401 F.2d 825, 826

(CCPA 1968).

On this record, the evidence shows that the knowledge level of one

with ordinary skill in the art is quite advanced.[7]  For instance, conventional

insurance schemes that use actuarial classes to determine vehicle insurance

costs were well known in the art at the time of the invention.  (*See e.g.*,

PR 13-14; 39.)  Further, we agree with Progressive that the Florida Guide

and New York Guide cited by Liberty discuss the same conventional prior

art knowledge that is disclosed in the background section of the '970 patent.

(*See e.g.*, PR 13-14 (The Florida Guide and New York Guide "discuss the

same subject matter (*i.e.*, the existence of traditional actuarial classes) that is

disclosed in the background section of the '970 patent"); PR 39 (The cited

portions of the Florida Guide are "essentially identical to the prior art

--------

[7] The field of the '970 patent is insurance which includes determining a cost
of vehicle insurance based on telematics data.  Ex 1009, ¶ 17; Ex 1012, ¶ 17.
A person of ordinary skill in the art as to insurance pricing would have at
least a B.S. in Mathematics, or equivalent, with at least 5 years of experience
in the insurance industry setting premiums for auto insurance, and as an
associate in the Casualty Actuarial Society.  Ex 1009, ¶ 17.  A person of
ordinary skill in the art as to telematics data would have at least a B.S.
degree in electrical engineering, computer engineering, computer science or
the equivalent thereof and at least one to two years of experience with
vehicle telematics systems.  Ex 1012, ¶ 17.

19

knowledge disclosed in columns 1 and 2 of the '970 patent.")) We therefore conclude that the background section of the '970 patent (specifically col. 1:17-2:37) is admitted conventional prior art. *In re Nomiya*, 509 F.2d 566, 571 (CCPA 1975). And thus the knowledge of one with ordinary skill in the art would include a thorough understanding of using actuarial classes to determine vehicle insurance costs.

We regard the conventional insurance cost determination techniques noted in the background section of the '970 patent (col. 1:17-2:37) as basic knowledge within the level of ordinary skill in the art. Hence, a person of ordinary skill in the art would have appreciated that when a vehicle operator is applying for an insurance policy from an insurance company, an insured profile for the vehicle operator would be generated to determine a base cost (a unique vehicle insurance cost), and such an insured profile includes coverage information such as limits and deductibles. We also observe that a person of ordinary skill in the art would have recognized that the base cost is the amount that the insurance company charges *prior to applying any discounts or surcharges*, and the total cost is calculated based on the base cost and any applicable discounts or surcharges.

Although Kosaka's prepayment amount is a deposit amount, one of ordinary skill in the art would have comprehended that insurance companies would want to make the prepayment amount equal to the base cost of insurance when utilizing Kosaka's insurance premium determination device. This is so because the base cost is the amount that the policy holder is obligated to pay the insurance company initially before any monitoring of

20

Case CBM2012-00002
Patent 6,064,970

the vehicle operator's driving characteristics. *See KSR,* 550 U.S. at 421, ("A person of ordinary skill is also a person of ordinary creativity, not an automaton.").

For the foregoing reasons, we conclude that Liberty's petition has demonstrated that it is more likely than not that claim 4 would have been obvious over Kosaka and the Florida Guide. As to claims 5, 16, and 17, Progressive relies upon the same arguments presented with regard to claim 4. (PR 42-43, 50.) The explanations provided by Liberty as to how each element of those claims is met by the cited prior art references appear to have merit and are otherwise unrebutted. Therefore, we likewise conclude that Liberty has demonstrated that it is more likely than not that claims 5, 16, and 17 are unpatentable over the same prior art of record.

*C. Claims 1 and 3*

Claim 1, reproduced below, is representative:

A method of generating a database comprising data elements representative of operator or vehicle driving characteristics, the method comprising:

*generating acturial [sic] classes of insurance, which group operators or vehicles having a similar risk characteristic, from actual monitored driving characteristics during a selected time period as represented by recorded data elements representative of an operating state of the vehicles or an action of the operators; and*

monitoring a plurality of the data elements representative of an operating state of a vehicle or an action of [the] *an* operator during a *latter* selected time period; and,

21

Case CBM2012-00002
Patent 6,064,970

> recording selected ones of the plurality of data elements
> into the database when said ones are determined to be
> appropriate for recording relative to determining a cost of
> insurance for the vehicle during the *latter* selected time period,

> said ones including, a time and location of vehicle
> operation and a corresponding log of vehicle speed for the time
> and location.[8]

Liberty alleges that claims 1 and 3 are unpatentable under 35 U.S.C. § 103(a) over Kosaka, Black Magic, and Herrod. (Pet. 35-41.) In particular, Liberty contends that the cited prior art references describe all of the claim elements. (*Id*.) Liberty further provides the rationales for combining the references. (Pet. 28-34.)

Progressive opposes and argues that: (1) the combination of prior art fails to disclose all the elements recited in claim 1; and (2) one would not have attempted to combine the references. (PR. 17.)

1. Whether the prior art combination discloses the claimed subject matter

Progressive alleges that the combination of prior art references fails to describe the actuarial-class claim limitation ("generating actuarial classes of insurance, which group operators or vehicles having a similar risk characteristic, *from actual monitored driving characteristics* during a selected time period as represented by recorded data elements representative of an operating state of the vehicles or an action of the operators") as recited in claim 1. (PR 22-30.) According to Progressive, Herrod's disclosure of a

---

[8] Reexam. Cert. col. 1:27-48.

22

Case CBM2012-00002
Patent 6,064,970

particular behavioral group based on the driver's driving characteristics are not "actuarial classes of insurance" because Herrod uses the behavioral groups for providing in-car advice for safe driving practices, not for generating "actuarial classes of insurance" as required by the actuarial-class claim limitation.  (PR 26-28.)  Progressive also asserts that Herrod's disclosure of behavioral groups is a "vague, high-level disclosure [that] includes no enabling disclosure" of generating actuarial classes of insurance as required by claim 1.  (PR 29.)

We are not persuaded by Progressive's arguments.  Specifically, Progressive fails to recognize that prior art references must be "considered together with the knowledge of one of ordinary skill in the pertinent art."  *In re Paulsen*, 30 F.3d at 1480.

To conduct a proper obviousness analysis, Herrod's disclosure must be read in light of the knowledge of one with ordinary skill in the art.  As discussed previously, generating actuarial classes of insurance which group operators or vehicles having a similar risk characteristic was well known in the art.  Further, the requirement that the actuarial classes are generated *from actual monitored driving characteristics* is described by Herrod.  (Pet. 36, citing to Herrod Abs. and 1-2.)

Herrod discloses a computer-based monitoring and reporting device that is used in a vehicle to measure driver acceleration patterns and report associated accident risks.  (Herrod 1-2.)  Herrod's device uses the measured acceleration data to classify the driver into one of several groups, each of which associates with a different level of accident risk.  (*Id.*)  According to

23

Case CBM2012-00002
Patent 6,064,970

Herrod, safe drivers can use the measured acceleration data to demonstrate their competence to insurance companies. (Herrod 2.)

Under the broadest reasonable construction standard, as discussed previously, the term "actuarial class" is interpreted as "a combination/group/groupings related to loss/risk/safety which are determined from classifications/characteristics representative of motor vehicle operational characteristics and driver behavior for which data is gathered." Applying that claim construction, Herrod's driver accident-risk groups clearly satisfy that the "actuarial class" element since Herrod's driver behavioral/accident-risk groups are determined based on the actual measured acceleration data and each group is associated with a different level of accident risk. In light of the collective teachings of Kosaka and Herrod, it would have been obvious to one with ordinary skill in the art to generate actuarial classes *from actual monitored driving characteristics*.

Progressive's argument that Herrod's disclosure of driver behavioral groups is limited to providing in-car advice is without merit. (PR 26-28.) Herrod describes that through monitoring equipment safe drivers are able to demonstrate their competence to insurance companies (Herrod 2, Background). *See KSR*, 550 U.S. at 416 (A reference may be read for all that it teaches, including uses beyond its primary purpose.).

As to Progressive's arguments regarding alleged non-enabling disclosure of Herrod, we are not convinced. (PR 28-30.) Prior art publications and patents are presumed to be enabled. *In re Antor Media Corp.,* 689 F.3d 1282, 1287-88 (Fed. Cir. 2012); *Amgen Inc. v. Hoechst*

24

Case CBM2012-00002
Patent 6,064,970

*Marion Roussel, Inc.*, 314 F.3d 1313, 1355 (Fed. Cir. 2003) (both claimed and unclaimed materials disclosed in a prior art patent are presumptively enabling, placing the burden on the patentee to show that unclaimed disclosures in a prior art patent are not enabling).  Progressive fails to demonstrate that Herrod does not provide an enabling disclosure for the disputed claim limitation.  Specifically, Progressive does not provide sufficient factual basis to support a showing that undue experimentation would be needed to practice the disputed claim limitation based on Herrod disclosure.  *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

2. <u>Whether one would have combined the prior art references</u>

Progressive argues that "Herrod discloses a crisp logic approach that assigns drivers to behavioral groups – an approach which is antithetical to the fuzzy logic approach of Kosaka." (PR 17.)  It is Progressive's position that this fundamental incompatibility between the two references would discourage skill artisan from combining the prior art references. (*Id.*)
To support its contention, Progressive cited several U.S. patents and a New York Times article related to fuzzy logic technology. [9]

---

[9] Hisano     US patent 5,239,616     Aug. 24, 1993
Sirag     US patent 5,260,526     Nov. 9, 1993
Wang     US patent 5,455,890     Oct. 3, 1995
"Fuzzy Thinking Has Merits When It Comes to Elevators" by Jeanne B. Pinder, the New York Times (Sept. 22, 1993).  (Ex 2005.)

25

Case CBM2012-00002
Patent 6,064,970

We disagree.  Rather, the evidence of record does not support Progressive's contention.  It is well-established that a determination of obviousness based on teachings from multiple references does not require an actual, physical substitution of elements.  *In re Mouttet*, 686 F.3d 1322, 1332 (Fed. Cir. 2012); *In re Etter*, 756 F.2d 852, 859 (Fed. Cir. 1985) (en banc); *In re Keller* 642 F.2d 413, 425 (CCPA 1981) (Obviousness does not require that all of the features of the secondary reference be bodily incorporated into the primary reference.).

As discussed *supra*, generating actuarial classes of insurance which group operators or vehicles having a similar risk characteristic was well known in the art at the time of the invention.  Herrod is relied upon to show that the actuarial classes are generated *from actual monitored driving characteristics*.  Progressive has not provided sufficient evidence that the mere substitution of *actual monitored* driving characteristics for *traditional reported* driving characteristics would have been beyond the level of an ordinary skilled artisan.  *See Leapfrog Ent., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1161 (Fed. Cir. 2007) ("[a]ccommodating a prior art mechanical device that accomplishes [a desired] goal to modern electronics would have been reasonably obvious to one of ordinary skill in designing children's learning devices").

Upon review of the references cited by Progressive for support of its contention, we conclude that the cited portions of the references articulate generally the advantages and features of fuzzy logic devices.  (PR 18-19, citing to Pinder 1 ("[T]raditional logic [uses] 'crisp' distinction, such as true

26

Case CBM2012-00002
Patent 6,064,970

or false…"); Hisano, col. 1:11-20 ("fuzzy sets differ from crisp, Boolean

type logic in that, as opposed to the latter, a fuzzy set allows for shades of

grey."); Wang, col. 1:42-44 ("[f]uzzy set theory, then, is useful in those

situations in which data and relationships cannot be written in crisp

mathematical terms."); Sirag, col. 5:42-45 ("crisp value is any value or

system of values which does not employ fuzzy logic.")).  In that regard, a

reference does not teach away if it merely discloses a general preference for

an alternative invention, and does not "criticize, discredit, or otherwise

discourage the solution claimed" in the patent.  *In re Fulton*, 391 F.3d 1195,

1201 (Fed. Cir. 2004).

 A prior art reference must be considered for everything it teaches by

way of technology and is not limited to the particular invention it is

describing and attempting to protect.  *EWP Corp. v. Reliance Universal Inc.*,

755 F.2d 898, 907 (Fed. Cir. 1985), *cert. denied*, 474 U.S. 843 (1985).

Here, Herrod does not suggest that actuarial classes based on *actual*

*monitored* driving characteristics must be implemented in a crisp logic

approach and cannot be implemented with the approach disclosed in Kosaka.

Progressive fails to provide sufficient explanation as to why such an

implementation would have been beyond the level of an ordinary skilled

artisan given that one of ordinary skill in the art as to fuzzy logic technology

would have the knowledge of artificial intelligence and neural network (*see*

*e.g.*, Pinder; Hisano; Wang).

 Progressive's reliance on *Acharya* is misplaced.  (PR 20-21.)

*Ex parte Acharya*, App. No. 2010-3919 (BPAI June 19, 2012).  Herrod is

27

Case CBM2012-00002
Patent 6,064,970

relied upon for the mere substitution of *actual monitored* driving characteristics for *traditional reported* driving characteristics. Progressive fails to provide sufficient evidence to support that such a substitution would change the fundamental operation of the claimed invention. Therefore, *Acharya* does not apply to the specific facts of the instant proceeding.

For the foregoing reasons, we conclude that Liberty has demonstrated that it is more likely than not that claim 1 is unpatentable over Kosaka, Black Magic, and Herrod. As to dependent claim 3, Progressive relies upon the same arguments presented with regard to claim 1. (PR 50.) The explanations provided by Liberty as to how each element of claim 3 is met by the cited prior art references appear to have merit and are otherwise unrebutted. Therefore, we likewise conclude that Liberty has demonstrated that it is more likely than not that claim 3 is unpatentable over the same prior art references.

### D. Claims 6-15 and 18

Claims 6 and 18 are independent claims. Claim 6, reproduced below, is representative:

A method of monitoring a human *operator* controlled power source driven vehicle, the method comprising:

extracting one or more data elements *by a computer programmed to monitor sensor data* from at least one sensor wherein the one or more elements are *actual driving characteristics* of at least one operating state of the and [the] at least one [human's] *human operator's* actions during a data collection period;

analyzing, grouping, and storing the one or more data

28

Case CBM2012-00002
Patent 6,064,970

> elements as group data values in a first memory related to a
> predetermined group of elements; and,
>
> correlating the group data values to preset values in a
> second memory and generating an output data value based on
> the correlation wherein the output data value is used to compute
> an insurance rating for the vehicle [FOR the data collection
> period] *for the data collection period that is based on an*
> *actuarial class of insurance which groups other human*
> *operator controlled power source driven vehicles having a*
> *similar operator or vehicle risk characteristic and which also*
> *represents the actual driving characteristics of the vehicle*
> *monitored and recorded from the at least one sensor.* [10]

Liberty alleges that claims 6-15 and 18 are unpatentable under

35 U.S.C. § 103(a) over the combination of Kosaka in view of Herrod.  (Pet.

52-71.)  In particular, Liberty contends that the cited prior art references

describes all of the claim elements.  (*Id.*)  Liberty further provides the

rationales for combining the references.  (Pet. 28-34.)

In addition to the arguments presented with respect to claim 1 which

we addressed previously, Progressive argues that the cited prior art

references fail to describe the analyzing limitation ("analyzing, grouping,

and storing the one or more data elements as *group data values* in a first

memory related to a predetermined group of elements"), and the correlating

limitation (correlating *the group data values* to preset values in a second

memory), as recited in claims 6 and 18.  (PR 44-49.)  According to

Progressive, the claim requires that *the same group data values* in the

_____

[10] Reexam. Cert. col. 2:26-48.

Case CBM2012-00002
Patent 6,064,970

analyzing limitation be correlated in the correlating limitation.  (PR 47.)

Progressive alleges that the cited portions of Kosaka show "totally disparate

data values in these two limitations."  (*Id*.)

We disagree with Progressive as the evidence of record does not

support Progressive's contention.

Kosaka's invention is related to an insurance premium determination

device that increases or decreases insurance premiums by continually

determining insurance premium changes through the detection of states that

lead to risk in the insurance customer.  (Kosaka 2, col. 1:54- col. 2:1-3;

col. 2:43-52.)  Kosaka's insurance premium determination device employs a

risk evaluation device for evaluating risk in the vehicle and driver.  *Id*.

Kosaka describes that the output from the external sensor and internal sensor

are input to the fuzzy logic part.  (Kosaka 4, col. 2:18-20.)  Kosaka's fuzzy

logic part determines comprehensive risk based on reasoning utilizing vague

empirical knowledge through the input of the internal measured data and the

external measured data.  (Kosaka 4, col. 2:20-24.)  In one of the

embodiments, Kosaka describes monitoring the *ground speed* of the

automobile, and forwarding the output of the speed detector to the signal

preprocessing unit and the system activation control part.  (Kosaka 6,

col. 2:7-10, col. 2:38-43; 7, col. 1:5-9.)   Kosaka's system compares the

speed with a set value to determine whether it exceeds the set value.

(Kosaka 7, col. 1:5-11.)  Based on those explicit disclosures of Kosaka, we

conclude that *the same monitored speed data* that is analyzed, grouped, and

Case CBM2012-00002
Patent 6,064,970

stored is being correlated to a preset value as required by the disputed claim limitations.

For the foregoing reasons, we conclude that Liberty's petition has demonstrated that it is more likely than not that claims 6 and 18 are unpatentable in view of Kosaka and Herrod. As to claims 9-15, Progressive relies upon the same arguments presented with regard to claims 6 and 18. (PR 42-43, 50.) The explanations provided by Liberty as to how each element of those claims is met by the cited prior art references appear to have merit and are otherwise unrebutted. Therefore, we likewise conclude that Liberty has demonstrated that it is more likely than not that claims 9-15 are unpatentable over the same prior art of record.

However, we observe that Liberty fails to satisfy the limitation "transmitting a signal corresponding to the determined triggering event to *a receiving system*" as required by claims 7 and 8. Liberty contends that "Kosaka's disclosure of generating and transmitting a signal explicitly teaches, or at minimum inherently, discloses, storing the signal in memory such that it can be accessed and transmitted." (Pet. 57-58, citing Kosaka 7 ("When the risk value exceeds a set value, a warning is sent by a warning device 45 to the *operator*." (Emphasis added.)) Kosaka's disclosure of transmitting a warning to the *operator* is not sufficient to satisfy the requirement of transmitting a signal to a *receiving system*. Liberty fails to direct us where in Kosaka discloses "a receiving system." Liberty also did not provide sufficient explanation as to why one of ordinary skill in the art

31

Case CBM2012-00002
Patent 6,064,970

would have recognized an operator (which is a person) as a receiving system.

Accordingly, we determine that Liberty's petition has not demonstrated that it is more likely than not that claims 7 and 8 are unpatentable in view of the cited prior art.

## V. OTHER CONSIDERATIONS

Progressive requests the Office to exercise its authority under 35 U.S.C. § 325(d) to deny the petition because the asserted prior art references and arguments were considered by the Office in the prior *ex parte* reexamination (Control No. 90/011,252). (PR 10-16.) In Progressive's view, to rehear grounds already considered would be contrary to the AIA and its legislative history, which foreclose repeated petitions that rely on the same or substantially the same prior art or arguments. (*Id.*)

We agree that the Office has the authority under 35 U.S.C. § 325(d) to reject a petition when the same or substantially the same prior art or arguments previously were presented to the Office. The relevant portions of 35 U.S.C. § 325(d) are reproduced as follows:

> In determining whether to institute or order a proceeding under this chapter, chapter 30, or chapter 31, the Director **may** take into account whether, and reject the petition or request because, the same or substantially the same prior art or arguments previously were presented to the Office. (Emphasis added.)

The legislative history also recognizes that 35 U.S.C. § 325(d) "*allows* the Patent Office to reject any request for a proceeding, including a request for

32

Case CBM2012-00002
Patent 6,064,970

*ex parte* reexamination, if the same or substantially the same prior art or arguments previously were presented to the Office respect to that patent." 157 Cong. Rec. S1042 (daily ed. Mar. 1, 2011) (statement of Sen. Kyl) (emphasis added).

It is important to note that the Office is <u>not</u> required to reject a petition merely for the reason that the same or substantially the same prior art or arguments were previously considered by the Office. Both the statutory provision and its legislative history include *permissible* language (*e.g.*, "may" and "allows"), rather than *mandatory* language (*e.g.*, "must" or "requires").

While we are cognizant of the burden on the patent owner and Office to rehear the same or substantially the same prior art or arguments that were considered by the Office in a prior proceeding, there are sufficient reasons in the instant proceeding to exercise our discretion to institute a review. Notably, we observe that Liberty, as the third-party requester in the prior *ex parte* reexamination, did not have the opportunity to submit arguments or evidence with respect to the amended or new claims in the prior proceeding. Those claims are now being challenged in the instant proceeding. And Herrod, which is relied upon by Liberty in the petition, was not previously considered by the Office. Moreover, a preponderance of the evidence supports that it is more likely than not that at least one challenged claim is unpatentable in view of the prior art of record.

Accordingly, taking into account the burden on the patent owner and the considerations set forth in 35 U.S.C. § 326(b) (*e.g.*, the efficient

33

Case CBM2012-00002
Patent 6,064,970

administration of the Office), we grant the petition as to those grounds that are authorized below, but we exercise our discretion to deny all other grounds as cumulative. *See also* 37 C.F.R. § 42.208. Progressive has the opportunity to file a response with supporting evidence to those grounds that are authorized, but such a patent owner response must be filed within three months from the date of institution (the entry date of this decision). 35 U.S.C. § 326(a)(8); 37 C.F.R. § 42.220. Progressive is not required to address the denied grounds, and should not do so.

## VI. ORDER

For the forgoing reasons, it is

**ORDERED** that pursuant to 35 U.S.C. § 324 and section 18(a) of the AIA, a covered business method review is hereby instituted as to claims 1, 3-6, and 9-18 of the '970 patent for the following grounds:

A. Claims 4, 5, 16, and 17 are unpatentable under 35 U.S.C. § 103(a) over Kosaka and Florida Guide;

B. Claims 1, 3, 11-12, 14 and 15 are unpatentable under 35 U.S.C. § 103(a) over Kosaka, Black Magic, and Herrod; and

C. Claims 6, 9-10, 13 and 18 are unpatentable under 35 U.S.C. § 103(a) over Kosaka and Herrod;

**FURTHER ORDER** that no other ground is authorized for the covered business method review;

34

Case CBM2012-00002
Patent 6,064,970

**FURTHER ORDER** that pursuant to 35 U.S.C. § 324(d) and
37 C.F.R. § 42.4, notice is hereby given of the institution of trial; the trial is
commencing on the entry date of this decision; and

**FURTHER ORDER** that an initial conference call with the Board is
scheduled for 2 PM Eastern Time on February 25, 2013; the parties are
directed to the Office Trial Practice Guide, 77 *Fed. Reg.* at 48765-66, for
guidance in preparing for the initial conference call, and should come
prepared to discuss any proposed changes to the Scheduling Order entered
herewith and any motions the parties anticipate filing during the trial.


PETITIONER:

J. Steven Baughman
Nicole M. Jantzi
Ropes & Gray
Email: steven.baughman@ropesgray.com
Email: nicole.jantzi@ropesgray.com

PATENT OWNER:

Calvin P. Griffith
James L. Wamsley, III
John V. Biernacki
Jones Day
Email: cpgriffith@jonesday.com
Email: jlwamsleyiii@jonesday.com
Email: jvbiernacki@jonesday.com

35

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of October 2014, I caused the foregoing brief to be electronically filed using the CM/ECF system, which will send notification of such filing to all parties of record.

I further certify that pursuant to Fed. R. App. P. 25(a)(2)(D) and 25(c), Federal Circuit Rule 25(a), and ECF-10(B) of the Court's Administrative Order Regarding Electronic Case Filing, dated May 17, 2012, I shall cause six paper copies of the foregoing brief to be filed at the address provided below within five days of the court's acceptance of the foregoing brief in ECF:

Office of the Clerk
United States Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

October 31, 2014

Respectfully submitted,

*/s/ Gary M. Ropski*
Gary M. Ropski
Cynthia A. Homan
James A. Collins
Laura A. Lydigsen
Nicholas A. Restauri
BRINKS GILSON & LIONE
455 N. Cityfront Plaza Drive
Suite 3600
Chicago, Illinois 60611

*Counsel for Appellant Progressive Casualty Insurance Co.*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of

Appellate Procedure 32(a)(7)(B), because it contains 13,286 words, excluding the

parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii)

and Federal Circuit Rule 32(b).

2.      This brief complies with the typeface requirements of Federal Rule of

Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of

Appellate Procedure 32(a)(6), because it has been prepared in a proportionally

spaced typeface using Microsoft Word 2010 in Times New Roman 14 point font.


October 31, 2014                              Respectfully submitted,

                                              */s/ Gary M. Ropski*
                                              Gary M. Ropski
                                              Cynthia A. Homan
                                              James A. Collins
                                              Laura A. Lydigsen
                                              Nicholas A. Restauri
                                              BRINKS GILSON & LIONE
                                              455 N. Cityfront Plaza Drive
                                              Suite 3600
                                              Chicago, Illinois 60611

                                              *Counsel for Appellant Progressive*
                                              *Casualty Insurance Co.*